## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE STOCKBRIDGE-MUNSEE COMMUNITY, BAND OF MOHICAN INDIANS, N8476 Moh He Con Nuck Road P.O. Box 70 Bowler, WI 54416 | ) ) ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | **COMPLAINT** |
| THE UNITED STATES OF AMERICA; THE UNITED STATES DEPARTMENT OF THE INTERIOR; DIRK KEMPTHORNE, in his official capacity as SECRETARY OF THE INTERIOR; and JAMES E. CASON, in his official capacity as ASSOCIATE DEPUTY SECRETARY OF THE INTERIOR, 1849 C Street, NW Washington, D.C. 20240 | ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. _____ |
| Defendants. | ) ) ) | |

## I.  Nature of the Action

1.      This is an action in which the Stockbridge-Munsee Community, Band of Mohican

Indians, seeks this Court's review of the May 23, 2008 decision by the United States

Department of the Interior to accept title to certain lands within Stockbridge's treaty-

guaranteed reservation in central New York and hold it in trust for the exclusive use and

benefit of another Indian tribe, the Oneida Indian Nation of New York.

2.  Plaintiff's claims for relief arise under:   the Administrative Procedure Act, 5 U.S.C.

§§702 & 706; 25 U.S.C. §177;  federal common law;  the 1788 Treaty of Fort Schuyler

and the February 25, 1789 New York statute that implemented it; and the 1794 Treaty of

Canandaigua, 7 Stat. 44.

## II.  Jurisdiction and Venue

3.  This Court's jurisdiction is invoked pursuant to the Administrative Procedure Act, 5

U.S.C. 706 and ; 28 U.S.C. §§1331, 1362, and 1367.  This Court's authority to issue

declaratory and injunctive relief arises under 28 U.S.C. §§ 1361, 1651, 2201, 2202, and 5

U.S.C. §706.

4.  As this is an action both where a substantial part of the events or omissions giving rise to

these claims occurred in the District of Columbia and in which defendants are:  a) an

agency of the United States; and, b) officers and employees of that agency who were

acting in their official capacity, venue in this Court is proper under 28 U.S.C. §1391(e).

## III.  Parties

5.  Plaintiff Stockbridge-Munsee Community (hereafter "plaintiff" or "Tribe" or

"Stockbridge Tribe") is an Indian Tribe recognized by the United States.  At all relevant

times, plaintiff has maintained tribal relations and has been recognized by the United

States as a self-governing Indian tribe.  Plaintiff's primary reservation and principal situs

is now located in the State of Wisconsin.  Plaintiff also possesses a tract of 122 acres,

more or less, within its 1788/1794 treaty reservation in New York. Plaintiff, currently

organized under the provisions of the Indian Reorganization Act of 1934, is the same

Stockbridge Tribe:

a) that was a third-party beneficiary to the 1788 Treaty of Fort Schuyler,

which established the New Stockbridge Reservation as a permanent home

for Stockbridge, as determined by Defendants' legal counsel in 1997 and

2002 ;

b) whose rights to permanent use and occupancy of the New Stockbridge

Reservation were recognized and guaranteed by a 1789 Act of the New

York State Legislature;

c) that was a signing party to the 1794 Treaty of Canandaigua wherein the

United States promised never to disturb the Stockbridge in the free use and

enjoyment of the New Stockbridge Reservation;

d) that, in the 19th Century, was dispossessed of the lands of the New

Stockbridge Reservation through the illegal actions of the State of New

York and the United States' failure to act on its trust duty to protect

plaintiff from New York's unconscionable and illegal actions;

e) that has pursued its claim regarding the New Stockbridge Reservation

lands, a portion of which are the subject of defendants' final decision

challenged in this action, first in the Indian Claims Commission beginning

in 1951 and, subsequently, in a still-pending action filed in 1986 in the

United States District Court for the Northern District of New York, styled

*Stockbridge-Munsee Community, Band of Mohican Indians v. State of New York, et al.*, No. 86-CV-1140 (currently stayed pending final resolution of motions for summary judgment in the Oneida land-claim action, No. 74-CV-187 (USDC, NDNY) (appeal pending in the United States Court of Appeals for the Second Circuit, argued June 3, 2008).

6.    Defendant United States Department of the Interior (DOI) is a federal agency that includes the Bureau of Indian Affairs (BIA). BIA administers the Indian Reorganization Act, 25 U.S.C. §§ 461 *et seq.* (IRA), and processes applications by Indian tribes for the United States to acquire and hold lands in trust for that tribe. In addition, the Department's legal office, the Office of the Solicitor, reviews requests by tribes for assistance from the United States in litigating, or otherwise helping to resolve, tribal claims to natural resources, including land. In those cases where the Solicitor's Office determines that the tribal claim is meritorious and litigation is necessary to protect tribal resources that are the subject of the United States' fiduciary duties, the Solicitor's Office issues litigation requests, supported by litigation reports, to the Department of Justice (DOJ) recommending that the United States initiate litigation to protect the subject claims.

7.    Defendant Dirk Kempthorne is the Secretary of the Interior and is charged by law with carrying out the duties and responsibilities of the United States as trustee for Indian tribes. In his official capacity, Secretary Kempthorne is charged with deciding whether to accept and hold title to lands in trust for tribes. Secretary Kempthorne is sued in his official capacity.

-4-

8.    Defendant James E. Cason is the Associate Deputy Secretary of the Interior.  On May 20,

2008, in his official capacity, under delegated authority, he signed the Record of Decision

(ROD) which is the subject of this action, notice of which was published in the Federal

Register on May 23, 2008.


## IV. Description of the Lands Affected by the Decision that is the Subject of this Action.

9.    The forty-three parcels listed below, totaling 3,312.475 acres, more or less, are situated

within the exterior boundaries of the 1788 New Stockbridge reservation as acknowledged

by the 1794 Treaty of Canandaigua.  Defendants' Record of Decision erroneously

characterizes these parcels as being situated within the exterior boundaries of the 1794

Oneida treaty reservation and states that the BIA intends to accept title to these parcels

and hold them in trust for the benefit of the Oneida Indian Nation of New York (Nation).

The parcels within New Stockbridge are:

| Tax Map Number | Acres | County |
| --- | --- | --- |
| 54.-2-2 | 103.890 | Madison |
| 54.2-2-3.12 | 80.177 | Madison |
| 54.2-2-3.13 | 2.237 | Madison |
| 54.2-2-3.62 | 0.500 | Madison |
| 54.-2-5 | 66.507 | Madison |
| 54.-2-6.1 | 62.386 | Madison |
| 54.-2-6.22 | 40.290 | Madison |
| 54.-2-8.12 | 59.869 | Madison |
| 54.3-3-8 | 129.910 | Madison |
| 55.-2-21.11 | 66.176 | Madison |
| 55.-2-21.12 | 92.663 | Madison |
| 55.-2-22 | 3.930 | Madison |
| 55.-2-5.11 | 125.773 | Madison |
| 55.-2-5.12 | 11.469 | Madison |

| | | |
|---|---|---|
| 55.-2-7 | 139.450 | Madison |
| 55.-2-8.1 | 110.630 | Madison |
| 55.-2-9 | 17.580 | Madison |
| 63.-1-2.1 | 220.761 | Madison |
| 63.-1-2.2 | 1.140 | Madison |
| 63.-1-3 | 0.918 | Madison |
| 64.-1-1 | 90.466 | Madison |
| 64.-1-13.1 | 61.822 | Madison |
| 64.-1-15.2 | 169.665 | Madison |
| 64.-1-17 | 36.600 | Madison |
| 64.-1-18 | 84.136 | Madison |
| 64.-1-2 | 125.140 | Madison |
| 64.-1-24.1 | 40.543 | Madison |
| 64.-1-24.31 | 9.679 | Madison |
| 64.-1-3.1 | 29.670 | Madison |
| 64.-1-3.2 | 27.670 | Madison |
| 64.-1-35 | 5.310 | Madison |
| 64.-1-6 | 73.727 | Madison |
| 65.-1-10 | 142.913 | Madison |
| 74.-1-16.1 | 279.847 | Madison |
| 74.-1-16.5 | 10.000 | Madison |
| 74.-1-17 | 87.460 | Madison |
| 74.-1-18 | 42.470 | Madison |
| 74.-1-19 | 97.930 | Madison |
| 74.-1-9 | 88.890 | Madison |
| 83.-1-18 | 98.582 | Madison |
| 311.000-2-26 | 116.111 | Oneida |
| 361.000-1-1.2 | 128.180 | Oneida |
| 361.000-1-8 | 129.685 | Oneida |

10.    The parcels listed in Paragraph 9 above have never been a part of any Oneida Indian

reservation.


### V.  Constitutional, Treaty, Statutory and Regulatory Requirements

A.    The 1788 Treaty of Fort Schuyler

11.    The first article of the 1788 Treaty of Fort Schuyler states that the "Oneidas do cede and

grant all their lands to the people of the State of New York forever." The second article

of the Treaty states that "[o]f the said ceded lands the following tract . . . shall be reserved

for . . . the Oneidas [to] hold to themselves and their posterity forever . . . ." The last

clause of the second article of the 1788 Treaty states:

> and further notwithstanding any reservations of lands to the Oneidas for their own
> use . . . the Stockbridge indians [sic] and their posterity forever are to enjoy their
> settlements on the lands heretofore given to them by the Oneidas for that purpose
> . . . that is to say, a tract of six miles square for the Stockbridge Indians.

The validity of the 1788 Treaty of Fort Schuyler was upheld in *Oneida Indian Nation of*

*New York v. State of New York*, 860 F.2d 1145 (2dCir. 1988), *cert. denied* 493 U.S. 871

(1989).

### B.    The 1789 Act that Implemented the 1788 Treaty

12.    In a 1789 Act, the New York State Legislature provided "that the tract of land, confirmed

by the Oneida Indians to the Stockbridge Indians at the said treaty, shall be and remain to

the said Stockbridge Indians and their posterity, under the restrictions and limitations

aforesaid." The "limitations" were that the tract shall remain for the cultivation,

improvement and use of the Stockbridge and their posterity; but without any power of

alienation or right of leasing the lands for any longer term than ten years. *AN ACT for the*

*sale and disposition of lands, belonging to the people of this State*, Laws of the State of

New York, Vol. III, Chap. 32, 69-72 (Albany, 1877). This Act formally established New

Stockbridge as an Indian reservation, declaring that the 1788 Treaty lands were

inalienable by the Tribe and would be held as Indian lands are held rather than as a

permanent fee-title estate.

### C.    The 1794 Treaty of Canandaigua

13.    Article II of the 1794 Treaty of Canandaigua, 7 Stat. 44, states:

> The United States acknowledge the lands reserved to the Oneida, Onondaga and Cayuga Nations, in their respective treaties with the state of New-York [sic], and called their reservations, to be their property; and the United States will never claim the same, nor disturb them or either of the Six Nations, nor their Indian friends residing thereon and united with them, in the free use and enjoyment thereof: but the said reservations shall remain theirs, until they choose to sell the same to the people of the United States, who have the right to purchase.

14.    In this article, the United States promised to never disturb any of the signatory tribes in the "free use and enjoyment" of their Confederal-period reservations, thereby stepping into the shoes of the State and extending federal recognition and protection to the New Stockbridge Reservation.

15.    The Indian Claims Commission found that article II of the Treaty "related to the lands of the Stockbridges" and that "[a]rticle II pledged the United States never to disturb them in their free use and enjoyment of New Stockbridge." *The Stockbridge Munsee Community v. United States*, 25 Ind. Cl. Comm. 281, 295 (1971).

16.    As a party to the 1794 Treaty, Stockbridge received annuities under the 1794 Treaty from the United States.

### D.    The Indian Non-Intercourse Act, 25 U.S.C. § 177.

17.    In 1790, the First Congress enacted the Indian Trade and Intercourse Act which statutorily re-affirmed exclusive federal jurisdiction over transactions involving Indian land.  That Act (referred to hereafter as the Non-Intercourse Act) expressly forbade and declared void *ab initio* any sale of land, or any title or claim thereto, by any Indian nation or tribe without the consent of Congress.  The Act has been continuously in force since

1790 and was re-enacted in the Act of March 1, 1793, 1 Stat. 329-330; the Act of May 19, 1796, 1 Stat. 469, 472; the Act of March 3, 1799, 1 Stat. 743, 746; the Act of March 30, 1802, 2 Stat. 139, 143: the Act of June 30, 1834, 4 Stat. 729; Rev. Stat. § 2116. Presently codified at 25 U.S.C. § 177, the Non-Intercourse Act in pertinent part provides:

> No purchase, grant, lease or other conveyance of land, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or conveyance entered into pursuant to the Constitution.

### E.    The 1934 Indian Reorganization Act and Interior's Regulations Thereunder.

18    Section 5 of the Indian Reorganization Act of 1934 (IRA), codified at 25 U.S.C. § 465, states:

> The Secretary of the Interior is hereby authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands, within or without existing reservations . . . for the purpose of providing land for Indians.

> \* \* \* \*

> Title to any lands or rights acquired pursuant to sections . . . 465 . . . shall be taken in the name of the United States in trust for the Indian tribe . . . for which the land is acquired, and such lands . . . shall be exempt from State and local taxation.

19.    To implement the Secretary's authority under Section 5 of the IRA, DOI has promulgated regulations published at 25 C.F.R. Part 151. Those relevant to this action are:

> a.    § 151.3 Land acquisition policy. Land not held in trust or restricted status may only be acquired for an individual Indian or a tribe in trust status when such acquisition is authorized by an act of Congress. \* \* \*

> b.    § 151.8 Tribal consent for nonmember acquisitions. An individual Indian or tribe may acquire land in trust status on a reservation other than its own only when the governing body of the tribe having jurisdiction over such reservation consents in writing to the acquisition; provided, that such consent shall not be required if the individual Indian or the tribe already

owns an undivided trust or restricted interest in the parcel of land to be acquired.

c.    § 151.10 On-reservation acquisitions. Upon receipt of a written request to have lands taken in trust, the Secretary will notify the state and local governments having regulatory jurisdiction over the land to be acquired, unless the acquisition is mandated by legislation. The notice will inform the state or local government that each will be given 30 days in which to provide written comments as to the acquisition's potential impacts on regulatory jurisdiction, real property taxes and special assessments. If the state or local government responds within a 30-day period, a copy of the comments will be provided to the applicant, who will be given a reasonable time in which to reply and/or request that the Secretary issue a decision. The Secretary will consider the following criteria in evaluating requests for the acquisition of land in trust status when the land is located within or contiguous to an Indian reservation, and the acquisition is not mandated:

(a)    The existence of statutory authority for the acquisition and any limitations contained in such authority;

(b)    The need of the individual Indian or the tribe for additional land;

(c)    The purposes for which the land will be used;

(d)    If the land is to be acquired for an individual Indian, the amount of trust or restricted land already owned by or for that individual and the degree to which he needs assistance in handling his affairs;

(e)    If the land to be acquired is in unrestricted fee status, the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls;

(f)    Jurisdictional problems and potential conflicts of land use which may arise;  and

(g)    If the land to be acquired is in fee status, whether the Bureau of Indian Affairs is equipped to discharge the additional responsibilities resulting from the acquisition of the land in trust status.

(h)    The extent to which the applicant has provided information that allows the Secretary to comply with 516 DM 6. appendix 4,

National Environmental Policy Act Revised Implementing
Procedures, and 602 DM 2, Land Acquisitions: Hazardous
Substances Determinations. (For copies, write to the Department
of the Interior, Bureau of Indian Affairs, Branch of Environmental
Services, 1849 C Street NW., Room 4525 MIB, Washington, DC
20240.)

**F.    The Administrative Procedure Act.**

20.    The Administrative Procedure Act (APA) waives the United States' immunity from suit

for agency action that is arbitrary, capricious, or otherwise not in accordance with law.

The sections of the APA relevant to this action are:

a.    5 U.S.C.A. § 702. Right of review. A person suffering legal wrong
because of agency action, or adversely affected or aggrieved by agency
action within the meaning of a relevant statute, is entitled to judicial
review thereof. An action in a court of the United States seeking relief
other than money damages and stating a claim that an agency or an officer
or employee thereof acted or failed to act in an official capacity or under
color of legal authority shall not be dismissed nor relief therein be denied
on the ground that it is against the United States or that the United States is
an indispensable party. The United States may be named as a defendant in
any such action, and a judgment or decree may be entered against the
United States: *Provided*, That any mandatory or injunctive decree shall
specify the Federal officer or officers (by name or by title), and their
successors in office, personally responsible for compliance. Nothing
herein (1) affects other limitations on judicial review or the power or duty
of the court to dismiss any action or deny relief on any other appropriate
legal or equitable ground; or (2) confers authority to grant relief if any
other statute that grants consent to suit expressly or impliedly forbids the
relief which is sought.

b.    5 U.S.C.A. § 706. Scope of review. To the extent necessary to decision
and when presented, the reviewing court shall decide all relevant questions
of law, interpret constitutional and statutory provisions, and determine the
meaning or applicability of the terms of an agency action. The reviewing
court shall--

(1)    compel agency action unlawfully withheld or unreasonably

-11-

delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be--

    (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

    (B) contrary to constitutional right, power, privilege, or immunity;

    (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

    (D) without observance of procedure required by law;

    (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

    (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

## VI. FACTS

**A.**    **Facts Relating to the Creation of the New Stockbridge Reservation and the Tribe's Subsequent Dispossession in Violation of Federal Law.**

21.    During the period beginning prior to European contact and extending into the Dutch colonial period, the Mohican Indian Tribe exclusively used and occupied a territory along the Hudson River from Lake Champlain to Long Island in what is now the State of New York. In 1609, they greeted Henry Hudson near the site of their capitol, which is now Albany, New York. Although the British signed a covenant of peace and friendship with the Tribe in 1621, the British plan of settlement following the purchase of New York from the Dutch resulted in the confiscation and destruction of Mohican hunting grounds. The Tribe was thus forced to relocate to a different part of its aboriginal territory, and in

-12-

the early 1700s settled on a reservation at Stockbridge in the Housatonic River valley of western Massachusetts where it established a peaceful farming community which achieved notoriety as a "model Indian society."

22.    During the Revolutionary War, the Tribe fought alongside the colonists under the leadership of Mohican Captains Daniel Ninham and Hendrick Aupamut. Captain Aupamut was decorated by General Washington for his bravery.

23.    Around the time of the Revolutionary War, encroaching white settlement and high land taxes in Massachusetts resulted in the Tribe deciding to leave its reservation at Stockbridge, Massachusetts and, at the invitation of the Oneida Nation, re-settle on lands within Oneida aboriginal territory in central New York. Following the end of the War, the Tribe removed to a six-mile-square tract of land in New York, which tract had, on information and belief, been surveyed and transferred to the Tribe by the Oneida Nation.

24.    Soon after the Tribe was securely settled on this tract, known as New Stockbridge, the State of New York and the Oneida Nation concluded the 1788 Treaty of Fort Schuyler, in the first article of which the State, acting under the Articles of Confederation, lawfully exercised the sovereign power to purchase Indian lands, which power had formerly resided in the Crown under the Law of Nations, by purchasing all Oneida Indian land and thereby extinguishing all Oneida aboriginal title (with the exception of Oneida aboriginal title to those lands which the State immediately granted back to the Oneida for its own use and occupancy in the second article of the Treaty). Then, in the second article, as had been demanded by the Oneida Nation in the negotiations leading to the Treaty, the State reserved and set aside from the lands it had just acquired in the first article, a separate,

-13-

permanent, Indian reservation for the Stockbridge Mohicans. The Treaty's description of the lands that were to comprise the Oneida Reservation expressly excluded the lands of New Stockbridge, and the Treaty separately reserved to "the Stockbridge Indians and their posterity forever . . . a tract of six miles square . . . ."

25.    On February 25, 1789, the New York Legislature, still operating under the Articles of Confederation, lawfully ratified and implemented the 1788 Treaty of Fort Schuyler in a statute declaring that the New Stockbridge Reservation "shall be and remain to the said Stockbridge Indians and their posterity . . . ." AN ACT for the sale and disposition of lands belonging to the people of this State, Laws of the State of New York, Vol. III, Chap. 32, 69-72 (Albany, 1877).

26.    Later in 1789, the Constitution of the United States became effective and the sovereign power to purchase Indian land and extinguish Indian title, which, under the Articles of Confederation, had theretofore resided in both the states and the central government, came to reside exclusively with the Federal Government. The United States, as the successor sovereign to the State of New York, thereby stepped into the shoes of the State respecting obligations and rights under the 1788 Treaty and its 1789 implementing act.

27.    In the Article of April 23, 1792, 2 Kappler's 1027, American State Papers. Indian Affairs, Vol. 1, p. 232, the United States acknowledged its obligations for the faithful adherence and assistance of the Stockbridge Indians to the United States during the Revolutionary War and promised to make certain annual expenditures in behalf of the Stockbridge.

28.    In the 1794 Treaty of Canandaigua between the United States and several New York Indian Tribes, including plaintiff, the United States acknowledged the reservations

established in Confederal-era treaties between the State of New York and several Indian

Tribes.  The United States also pledged never to disturb the occupancy of the Oneida or

the Stockbridge, as "Indian friends" of the Oneida.  The United States thereby stepped

into the shoes of the State respecting obligations and rights under the 1788 Treaty of Fort

Schuyler and its 1789 implementing act.

29.    Plaintiff was a party signatory to the 1794 Treaty of Canandaigua, was an "Indian friend"

of the Oneida Nation under article II of that Treaty, and received annuities directly from

the United States, as did the other tribes that were parties to the 1794 Treaty.

30.    In the Treaty of December 2, 1794, 7 Stat. 47, the United States again acknowledged its

obligations for the faithful adherence and assistance of the Stockbridge Indians to the

United States during the Revolutionary War and promised to make certain additional

annual expenditures in behalf of the Stockbridge to compensate Stockbridge for losses

sustained during the Revolutionary War.

31.    In a series of legislative enactments, including enactments in 1791, 1792, 1797, 1801,

1806, and 1813, the New York State Legislature repeatedly re-affirmed the 1788 Treaty

of Fort Schuyler and its 1789 implementing Act.  For example, the 1813 Act, in language

similar to that contained in earlier Acts, declared that the tract "be and remain to the said

Stockbridge Indians and their posterity forever, but without any power of alienation, or

right of leasing or disposing of the same, or any part thereof."  Law of April 10, 1813, Ch.

93, §9 [1813] N.Y. Laws 153.

32.    There has been no subsequent treaty or agreement with the United States that purports to

either extinguish the Stockbridge Tribe's recognized title to New Stockbridge or ratify

-15-

any attempted extinguishment thereof by the State of New York.

33.    During the period from 1818 to 1842, the State entered into a series of 15 land-purchase
       agreements, which were called "treaties," with the Stockbridge Tribe. No officer of the
       United States was present at the execution of these transactions, and the United States did
       not consent to or approve these purchases and transfers and has not subsequently ratified
       them. Through these transactions, the State acquired possession of almost all of the land
       within the New Stockbridge Reservation. These transactions were not the result of
       voluntary, arms-length agreements between the parties. Rather, in each case, the Tribe
       was in a vastly inferior bargaining position and received unconscionably low
       consideration imposed by the State.

34.    In addition to the land that was transferred in the 15 transactions described in the
       preceding paragraph (33, above), certain small portions of the New Stockbridge
       Reservation were never purportedly transferred by any agreement between the State and
       the Tribe. Despite this fact, the State wrongfully took these lands from the Stockbridge
       Tribe by purporting to transfer them to third parties through letters-patent or similar
       instruments. These transfers were never agreed to by the Tribe, nor were they consented
       to, approved of, or subsequently ratified by the United States.

35.    After each acquisition of Stockbridge Reservation land, the State of New York
       wrongfully took possession and then purported to sell those lands to third parties at a
       substantial profit to the State.

36.    The defendants in the Stockbridge land-claim action presently pending in the United
       States District Court for the Northern District of New York claim under mesne

-16-

conveyances from the State, and the titles to the 43 parcels which BIA intends to acquire

in trust for the benefit of the Oneida Indian Nation of New York trace back through

mesne conveyances to the titles issued by the State to the third-party purchasers described

above.

B.    **Facts Relating to Stockbridge's On-going Efforts to Resolve its New Stockbridge Land Claim and Enlist the Support of its Trustee, the United States.**

37.    In August,1951, Stockbridge filed a claim for money damages against the United States

in the Indian Claims Commission.  Stockbridge did not admit that its recognized Indian

title had ever been extinguished.  The Stockbridge petition asserted, *inter alia*, that the

United States:

> failed in its duty and obligation to secure the Stockbridge Tribe in the possession
> of its land in the State of New York in accordance with it promises in the Treaties
> of April 23, 1792 . . . , November 11, 1794, 7 Stat. 44 and December 2, 1794, 7
> Stat. 47.  It failed to lend any aid or assistance to the Stockbridge Tribe and
> permitted it to be exploited and to be unconscionably deprived of its land for a
> grossly inadequate consideration and in violation of its own statute in such case
> provided.  It took no steps to recover the land for petitioners or to collect the
> consideration therefor, if any.  It failed to act fairly and honorably towards
> petitioners and in consonance with its obligations as a guardian.

38.    In its answer to Stockbridge's petition in the Indian Claims Commission, the United

States denied that it was under any fiduciary duty or obligation to the Stockbridge Indians

to intervene in connection with the state treaties described in paragraph 33 above and

denied that the Non-Intercourse Act applied to protect Stockbridge lands or to establish

trust duties on the part of the United States.

39.    In 1971, the Indian Claims Commission ruled against the United States on the issues

described in ¶ 38 above, holding that the Non-Intercourse Act did apply to protect

Stockbridge lands and that the United States did have a duty under that Act to protect

Stockbridge lands.

40.     In the same 1971 decision, the Indian Claims Commission held that article II of the 1794

Treaty "related to the lands of the Stockbridges" and that "[a]rticle II pledged the United

States never to disturb them in their free use and enjoyment of New Stockbridge." *The*

*Stockbridge Munsee Community v. United States*, 25 Ind. Cl. Comm. 281, 295 (1971).

41.     In the same 1971 decision, the Indian Claims Commission also held that:

> In short, the Trade and Intercourse Act applies regardless of the nature or extent of
> the Indians' title in the land, so long as the tribe has some property interest. . . .
> Nor does it matter how the tribe may have obtained its interest in the land. . . .
> The Stockbridges received an interest in New Stockbridge from the State of New
> York under a treaty entered into September 22, 1788, and under a law of the New
> York State Assembly enacted April 10, 1813.  The interest created was a right to
> permanent use and occupancy. . . . [I]t is clear that their interest in New
> Stockbridge was no less compensable than is the interest possessed by a tribe
> holding land under aboriginal title or by federally recognized title . . . .

*The Stockbridge Munsee Community v. United States*, 25 Ind. Cl. Comm. 281, 291-92
(1971)  (citations omitted).

42.     In 1978, following a two-day trial in 1974 on the issue of whether the United States had

actual or constructive knowledge of the state treaties described in paragraph 33 above, the

Indian Claims Commission found that the Government did have the requisite knowledge

and reaffirmed its 1971 findings and conclusions. *The Stockbridge Munsee Community v.*

*United States*, 41 Ind. Cl. Comm. 192, 207 (1978).

43.     In 1981, the Stockbridge Tribe submitted a formal, written request to the Department of

the Interior asking for United States' assistance in resolving its land claim, including, if

necessary, the initiation of litigation on the Tribe's behalf.

44.    In 1986, the Tribe filed its land claim on its own behalf, suing the State of New York, Madison and Oneida Counties, several towns, and the State Highway Department. The suit did not name individual landowners as defendants.

45.    In 1987, the Oneida Indian Nation of New York intervened in Stockbridge's land-claim action as a defendant, without limitation and for all purposes, asserting that the claimed area belongs to them, not to Stockbridge, and seeking dismissal of the action. The order granting intervention states that "The Nation shall be treated as a party defendant for all purposes."

46.    In 1995, the State of New York moved to be dismissed from the case on the grounds that it was immune from suit under the Eleventh Amendment.

47.    The land-claim action was then stayed, first to permit the United States Supreme Court to complete its review of Eleventh Amendment jurisprudence, and thereafter to give the United States time to decide whether to intervene.

48.    In 1996, because the Supreme Court had decided the Eleventh Amendment cases in the states' favor, the United States Department of the Interior (DOI) asked the Department of Justice (DOJ) to intervene in Oneida and Mohawk land-claim cases, *i.e.* file suit in the name of the United States as trustee on behalf of the tribes, so that the State of New York would not be dismissed as a party.

49.    On August 25, 1997, in a litigation report and request signed by Interior Solicitor John Leshy, DOI requested that the United States, in its capacity as trustee, intervene in the Stockbridge land-claim action.

50.    In 1998, the United States, in its capacity as trustee, intervened in the Oneida and Mohawk

land-claim actions. DOJ took no action on the Stockbridge litigation request.

51. On information and belief, in a letter dated January, 2001, DOI wrote to DOJ and stated that, under the circumstances, the interests of both the Stockbridge and the Oneida, and the interests of the United States, as trustee for both tribes, would best be served by intervention of the United States on its own behalf in the Stockbridge land-claim action.

52. On April 2, 2002, DOI sent another letter to DOJ that once again found the Stockbridge Tribe's claim "meritorious" and urged DOJ to encourage and pursue settlement of the Stockbridge land-claim as it was then doing in the Oneida land-claim-mediation process.

53. On June 13, 2002, representatives of the Stockbridge Tribe followed up on DOI's April 2, 2002 letter and met with policy-level DOJ officials in Washington, D.C., specifically Assistant Attorney General Thomas Sansonetti, among others. At that meeting, the Tribe's representatives requested the United States to express to the federal district court its support for a mediated settlement process in the Stockbridge land claim. Mr. Sansonetti declined. He told the Tribe's representatives that before the United States would consider any action in the Stockbridge case, DOI, as the client and policy agency, would need to inform DOJ which tribe, the Stockbridge or the New York Oneida, was the proper tribal claimant in the Stockbridge land-claim action.

54. On August 12, 2002, Associate Solicitor for Indian Affairs Philip Hogen wrote to Assistant Attorney General Sansonetti, amending DOI's 1997 litigation request. In response to Mr. Sansonetti's June 13, 2002 request for clarification from DOI regarding which tribe, Stockbridge or the Oneida Nation of New York, was the proper tribal claimant, the August 12 letter supplemented and clarified the merits analysis in DOI's

earlier litigation report, stating that "we want to make clear that it is DOI's position that

Stockbridge is the *only* proper tribal claimant to the six-mile square tract in question."

(Emphasis in original).  The letter further concluded that:

> [a]n examination of the 1788 Treaty and the 1789 Act demonstrates that they
> extinguished any remaining Oneida Indian title to the six-mile-square tract. * * *
>
> Accordingly, all title and interest of the Oneida Nation in the lands of the subject
> tract ended with the 1788 Treaty of Fort Schuyler and the 1789 Act.  All
> subsequent actions of the United States, including the 1794 Treaty of
> Canandaigua, which confirms the interests of the Stockbridge in the six-mile
> square as 'Indian friends,' must be construed accordingly.

55.    The August 12, 2002 letter amended DOI's litigation report by recommending

intervention by the United States at that juncture of the case, to the extent necessary to

address the recent arguments in support of dismissal on 11th Amendment grounds made

by the State of New York in its opposition to the Stockbridge motion for mediation.

56.    Thereafter, the United States took no action and Stockbridge filed its own motions for an

order of referral to mediation and a limited lifting of the stay to determine the proper

tribal claimant.  On July 24, 2003, the district court in the Tribe's land-claim action

denied Stockbridge's motions to order mediation and to lift the stay for the limited

purpose of determining the proper tribal claimant.  With regard to mediation, the court

noted that "[t]he State opposes mediation on the grounds that it is immune from this suit

under the Eleventh Amendment."  With regard to a limited lifting of the stay, the district

court stated that it "will not lift the stay to decide a discrete (and complex) issue which

would be rendered moot by a finding that the State is immune from this suit."  The court

then ordered that the stay would be lifted in its entirety on December 1, 2003, in order to

give the United States just over four months to decide whether it would intervene, stating "[t]he Court hopes that by that time the United States will have decided whether it will intervene."

57.    The United States did not intervene and subsequently, in 2004, the Tribe amended its complaint to conform the Tribe's claims against the State to post-1986 developments in Eleventh Amendment jurisprudence.

58.    As of the date of the filing of this Complaint, the United States has neither intervened in the Stockbridge land-claim action nor filed its own action to protect Stockbridge's interests.  Nor has it informed Stockbridge of the reasons why it has taken no action.

59.    In its 2004 amended complaint, referred to in paragraph 57 above, Stockbridge also asserted a new cause of action under the 1788 Treaty of Fort Schuyler, which had been upheld by the Second Circuit in 1988, after the original complaint was filed, and conformed its complaint to the state of the case and to evidence presented and positions asserted by defendant-intervenor Oneida Indian Nation of New York in the supplemental summary judgment proceedings.  Specifically, the amended complaint, relying on the Nation's intervention without limitation and for all purposes, named the Nation as a defendant and asserted claims in ejectment against the Nation to the lands that are also the subject of this action, that is, those lands purchased by the Nation subsequent to its intervention in the Stockbridge land-claim action that are situated within the 1788/1794 New Stockbridge treaty reservation and which have never been a part of any Oneida reservation.

60.    On June 20, 2007, Stockbridge filed Notices of Pendency in its pending land-claim action

in the United States District Court for the Northern District of New York on the

approximately 3,760 acres that were purchased by the Nation within the 1788 New

Stockbridge Reservation subsequent to the Nation's intervention in Stockbridge's land-

claim action.

C.   **Facts Relating to the Land-to-Trust Application that is the Subject of the ROD and Stockbridge's Efforts to Protect its Claims in the Administrative Proceedings.**

61.   On March 29, 2005, the United States Supreme Court ruled in *City of Sherrill v. Oneida*

*Indian Nation of New York*, 544, U.S. 197, that over 17,000 acres, including the lands that

are the subject of this action, which the Oneida Indian Nation of New York had

purchased on the open market in the 1990s, could not be unilaterally withdrawn from the

local tax rolls by the Nation.  Instead, if the Nation wished to expand the area over which

it exercised sovereign control as an Indian tribe, it would have to use the mechanism

provided by Congress for the acquisition of lands for tribal communities that takes into

account the interests of others with stakes in the area's governance and well being.  The

Court pointed the Nation to Section 5 of the IRA and 25 C.F.R. § 151.10 (2004) as the

proper avenue for the Nation to reestablish sovereign authority.

62.   Shortly after the ruling in *City of Sherrill v. Oneida Indian Nation of New York*, on April

4, 2005, the Nation filed an application with the BIA requesting that it accept and hold in

trust for the Nation's benefit over 17,000 acres, including the New Stockbridge treaty

reservation lands which are the subject of defendants' ROD.

63.   Fifteen days later, in a letter dated April 19, 2005, Stockbridge President Robert Chicks

wrote to BIA Eastern Area Office Regional Director Franklin Keel, advising him that

certain of the lands included within the land-to-trust application were the subject of
Indian Claims Commission decisions and Stockbridge's pending land-claim action in the
Northern District of New York, as well as two litigation requests by DOI to DOJ. The
letter objected to BIA's consideration of taking New Stockbridge Reservation lands in
trust for the Nation without Stockbridge's written consent or "until such time as the
Stockbridge land-claim is finally concluded . . . ."

64.     Over five months later, in a letter dated September 30, 2005, President Chicks, having
received no acknowledgment of or response to his letter of April 19, 2005, again wrote to
Regional Director Keel advising again of Stockbridge's pending land claim and
Stockbridge's objection to BIA's consideration of acquiring New Stockbridge
Reservation lands for the benefit of the Nation.

65.     On January 23, 2006, Stockbridge attorney Don B. Miller wrote to Mr. Keel, advising
that the lands within the 1788/1794 New Stockbridge treaty reservation "are the subject
of a possessory land claim filed in the United States District Court for the Northern
District of New York in 1986 . . . and 1997 and 2002 litigation requests from DOI to
DOJ," and therefore should be excluded from the scope of BIA's environmental review."

66.     On February 24, 2006, Stockbridge attorney Don B. Miller again wrote to Mr. Keel,
specifically identifying the Group 3 parcels in the trust application that were "subject to
Stockbridge's objection, i.e., those situated outside the boundaries of the Oneida Indian
reservation and within the boundaries of the Stockbridge Reservation" and which "have
never been situated within the boundaries of an Oneida Indian reservation." This
February 24, 2006 letter reiterated that "[t]hese lands are the subject of a claim filed by

Stockbridge in the United States District Court for the Northern District of New York . . .

and 1997 and 2002 litigation requests from DOI to DOJ."

67.    On August 28, 2006, the BIA issued a Draft Environmental Impact Statement (DEIS)

recommending that BIA acquire all of the applied-for parcels within the New Stockbridge

Reservation in trust for the benefit of the Nation.  The maps contained in the DEIS did

not note the existence of or show the location of the 1788/1794 Stockbridge reservation,

but instead depicted the entire area as the Oneida reservation.  Similarly, while the DEIS

made brief mention of a competing claim by Stockbridge, it contained no mention or

analysis of the history or different legal status of the Stockbridge reservation parcels that

were included in its recommended action.

68.    On December 19, 2006, Stockbridge submitted detailed comments on the DEIS.

Stockbridge's comments complained that "rather than address the concerns expressed in

those letters [referenced in ¶¶ 63-66 above], the DEIS was crafted to avoid any mention

of the existence or history of the New Stockbridge reservation. . . . and blithely treat[s it]

as part and parcel of the Oneida Reservation."  The comments renewed Stockbridge's

objections and provided legal/historical analysis of Stockbridge's pending land-claim

action in federal district court in New York.  Stockbridge's comments noted, among other

things:

> Stockbridge opposes any action by DOI that would place in trust for the
> benefit of the Nation any lands located within the boundaries of the 1788
> Stockbridge reservation without Stockbridge's express written consent.
> Stockbridge therefore requests that DOI's final EIS delete all of the approximately
> 3,760 acres of Stockbridge land from further consideration in this land-to-trust
> process.  In the alternative, to the extent that Stockbridge lands remain under
> consideration for transfer into trust for the benefit of the Nation, at the very least

-25-

the final EIS must accurately set forth the distinct history and legal status of those lands and honestly evaluate the impacts of any action that would result from placing Stockbridge reservation lands in trust for the Nation's benefit.

**D.**   **Facts Relating to the Record of Decision that is the Subject of this Action.**

69.   On February 22, 2008, the BIA issued its Final Environmental Impact Statement (FEIS), purportedly analyzing the potential effects of acquiring 17,370 acres in trust for the Nation, including those situated within the 1788 New Stockbridge Reservation.

70.   On May 20, 2008, Defendant James Cason signed the BIA's Record of Decision (ROD) in the matter of the April 2, 2005 land-to-trust application of the Oneida Indian Nation of New York.  Therein, defendant Department of the Interior announced its intent to acquire approximately 13,003.89 acres in trust status for the Nation, including approximately 3,312.475 acres situated within the 1788 New Stockbridge Reservation.

71.   Notice of the ROD was published in the Federal Register on May 23, 2008.

72.   Signing of the ROD and publication of the Notice of its signing in the Federal Register constitutes final agency action.

73.   The ROD contains analysis relevant to Stockbridge's objections in two sections.  The Stockbridge-relevant analysis is set out fully as follows:

a)   *§ 2.1.2*        ***Resolution of Land Claim Alternative***

The acquisition of land in trust status for Indian tribes under authority of Section 5 of the IRA is separate from tribal land claims based on Federal common law and/or the Non-Intercourse Act, 27 U.S.C. § 177.  For example, a tribe may still maintain a money damages claim based on a possessory right and/or an unjust enrichment claim after the land at issue has been re-acquired by the tribe and placed into trust.  Such relief would, in the Department's view, also still be available to any other tribal claimants to the same land.  Thus, the pending land claims of other Indian tribes to some or all of the lands claimed and owned by the Nation, including the claims of the Oneida Tribe of Indians of Wisconsin and the

-26-

Stockbridge-Munsee Community Band of Mohican Indians, do not disqualify the Subject Lands from being acquired in trust for the Nation.

b)    § 7.1       **25 C.F.R. § 151.3 – Land Acquisition Policy**

* * * *

Certain lands now owned by the nation and located in the Town of Stockbridge are claimed by the Stockbridge-Munsee Community Band of Mohican Indians to be within a Stockbridge reservation. The Nation contends that all of these lands are located within the Oneida reservation. This dispute does not prevent the United States, through the Secretary, from acquiring title to the Subject Lands in trust for the Nation. No court has ruled on the Stockbridge-Munsee Community's claim to a Stockbridge reservation in New York. Nor does the Stockbridge-Munsee Community currently exercise jurisdiction over the disputed area. Therefore, it is the Department's determination that 25 C.F.R. § 151.8 does not apply to require consent of the Stockbridge-Munsee community to acquire the disputed lands in trust for the Nation. Moreover, the Nation-owned parcels that are both (a) located within the disputed area and (b) included in the Subject Lands are all located contiguous to the undisputed (by the Stockbridge-Munsee Community) Oneida Reservation. Lands that are located "within or contiguous to" the Oneida reservation are subject to the on-reservation trust acquisition criteria. *See* 25 C.F.R. § 1515.10. The Department considered the reservation dispute in its selection of the Preferred Alternative (Alternative I) in the Final EIS. This final determination differs from the Preferred Alternative identified in the Final EIS in that the Department has removed one parcel (Parcel 136) located in the Town of Stockbridge that is not contiguous to the undisputed Oneida reservation.

74.    In addition, *§ 7.9.2* of the ROD refers tribal "commenters" to Appendix M of the Final

EIS for "information responsive to their comments and/or to see how their comment was

dealt with."

75.    In response to the issues raised in President Chicks' letter of April 19, 2005, referenced in

¶ 63 above, Appendix M of the Final EIS contains only the following response (other

than three notations that "[y]our comment is noted."):

Prior to the U.S. Supreme Courts [sic] 2005 decision in *City of Sherrill*, the Nation exercised Jurisdiction [sic] over its lands, including those lands located

with the Stockbridge claim area. Following the U.S. Supreme Courts [sic] decision, the Nation lacks sovereignty over the lands as a matter of Law [sic]. Thus, even assuming *arguendo* that the Stockbridge claim area constitutes a reservation of the Stockbridge.[sic] It [sic] would appear that following the U.S. Supreme Courts [sic] decision in *City of Sherrill*, the Stockbridge lacks sovereignty over the lands at issue as a matter of law. The Associate Solicitor's letter [sic] of August 25, 1977 [sic] and August 12, 2002 to the Department of Justice reflects the Department of the Interior's perspective as part of an extended interagency communication concerning whether the United States should take a position with regard to the Stockbridge land claim and does not reflect any final or official position with regard to the Stockbridge land claim. Accordingly, the Associate Solicitor's 1977 [sic] and 2002 letters to the Department of Justice are not binding on the Bureau with regard to the Bureau's analysis of this EIS or consideration of the Nation's applications. . . . ."

76.    With regard to points raised in President Chicks' letter of September 30, 2005, referenced in ¶ 64 above, Appendix M of the Final EIS responds only that "[y]our comment is noted."

77.    With regard to Stockbridge counsel's letter of January 23, 2006, referenced in ¶ 65 above, advising yet again that the subject lands are subject to a "possessory land claim" action in federal district court, Appendix M of the Final EIS notes only that "[y]our comment is noted." With regard to the same letter's statement that "the scope of your environmental review . . . should exclude any lands within the boundaries of the six-mile-square Stockbridge reservation," Appendix M notes only that "[y]our preference is noted."

78.    With regard to Stockbridge counsel's letter of February 24, 2006, referenced in ¶ 66 above, which again objected to the acquisition of any New Stockbridge Reservation lands in trust for the Nation without Stockbridge's consent and again advised that the subject lands are the subject of a land-claim action in federal district court and two litigation requests by DOI to DOJ, Appendix M of the Final EIS states only: "Please refer to

Response T-2" (Response T-2 is reproduced in full in ¶ 75 above.)  With regard to that portion of counsel's letter that identified the specific parcels subject to Stockbridge's objection, Appendix M states that "[y]our comment is noted."

79.    With regard to Stockbridge counsel's letter of December 19, 2006 commenting on the Draft EIS, referenced in ¶ 68 above, Appendix M's primary response is to refer Stockbridge to Response T-2, reproduced in full in ¶ 75 above.  The only additional substantive responses to Stockbridge's December 19, 2008 comments are:

      a.)    a one-sentence statement that it is the Department's position "that the Stockbridge claim area is located within the exterior boundaries of the Oneida's Reservation.  See Introduction: Figure 1.1.3."  (Figure 1.1.3, copy attached, is a map of the Oneida Reservation which omits any reference to the New Stockbridge reservation and instead depicts the area of the New Stockbridge reservation as part of the Oneida reservation.  It is identical to the map contained in the Draft EIS);

      b.)    a one-sentence statement that many of Stockbridge's "suggested edits reflect the Stockbridge position with regard to its disputed land claim, which the Department of Interior acknowledges but, as of this date, has not officially endorsed; and

      c.)    a one-sentence statement that "[t]he U.S. Supreme Courts [sic] decision in *Oneida II* States [sic] that the Oneidas [sic] Reservation is 300,000 acres in size."

80.    The ROD contains no analysis and cites no legal authority in support of its "view" that

Stockbridge's ability to maintain a money-damages claim based on a possessory right and/or an unjust-enrichment claim will not be affected by the Department taking title to the land in trust for the exclusive use and benefit of the Nation.

81.    The ROD fails to consider whether the decision to acquire New Stockbridge Reservation lands in trust for the benefit of the Nation might impair or extinguish Stockbridge's property rights or the viability of Stockbridge's pending land-claim action.

82.    The ROD fails to consider whether acquisition of New Stockbridge lands in trust for the exclusive use and benefit of the Nation might result in an extinguishment of Stockbridge treaty and property rights or whether the termination of Stockbridge's right of possession resulting from the Department's acquisition might impair or cut off, as of the date of the trust acquisition, a Stockbridge claim to pre-judgment interest.

83.    The ROD fails to consider and analyze whether acquisition of title to New Stockbridge lands for the exclusive use of the Nation might affect the availability of the remedy of ejectment, which Stockbridge seeks against the Nation in its pending land-claim action in the Northern District of New York and, in particular, it fails to consider whether the Quiet Title Act might bar that relief after the land has been acquired by the United States.

84.    The Department refused to require Stockbridge's consent to the proposed acquisition pursuant to 25 C.F.R. §151.8 on the basis that Stockbridge does not have jurisdiction over the New Stockbridge Reservation.

85.    The Department failed to analyze whether Stockbridge's consent to the proposed trust acquisition, as the plaintiff in a pending federal-court action claiming recognized title to New Stockbridge and the remedy of ejectment, *i.e.,* possession of the subject lands,

against the defendant-intervenor Nation, is required independently of 25 C.F.R. §151.8 as a condition precedent to the acquisition of the land in trust for the Nation.

86.    The Department failed to accord the decisions of the Indian Claims Commission in Docket 300-A and the Solicitor and Associate Solicitor any weight or engage in a thoughtful, in-depth analysis of the issues they raise in the context of this trust application.

87.    The Department failed to consider, among the various alternative actions, an alternative that excluded from acquisition the lands of the New Stockbridge Reservation.

### FIRST CLAIM FOR RELIEF
VIOLATION OF THE APA
AGENCY ACTION THAT IS ARBITRARY, CAPRICIOUS
AND AN ABUSE OF DISCRETION

88.    The Tribe repeats, re-alleges, and incorporates by reference herein the allegations contained in paragraphs 1 through 88.

89.    The APA provides that a court reviewing a final agency action "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A).

90.    The Department's decision to acquire New Stockbridge Reservation lands in trust for the benefit of the Nation based upon a summarily stated "view" without adequate legal analysis of the possible effects of its decision on Stockbridge's property rights, the viability of Stockbridge's pending land-claim action, or available remedies in that action, and without requiring Stockbridge's consent or considering an alternative that did not

-31-

include the acquisition of New Stockbridge lands is arbitrary, capricious, and an abuse of discretion.

## SECOND CLAIM FOR RELIEF
### VIOLATION OF THE APA
### AGENCY ACTION THAT IS NOT IN ACCORDANCE WITH LAW
### BREACH OF COMMON-LAW TRUST DUTIES

91.     The Tribe repeats, re-alleges, and incorporates by reference herein the allegations contained in paragraphs 1 through 90.

92.     The Department's common-law trust duties to Stockbridge include the duty to preserve and protect Stockbridge's property rights, lands and natural resources guaranteed to it under federal law.

93.     The Department's decision to acquire New Stockbridge Reservation lands in trust for the benefit of the Nation based upon a summarily stated "view" without adequate legal analysis of the possible effects of its decision on Stockbridge's property rights, the viability of Stockbridge's pending land-claim action, or available remedies in that action, and without requiring Stockbridge's consent or considering an alternative that did not include the acquisition of New Stockbridge lands constitutes a violation of the Department's common-law trust duty to Stockbridge.

## THIRD CLAIM FOR RELIEF
### VIOLATION OF THE APA
### AGENCY ACTION THAT IS NOT IN ACCORDANCE WITH LAW
### BREACH OF TRUST DUTIES ARISING FROM
### THE 1788 TREATY OF FORT SCHUYLER AND
### ITS 1789 IMPLEMENTING ACT

94.     The Tribe repeats, re-alleges, and incorporates by reference herein the allegations contained in paragraphs 1 through 93.

-32-

95. The 1788 Treaty of Fort Schulyer and the 1789 Act of the New York State Legislature that implemented it created a permanent Indian reservation for Stockbridge and pledged the United States, as the successor to the State of New York, to preserve Stockbridge's rights to the permanent use and occupancy thereof.

96. The Department's decision to acquire New Stockbridge Reservation lands in trust for the benefit of the Nation based upon a summarily stated "view" without adequate legal analysis of the possible effects of its decision on Stockbridge's property rights, the viability of Stockbridge's pending land-claim action, or available remedies in that action, and without requiring Stockbridge's consent or considering an alternative that did not include the acquisition of New Stockbridge lands constitutes a violation of the Department's trust responsibilities to Stockbridge under the 1788 Treaty of Fort Schulyer and the 1789 Act of the New York State Legislature that implemented it.

### FOURTH CLAIM FOR RELIEF
VIOLATION OF THE APA
AGENCY ACTION THAT IS NOT IN ACCORDANCE WITH LAW
BREACH OF TRUST DUTIES ARISING FROM
THE 1794 TREATY OF CANANDAIGUA

97. The Tribe repeats, re-alleges, and incorporates by reference herein the allegations contained in paragraphs 1 through 96.

98. By the 1794 Treaty of Canandaigua, the United States promised never to disturb the Stockbridge in the free use and enjoyment of the New Stockbridge Reservation.

99. The Department's decision to acquire New Stockbridge Reservation lands in trust for the benefit of the Nation based upon a summarily stated "view" without adequate legal analysis of the possible effects of its decision on Stockbridge's property rights, the

viability of Stockbridge's pending land-claim action, or available remedies in that action, and without requiring Stockbridge's consent or considering an alternative that did not include the acquisition of New Stockbridge lands constitutes a violation of the Department's trust responsibilities to Stockbridge under the 1794 Treaty of Canandaigua.

**FIFTH CLAIM FOR RELIEF**
VIOLATION OF THE APA
AGENCY ACTION THAT IS NOT IN ACCORDANCE WITH LAW
BREACH OF TRUST DUTIES ARISING FROM
THE INDIAN NON-INTERCOURSE ACT, 25 U.S.C. § 177

100.   The Tribe repeats, re-alleges, and incorporates by reference herein the allegations contained in paragraphs 1 through 99.

101.   The Non-Intercourse Act expressly forbade and declared void *ab initio* any sale of land, or any title or claim thereto, by any Indian nation or tribe without the consent of Congress, and committed the United States to protect Stockbridge in the free use and enjoyment of the New Stockbridge Reservation.

102    The Department's decision to acquire New Stockbridge Reservation lands in trust for the benefit of the Nation based upon a summarily stated "view" without adequate legal analysis of the possible effects of its decision on Stockbridge's property rights, the viability of Stockbridge's pending land-claim action, or available remedies in that action, and without requiring Stockbridge's consent or considering an alternative that did not include the acquisition of New Stockbridge lands constitutes a breach of the Department's trust responsibilities to Stockbridge under the Indian Non-Intercourse Act, 25 U.S.C. § 177.

### SIXTH CLAIM FOR RELIEF
VIOLATION OF THE APA
AGENCY ACTION THAT IS NOT IN ACCORDANCE WITH LAW
25 C.F.R. §151.8 IS ILLEGAL AS APPLIED TO STOCKBRIDGE'S INTEREST IN
NEW STOCKBRIDGE AND ITS APPLICATION CONSTITUTES A BREACH OF TRUST

103.    The Tribe repeats, re-alleges, and incorporates by reference herein the allegations

contained in paragraphs 1 through 102.

104.    25 C.F.R. §151.8 was promulgated before the United States Supreme Court's decision in

*City of Sherrill v. Oneida Indian Nation* and therefore did not envision a circumstance

wherein a tribe retains recognized Indian title to its reservation but has lost its governing

authority over that reservation. The claim to recognized Indian title to a reservation,

asserted in a pending federal-court action, is a legally cognizable interest, and §151.8

promulgated affords neither recognition of, nor protection to, that interest.

105.    25 C.F.R. §151.8 is unlawful as applied to the proposed acquisition of New Stockbridge

lands in trust for the Nation because it breaches the United States' trust responsibilities to

Stockbridge by not affording Stockbridge the right to consent to such acquisition, thereby

undermining the legal viability of Stockbridge's claim to the New Stockbridge lands that

are the subject of the ROD, as well as Stockbridge's claims to the entire New Stockbridge

Reservation.

### SEVENTH CLAIM FOR RELIEF
VIOLATION OF THE APA
AGENCY ACTION UNLAWFULLY WITHHELD OR UNREASONABLY DELAYED
AND BREACH OF TRUST

106.    The Tribe repeats, re-alleges, and incorporates by reference herein the allegations

contained in paragraphs 1 through 105.

-35-

107.   The APA provides that "[t]he reviewing court shall . . . compel agency action unlawfully
       withheld or unreasonably delayed . . . ." 5 U.S.C. § 706(1).

108.   As Stockbridge's trustee, the United States has a trust responsibility to protect
       Stockbridge in the in the free use and enjoyment of the New Stockbridge Reservation and
       to defend it from unlawful encroachments or trespasses on, or the illegal acquisition of
       title to, or possession of, the lands of such Reservation.

109.   The United States' failure to intervene in the Stockbridge land-claim action or take other
       affirmative steps to protect Stockbridge's claims from possible dismissal due to the State
       of New York's immunity to suit under the Eleventh Amendment constitutes a breach of
       the United States' trust responsibilities to Stockbridge under federal common law, the
       1788 Treaty of Fort Schuyler and its 1789 implementing act, the 1794 Treaty of
       Canandaigua, and the Indian Non-Intercourse Act.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays that this Court:

1.   **DECLARE** that the ROD is arbitrary, capricious and an abuse of discretion.

2.   **DECLARE** that the ROD is not in accordance with law because it breaches the
     Department's trust duties to Stockbridge under federal common law, the 1788 Treaty of
     Fort Schuyler and its 1789 implementing act, the 1794 Treaty of Canandaigua and the
     Indian Non-Intercourse Act.

3.   **DECLARE** that the Department's failure to consider an alternative that excluded the
     lands of the New Stockbridge Reservation is arbitrary, capricious, an abuse of discretion
     and is not in accordance with law because it constitutes a breach of the Department's trust

-36-

responsibilities to Stockbridge under federal common law, the 1788 Treaty and its 1789 implementing act, the 1794 Treaty of Canandaigua and the Indian Non-Intercourse Act.

4.     **DECLARE** that the United States' failure to intervene in Stockbridge's land-claim action or otherwise act to protect Stockbridge's property rights claims from possible dismissal due to the State of New York's immunity to suit under the Eleventh Amendment constitutes a breach of the United States' trust responsibilities to Stockbridge under federal common law, the 1788 treaty of Fort Schuyler and its 1789 implementing act, the 1794 Treaty of Canandaigua, and the Indian Non-Intercourse Act.

5.     **DECLARE** that 25 C.F.R. §151.8 is unlawful as applied because its application here breaches the Department's trust responsibilities by failing to recognize and protect Stockbridge's interests as the holder of the claim to recognized title to the New Stockbridge Reservation.

6.     **REMAND** to the Department that portion of the ROD pertaining to the acquisition of 3,312.475 acres of land, more or less, situated within the exterior boundaries of the New Stockbridge Reservation on behalf of the Nation, and **ORDER** the Department to make specific determinations regarding whether the acquisition of such land impairs Stockbridge's property rights or the viability of Stockbridge's pending land-claim action; and, in particular, determine whether: (1) the acquisition might impair or cut off, as of the date of the trust acquisition, a Stockbridge claim to pre-judgment interest; (2) the acquisition might deprive Stockbridge of the ejectment remedy against the Nation in the pending land-claim action; and (3) the consent of Stockbridge, as the plaintiff in a pending land-claim action asserting a claim of recognized title to New Stockbridge and a

possessory right to the subject lands, should be required as a condition precedent to the proposed acquisition.

7.    **ORDER** the United States, in a timely fashion after the stay in the Stockbridge land-claim action has been lifted, to intervene on behalf of Stockbridge or take other affirmative steps to protect Stockbridge's claims from possible dismissal based on the State of New York's immunity to suit under the Eleventh Amendment at least until such time as the court in that action determines whether Stockbridge or the Nation is the proper tribal claimant to the New Stockbridge Reservation, or, in the alternative, provide to Stockbridge a reasoned, written decision explaining its reasons for failing to intervene or take protective action.

8.    Award such other and further relief as the Court may deem just and proper.

Respectfully submitted this 17th day of June, 2008.

Derril Jordan (D.C. Bar No. 470591)
Nordhaus Law Firm, LLP
Suite 801
1401 K Street, N.W.
Washington, D.C.  20005
(202) 530-1270
email: DJordan@NordhausLaw.com

Don B. Miller (D.C. Bar No. 215962)
Don B. Miller, PC
1305 Cedar Avenue
Boulder, Colorado   80403
(303) 545-5533
(303) 545-2523 (fax)
email: dbmiller01@msn.com

Howard Bichler (WI Bar No.1017209)
Office of Legal Counsel
Stockbridge-Munsee Indian Community, Band
    of Mohican Indians
N8476 Moh He Con Nuck Road
P.O. Box 70
Bowler, Wisconsin 54416
(715) 793-4392
email: howard.bichler@Mohican-nsn.gov

Counsel for Stockbridge-Munsee Community, Band
of Mohican Indians

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| The Stockbridge-Munsee Community, Band of Mohican Indians | The United States of America; The United States Department of the Interior |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    88888
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Derril B. Jordan
Nordhaus Law Firm, LLP
1401 K Street, NW Suite 801
Washington, D.C. 20005

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE an x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
○ 3 Federal Question (U.S. Government Not a Party)
◉ 2 U.S. Government Defendant
○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| ○ A. Antitrust | ○ B. Personal Injury/ Malpractice | ◉ C. Administrative Agency Review | ○ D. Temporary Restraining Order/Preliminary Injunction |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>**Social Security:**<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☒ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| ○ E. General Civil (Other) | OR | ○ F. Pro Se General Civil |
|---|---|---|

| **Real Property**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent, Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property<br><br>**Personal Property**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | **Bankruptcy**<br>☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br><br>**Property Rights**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**Federal Tax Suits**<br>☐ 870 Taxes (US plaintiff or defendant<br>☐ 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty**<br>☐ 610 Agriculture<br>☐ 620 Other Food &Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other<br><br>**Other Statutes**<br>☐ 400 State Reapportionment<br>☐ 430 Banks & Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation | ☐ 470 Racketeer Influenced & Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 900 Appeal of fee determination under equal access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original    ○ 2 Removed    ○ 3 Remanded from    ○ 4 Reinstated    ○ 5 Transferred from    ○ 6 Multi district    ○ 7 Appeal to
 Proceeding      from State      Appellate Court      or Reopened       another district       Litigation          District Judge
                 Court                                                   (specify)                                  from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

5 U.S.C. §§702 & 706; 25 U.S.C. §177; 1788 Treaty of Fort Schuyler; 7 Stat. 44.

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS<br>ACTION UNDER F.R.C.P. 23 | **DEMAND $** [_____]<br>**JURY DEMAND:** | Check YES only if demanded in complaint<br>YES ☐   NO ☒ |
|---|---|---|---|

**VIII. RELATED CASE(S)**    (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.
   **IF ANY**

DATE   June 17, 2008    SIGNATURE OF ATTORNEY OF RECORD   *[signature]*

---

INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.