UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| STOCKBRIDGE MUNSEE COMMUNITY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:08-cv-01031 |
| UNITED STATES OF AMERICA, *et al.,* | ) ) | |
| Defendants. | ) ) ) | |

**DEFENDANT'S MOTION TO TRANSFER VENUE AND TO SUSPEND OBLIGATION
TO ANSWER IN THE DISTRICT OF COLUMBIA**

Pursuant to 28 U.S.C. § 1404(a), the defendants move to transfer this case to the United States District Court for the Northern District of New York. There is no appreciable connection between this case and the District of Columbia and, for the reasons stated in the accompanying Memorandum of Law in Support of Motion to Transfer Venue, the matter should be transferred to the United States District Court for the Northern District of New York.

The defendants further move the Court to suspend their obligation to answer Plaintiff's Complaint until thirty days following judicial resolution of the venue issue or at a time to be determined by the transferee court.

Dated this 28th day of August 2008.

Respectfully submitted,
RONALD J. TENPASS
Assistant Attorney General
Environment and Natural resources Division

 /s/ *Maureen E. Rudolph*
Maureen E. Rudolph, S.D. Bar No. 3136
Edward J. Passarelli,
U.S. Department of Justice
Environment & Natural Resources Division
General Litigation Section
P.O. Box 663
Washington D.C. 20044-0663
Phone:  (202) 305-0479
Phone:  (202) 305-0468
Facsimile:  (202) 305-0506

OF COUNSEL:
Thomas A. Blaser
Attorney-Advisor
Division of Indian Affairs
Office of the Solicitor
U.S. Department of the Interior
1849 C Street, N.W.   MS 6513
Telephone:  (202) 208-5811
Facsimile:  (202) 219-1791

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STOCKBRIDGE MUNSEE COMMUNITY, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) No. 1:08-cv-01031 |
| UNITED STATES OF AMERICA, *et al.,* | ) ) ) |
| Defendants. | ) ) ) |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO TRANSFER VENUE AND TO SUSPEND OBLIGATION TO ANSWER IN THE DISTRICT OF COLUMBIA**

Plaintiff, the Stockbridge Munsee Community, Band of Mohican Indians ("Stockbridge-Munsee"), challenges the Department of Interior's ("Interior" or "Defendants") decision to take certain lands located in New York into trust for the benefit of another tribe, the Oneida Indian Nation of New York. Pl.'s Am. Compl. ¶ 1. Plaintiff's Amended Complaint alleges that some of the land Interior intends to take into trust for the Oneida is actually within the exterior boundaries of a historical Stockbridge-Munsee reservation, and thus, Interior cannot take the land into trust for the Oneida. See generally Id. Plaintiff seeks, through declaratory and injunctive relief, to have Interior's decision set aside under the Administrative Procedure Act. Id. ¶ 69-87 and First Claim for Relief. As demonstrated below, there is no particular connection between this case, or the requested relief, and the District of Columbia. On the contrary, this case has strong connections to New York where the subject property is located, and where six other challenges to the same administrative action are pending. For these reasons and pursuant to 28

U.S.C. § 1404(a), Defendants respectfully move to transfer venue of this case to the United

States District Court for the Northern District of New York.[1]

## STATUTORY AND REGULATORY BACKGROUND

### A.    Interior's Land-Into-Trust Regulations, Codified at 25 C.F.R. Part 151

25 C.F.R. § 151 sets forth the authorities, policy and procedure by which the United

States can acquire and take into trust status for the benefit of individual Indians and tribes.  The

regulations distinguish between on-reservation acquisitions and off-reservation acquisitions.

Compare 25 C.F.R. 151.10 with 25 C.F.R. 151. 11.  Importantly, both types of acquisitions

require Interior to notify the state and local governments having jurisdiction over the land to be

acquired, and to consider the potential impacts of the acquisition on regulatory jurisdiction and

real estate taxes.  Id.  Land that is taken into trust by the United States is protected against

voluntary or involuntary alienation without federal approval and exempted from state and local

taxation.  Placement of land in trust also preempts state and local regulation of the use of the

land.  See Act of May 25, 1926, ch. 379, 44 Stat. 629 (formerly codified at 43 U.S.C. §§ 733-736

(1975)); 25 U.S.C. § 465; 43 C.F.R. § 2564.4; 25 C.F.R. §§ 1.4, 152.22.

### B.    Oneida Indian Nation of New York Fee-to-Trust Request

In the 1970's, the Oneida filed a lawsuit claiming that certain lands in New York were

improperly taken from the Oneida by the State of New York.  Ex. F at 11.  Since 1986, the

Stockbridge-Munsee have also had a pending land claim action in the Northern District of New

York, naming the State of New York, Madison and Oneida Counties, several towns and the State

---

[1]Pursuant to Local Rule 7, Defendants' counsel contacted Plaintiff's counsel, Donald Miller, to
discuss this motion.  Plaintiff's counsel stated that Plaintiff objects to this motion.

Highway Department as defendants.  Pl.'s Am. Compl. ¶ 44; <u>Stockbridge-Munsee Community v. State of New York, et al.</u> Civ. No. 86-cv-1140 (N. D. NY).  The Oneida intervened in the Stockbridge-Munsee land claim, claiming an interest in the lands asserted by the Stockbridge-Munsee.  Pl.'s Am. Compl. ¶ 45.  In 2004, the Stockbridge-Munsee filed an amended complaint in its New York land claim asserting that the land it challenges here in this action has never been part of any Oneida reservation.  Pl.'s Am. Compl. ¶ 59.

In March 2005, the Supreme Court ruled in <u>City of Sherrill v. Oneida Indian Nation of New York</u>, 544 U.S. 197 (2005), that the Oneida Nation could not unilaterally assert tribal tax immunity over land it recently reacquired in the City of Oneida, New York.  Instead the Court stated that "section 465 [the Indian Reorganization Act and implementing regulations found at 25 C.F.R. § 151] provides the proper avenue for the Oneida Indian Nation to reestablish sovereign authority over territory last held by the Oneidas 200 years ago."  <u>City of Sherrill v. Onedia Indian Nation of New York</u>, 544 U.S. 197, 220-221; <u>see</u> <u>also</u> Pl.'s Am. Compl. ¶ 61 (characterizing the Supreme Court's decision as directing the Oneida to "use the mechanism provided by Congress for the acquisition of lands for tribal governments that takes into account the interest of others with stakes in the area's governance and well being").  On April 4, 2005, the Oneida Nation of New York requested Interior to acquire title to approximately 17,370 acres of real property in trust status for the Oneida.  <u>Id.</u> ¶ 62.  The property is located in Madison and Oneida Counties in New York.  Ex. F at 6.

The Oneida request categorized the land into three groups:  Group one comprises approximately 3,428 acres in Oneida County, which includes the Oneida's Turning Stone Resort and Casino along with five neighboring golf courses, and one SavOn gas station and convenience

store.  Ex. F at 6.  Group two comprises 6,475 acres in Madison and Oneida Counties and

contains the Oneida's government, health, education, and cultural facilities and activities;

member housing; hunting lands and numerous tribal business enterprises.  Id.  Group three

comprises approximately 7,467 acres in Madison and Oneida Counties and are generally

undeveloped agricultural lands.  Id.

Following extensive National Environmental Policy Act processes, along with

consultations with the State of New York and the local governments, and after review of

comments received by the Stockbridge-Munsee, on May 20,2008, Interior decided to take

approximately 13,000 acres into trust for the Oneida (including the lands claimed by the Plaintiff

here).  See generally Ex. F.

### C.    Similar Challenges to Interior's Land-Into-Trust Decision Already Pending in the Northern District of New York

Along with this Administrative Procedures Act challenge to Interior's May 20, 2008 land

into-trust decision, six other cases have been filed in the Northern District of New York.  See

Upstate Citizens for Equality, Inc. v. United States, 5:08-cv-00633; City of Oneida v.

Kempthorne, 5:08-cv-00648; Niagara Mohawk Power Corporation v. Kempthorne, 5:08-cv-

00649; New York v. Kempthorne, 6:08-cv-00644; Town of Verona v. Kempthorne, 6:08-00647;

Central New York Fair Business Association v. Kempthorne, 6:08-cv-00660; see also Ex. G.  All

six cases claim Interior's decision was arbitrary and capricious under the Administrative

Procedures Act.  Id.

D.    Change of Venue, 28 U.S.C. § 1404(a)

28 U.S.C. § 1404(a) affords the Court wide discretion to determine the appropriate venue

of a case based on plaintiff's claims and the issues to be litigated.  The Statute states as follows:

> (a) For the convenience of the parties and witnesses, in the interest
> of justice, a district court may transfer any civil action to any other
> district or division where it might have been heard.

The purpose of § 1404(a) is "to prevent the waste 'of time, energy and money' and 'to protect

litigants, witnesses and the public against unnecessary inconvenience and expense ... .'"  Van

Dusen v. Barrack, 376 U.S. 612, 616 (1964) (citing Continental Grain v. Barge, FBL-585, 364

U.S. 19, 26 & 27 (1960)).  Defendants carry the burden of demonstrating that transfer of this

action serves those purposes and furthers the interest of justice.  Citizen Advocates for

Responsible Expansion v. Dole, 561 F. Supp. 1238, 1239 (D. D.C. 1983) (citing Oudes v. Block,

516 F. Supp. 13, 15 (D. D.C. 1981).  However, that burden is substantially diminished, where, as

here, Defendants seek to transfer the action to the forum where Plaintiffs reside.  Id.; see also

Martin-Trigona v. Meister, 668 F. Supp. 1, 3 (D. D.C. 1987) (Plaintiff's choice of forum is a

much less significant factor where the plaintiff is a foreigner to that forum).

## ARGUMENT

I.    TRANSFER OF THIS CASE TO THE NORTHERN DISTRICT OF NEW YORK
      IS APPROPRIATE UNDER THE CHANGE OF VENUE STANDARD OF 28
      U.S.C. § 1404

28 U.S.C. § 1404(a) is intended to facilitate transfer of actions to a more appropriate

federal forum.  See Piper Aircraft Co. v. Reyno, 454 U.S. 235, 254 (1981); Van Dusen v.

Barrack, 376 U.S. 612, 616 (1964).  In general, a district court acting pursuant to 28 U.S.C. §

-5-

1404(a) may transfer an action to another federal forum if two requirements are met.  First, as a threshold matter, the proposed transferee district must be one in which the action might have been brought originally.  See DeLoach v. Phillip Morris Cos., 132 F. Supp. 2d 22, 24 (D.D.C. 2000).  Second, the Court must then decide, in the exercise of its discretion, whether the transfer is warranted.  In making the determination whether transfer is warranted, the statute requires the Court to examine three factors: (1) the convenience of the parties; (2) the convenience of the witnesses; and (3) the interest of justice.  The Court has broad discretion to order transfer under this standard.  In re Scott, 709 F.2d 717, 720 (D.C. Cir. 1983);  see also Norwood v. Kirkpatrick, 349 U.S. 29 (1955).  As discussed below, transfer to the Northern District of New York is appropriate here.

**A.    The Transferee Forum In New York Is One Where the Case Could Have Been Brought**

A "threshold consideration" in determining the appropriateness of transfer under § 1404(a) is whether the action "might have been brought" in the transferee district.  Nichols v. U.S. Bureau of Prisons, 895 F. Supp. 6, 8 (D.D.C. 1995); see also Van Dusen, 376 U.S. at 616 (transfer power is expressly limited by the clause restricting transfer to those districts in which the action "might have been brought").  Venue is proper in the judicial district in which a substantial part of the claim occurred, or where a substantial part of the property that is the subject of the action is situated.  28 U.S.C. § 1391(e).  This element is satisfied in this case because the land that is identified in Plaintiff's Amended Complaint and all other lands that are directly affected by Interior's land-into-trust decision are situated in New York.  See generally Pl.'s Am. Compl.

_____**B.**    **The Convenience to the Parties and Witnesses Will Be Served By Transferring This Case.**

**1.**    **Convenience to the parties.**

The United States is fully prepared to litigate this matter in New York. For Plaintiff, who currently resides in Wisconsin, Pl.'s Am. Compl. ¶ 5, presumably litigation in either forum is equally as convenient (though they do have a land claim case pending in the Northern District of New York). Conversely, as Defendants are also facing six challenges to Interior's land-into-trust decision in the Northern District of New York, Defendants will be forced to defend the same decision in both forums. And the other litigants (the State of New York, counties, and citizen groups) are all located in New York.

**2.**    **Convenience to the witnesses.**

Convenience to witnesses is not an important factor in this case. Plaintiffs challenge agency action pursuant to the APA, under which judicial review is limited to the administrative record compiled by the agency. Florida Power v. Lorion, 470 U.S. 729 (1985). Thus no witnesses will be required.

**C.**    **Transfer to New York Is In the Interest of Justice**

The strongest reason to transfer this action to the District of Connecticut is that the interests of justice will best be advanced by such a transfer. The interests of justice are furthered by preventing unnecessary expense to the public and duplicative use of judicial resources. Continental Grain Co. v. FBL-585, 364 U.S. 20, 26; see also Martin-Trigona v. Meister, 668 F. Supp. 1, 3 (D.D.C. 1987) ("The interests of justice are better served when a case is transferred to the district where related actions are pending.").

In addition, the interests of justice are promoted when a localized controversy is resolved locally where concerned citizens may closely follow the proceedings.  Citizen Advocates for Responsible Expansion (I-Care) v. Dole, 561 F. Supp. 1238, 1240 (D.D.C. 1983); Gulf Oil v. Gilbert, 330 U.S. 501, 509 (1947).  This compelling interest can only be furthered by transfer of this case to the Northern District of New York.  Armco Steel Co. v. CXS Corp., 790 F. Supp. 311, 324 (D.D.C. 1991).

> 1.     **This action involves claims that are local in nature to the State of New York, where similar litigation is ongoing, and therefore, should be transferred there.**

"[J]ustice requires that such localized controversies be decided at home."  Citizen Advocates, 561 F.Supp. at 1240; Armco Steel, 790 F. Supp. at 324 (the interest in having local controversies decided locally is compelling); Harris v. Republic Airlines, 699 F. Supp. 961, 963 (D.D.C. 1988).  Placement of the land in trust status would result in the land being secured against voluntary or involuntary alienation and exempted from state and local taxation and preempt state and local regulation of the use of the land.  Thus, as the land-into-trust regulations recognize, the consequences of placing the land in trust status directly affects local New York interests.

Where a case predominantly implicates interests in another state and the current venue is one with which the affected citizens have little to no connection, the Court has found the local interest compelling and ordered transfer.  For example, in Shawnee Tribe v. United States, 298 F. Supp. 2d 21 (D.D.C. 2002), the complaint raised the issue of whether portions of a military reservation in Kansas could be considered reservation land, such that the land could be transferred to Interior to be held in trust for the Tribe.  The Court decided that the lawsuit's

transfer from the District of Columbia to the United States District Court in Kansas was appropriate, stating that "the most persuasive factor favoring transfer . . . is the local interest in deciding a sizable local controversy at home." Id. at 26.  Central to the Court's opinion was that judicial allocation of the subject property would directly impact local Kansas interests.  Id.

Likewise, in Southern Utah Wilderness Alliance v. Norton, 315 F. Supp. 2d 82 (D.D.C. 2004), the plaintiff sought venue in the District of Columbia of a dispute involving twenty-one parcels of land in Utah.  There, the Court concluded that National Environmental Policy Act considerations were localized interests that "directly touch[ed] local citizens." Id. at 88.  The Court granted the Government's transfer motion, stating that "[i]t makes sense that these alleged consequences would be most particularly felt in Utah, and thus that the courts of Utah would have a clear interest in resolving the dispute." Id. (citing Trout Unlimited v. United States Department of Agriculture, 944 F. Supp. 13, 20 (D.D.C. 1996)).  In this case, the geographic, economic, and political ramifications and considerations resulting from review in the District of Columbia will impact New York similar to the situations presented in Shawnee Tribe and Southern Utah Wilderness Alliance.

Indeed, as shown by the amount of other challenges to this particular land-into-trust decision, there is a sizeable local interest regarding Plaintiff's suit; six other plaintiffs (including the State of New York, Madison and Oneida Counties and various citizen groups) have challenged the same land-into-trust administrative action of the Department of the Interior in the Northern District of New York.  See Ex. G. As the Supreme Court stated in Gulf Oil v. Gilbert:

> In cases which touch the affairs of many persons, there is reason for holding trial [or motions hearing] in their view and reach rather than in remote parts of the country where they can learn of it by report only.  There is a local interest in

having localized controversies decided at home.

330 U.S. 501, 509 (1947).  As this Court stated more recently:

> [T]here is a significant benefit to allowing those whose lives will be most immediately affected by the outcome of litigation, as well as the local media, to physically attend the proceedings which will determine the outcome.  There is no substitute for personally observing, watching and evaluating the judge who presides, hearing the quality of the arguments, and getting a first-hand impression of whether the proceeding is being handled with the appropriate fairness and seriousness.

Ex. A, Santee Sioux Tribe of Nebraska v. National Indian Gaming Commission, Civ. No. 99-528, Slip op. at 8 (D.D.C. Apr. 19, 1999).  In short, "justice requires such localized controversies be decided at home."  Citizen Advocates for Responsible Expansion (I-Care), 561 F. Supp. at 1240.

       **2.**      **This action should be transferred in order to avoid a duplicative waste of judicial resources and the possibility of inconsistent results.**

Transfer to this action to New York avoids waste of judicial resources and the possibility of inconsistent results.  This court has previously stated:

> The Court finds, however, that the interest of justice overwhelmingly favors transfer of this case to Connecticut.  The action here and that in Connecticut *seek review of the same administrative decision* and present similar claims and demands for relief.  If this case were transferred to Connecticut, the cases could be consolidated; thus saving expense to the public and avoiding the duplicative use of judicial resources.

See Ex. E, Towns of Ledyard, et al. v. Unites States, Civ. No. 95-0880, slip op. at 4 (emphasis added); Ex. A, Santee Sioux Tribe of Nebraska, slip. op. at 9; Ex. B, Cheyenne-Arapho Tribe of Oklahoma v. Reno, Civ. No. 98-cv-065 (D.D.C.), slip op. at 4 (transferring the action based in part due to a consolidated action pending in another jurisdiction); Ex. C, Apache Tribe of the Mescalero Reservation v. Reno, Civ. No. 96-115 (D.D.C.), slip op. at 6 (transferring action based

in part on action raising the same broad challenge already pending in the transferor jurisdiction).

The administrative record will be the same for this case and the other six challenges to this

decision, already pending in New York.  Thus, in regard to the convenience of the parties as well

as the interests of justice, transfer of this case to the Northern District of New York is more than

justifiable.

> **3.    The Northern District of New York's familiarity with the land claim disputes of the Oneida and the Stockbridge-Munsee favors transferring to the Northern District of New York.**

The Court may also take note of the fact that the courts of the Northern District of New

York and the Second Circuit have considerable experience with land disputes in New York and

specifically with the land claim disputes of the Stockbridge-Munsee and the Oneida.  See, e.g.,

Shawnee Tribe, 298 F. Supp. 2d at 21 (expertise of the Tenth Circuit courts in Indian matters

favors transfer); Oneida Nation v. State of New York, City of Sherrill v. Oneida Indian Nation of

New York, 544 U.S. 197 (2005).  Of note, the Stockbridge-Munsee have raised the claim of

whether the land they challenge here as part of the land-into-trust decision is Stockbridge or

Oneida land in its land claim action pending in the Northern District of New York.  Stockbridge-

Munsee Community v. State of New York, et al. Civ. No. 86-cv-1140 (N. D. NY).[2/]

Moreover, having the decisionmaker located in Washington D.C. does not change the

analysis, nor the appropriateness of transferring venue.  As noted by the D.C. Circuit:

Courts in this circuit must examine challenges to personal jurisdiction and venue

---

[2/] Even though Plaintiff filed its substantive challenge to the land-into-trust decision here in the D.D.C., Plaintiff also filed a preliminary injunction challenge to the land-into-trust decision in its New York land claim case.  Stockbridge-Munsee Community v. State of New York, et al. Civ. No. 86-cv-1140 (N. D. NY), Dkt. No. 264 (June 24, 2008).  Plaintiff has subsequently withdrawn its preliminary injunction challenge.

carefully to guard against the danger that a plaintiff might manufacture venue in the District of Columbia. By naming high government officials as defendants, a plaintiff could bring a suit here that properly should be pursued elsewhere.

Cameron v. Thornburgh, 983 F. 2d 253, 256 (D.C. Cir. 1993); see also DeLoach v. Phillip Morris Co., 132 F. Supp. 2d 22, 25 (D. D.C. 2000) (noting that venue is inappropriate in the District of Columbia where "the only real connection [the] lawsuit has to the District of Columbia is that a federal agency headquartered here (USDA) is charged with generally regulating and overseeing the [administrative process]."); Ex. D, Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin v. United States, Civ. No. 01-1042 (D.D.C.), slip op. at 6. "Mere involvement on the part of federal agencies, or some federal officials who are located in Washington D.C., is not determinative." Shawnee Tribe v. United States, 298 F. Supp. 2d 21, 25-26 (D.D.C. 2002). Importantly, Plaintiff's Complaint does not allege any connection to the lands or citizens of the District of Columbia. Thus, compelling New York local interests inherent in this lawsuit and the expertise of the Second Circuit courts concerning such issues strongly favor transfer to New York.

## II.    PLAINTIFF'S CHOICE OF FORUM IS ENTITLED TO LITTLE, IF ANY, DEFERENCE

While the movant bears the burden of demonstrating that transfer is warranted, when a plaintiff chooses a forum that is not its home – as is the case here – the plaintiff's choice of forum is entitled to far less deference than the choice of a home forum. See Piper Aircraft Co., 454 U.S. at 255-56; Shawnee Tribe, 298 F. Supp. 2d at 24-25 (The deference that may ordinarily be due a plaintiff's choice of forum is substantially lessened where suit was brought in the plaintiff's non-home forum and transfer is sought to the forum where the plaintiff resides.).

Considered in light of the foregoing factors, Plaintiff's decision to file the action in the District of Columbia is entitled to little, if any, deference. Plaintiff is located in Wisconsin. Pl.'s Compl. ¶ 5. Furthermore, as discussed above, the subject matter of this litigation is significantly connected to New York. The District of Columbia has no meaningful ties to, or interest in, the factual and policy issues underlying this litigation. Federal agencies, like Interior, make policy decisions in the District of Columbia every workday. Here, the policy at issue relates to the State of New York, a tribe and local governments, located in New York .

In concert with Defendants' motion to transfer venue of the case, Defendants also move the Court to suspend its obligation to answer the Complaint until thirty days following judicial resolution of the venue issue or at a time to be determined by the transferee court.

## CONCLUSION

For these reasons, Defendants' motion for transfer to the Northern District of New York, and to suspending answering Plaintiffs' Complaint in the District of Columbia should be granted.

Dated this 28th day of August 2008.

Respectfully submitted,
RONALD J. TENPASS
Assistant Attorney General
Environment and Natural resources Division

  /s/ *Maureen E. Rudolph*
Maureen E. Rudolph, S.D. Bar No. 3136
Edward J. Passarelli,
U.S. Department of Justice
Environment & Natural Resources Division
General Litigation Section
P.O. Box 663
Washington D.C. 20044-0663
Phone: (202) 305-0479

-13-

Phone:  (202) 305-0468
Facsimile:  (202) 305-0506

OF COUNSEL:
Thomas A. Blaser
Attorney-Advisor
Division of Indian Affairs
Office of the Solicitor
U.S. Department of the Interior
1849 C Street, N.W.   MS 6513
Telephone:  (202) 208-5811
Facsimile:  (202) 219-1791

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SANTEE SIOUX TRIBE OF NEBRASKA,      :
                                     :
                Plaintiff,           :
                                     :
                                     :
              v.                     :   Civil Action No. 99-528 (GK)
                                     :
NATIONAL INDIAN GAMING COMMISSION,   :
                                     :
                Defendant.           :
                                     :

FILED

APR 1 9 1999

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

MEMORANDUM OPINION

Plaintiff, Santee Sioux Tribe of Nebraska ("the Tribe"), has brought suit in this Court challenging the constitutionality of various provisions of the Indian Gaming Regulatory Act ("IGRA" or "the Act"), 25 U.S.C. § 2701-2721 (1994). In addition to seeking a declaratory judgment, the Tribe seeks to enjoin enforcement of a final Order of Closure of the National Indian Gaming Commission ("NIGC or "the Commission") which would close its Ohiya Casino in the State of Nebraska. Defendant, the NIGC, has moved to transfer the case to the United States District Court for the District of Nebraska, where extensive court and appellate proceedings relating to this Casino have already taken place, and where contempt proceedings are ongoing. Plaintiff opposes the transfer.

Upon consideration of Defendant's Motion, Plaintiff's Opposition, Defendant's Reply, the applicable case law, and the entire record herein, for the reasons discussed below, Defendant's

EXHIBIT A

Motion to Transfer is **granted**.

## I.  Statutory Background

In 1988, Congress enacted the Indian Gaming Regulatory Act which was designed to "provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal government." 25 U.S.C. § 2701(5)(1994).

The Act divides gaming into three categories.  Class III gaming, which is the category at issue in this case, includes banking card games, dice games, roulette, dog racing, horse racing, lotteries, and electronic and electro-mechanical facsimiles of games of chance.  25 U.S.C. § 2703 (6)-(8)(1994).[1]  Under the statute, such Class III gaming activities are lawful on tribal lands only if they are, inter alia, "located in a state that permits such gaming for any purpose by any person, organization, or entity;" and operated in accordance with the provisions of a Tribal-State compact entered into by the Indian tribe and the state in which the tribe is located.  25 U.S.C. § 2710(d)(1)(1994).

When a tribe becomes interested in operating Class III gaming activities, it is required under the statute to initiate the process by requesting the State to enter into negotiations, and the State is required "to negotiate with the Indian tribe in good faith to enter into such a compact".  25 U.S.C. § 2710(d)(3)(A)(1994).

---

[1] The Class III gaming operated by the Tribe consisted of video slot, poker, and blackjack machines.

If the State fails to negotiate in good faith, the Act provided that the tribe could sue the State in federal district court; the Act also provided various statutory remedies designed to bring the state and the tribe to a final tribal-state compact so that the tribe could satisfy the requirements of IGRA and conduct lawful gaming activities. 25 U.S.C. §§ 2710(d)(7)(A) and (B)(1994).

In 1997, the Supreme Court ruled that Congress lacked the authority to abrogate a State's Eleventh Amendment immunity from suit and that Section 2710(d)(7)(A) of IGRA was therefore unconstitutional. <u>Seminole Tribe of Florida v. Florida</u>, 517 U.S. 49 (1996). The practical consequence of this ruling was to leave Indian tribes without recourse to the courts if they were unable, because of bad faith negotiations on the part of the State, to conclude the statutorily required Tribal-State compact. Without the existence of such a Tribal-State compact, the tribes would be unable to obtain permission from the Commission to operate gaming facilities.

II.  Procedural History

Plaintiff is a federally recognized tribe whose reservation is entirely situated within the State of Nebraska. In February 1993, the Tribe began a long period of negotiations with the State of Nebraska to conclude a Tribal-State compact for the conduct of Class III gaming on the Tribe's reservation. Ultimately, the negotiations failed, and there was evidence before the Commission that would "tend to suggest that the Governor did not negotiate in

3

good faith". Pl.'s Ex. 1 at 14.[2] In February 1996, the Tribe opened its Ohiya Casino, a gaming facility with Class III gaming devices.

In February 1996, the Tribe also filed an action in the U.S. District Court for the District of Nebraska against the State of Nebraska and its Governor, pursuant to IGRA § 2710(d)(7)(A)(i), alleging bad-faith negotiations by the State. That suit was dismissed on grounds of Eleventh Amendment immunity under Seminole. Santee Sioux Tribe v. State of Nebraska, 121 F.3d 427 (8th Cir. 1997).

Thereafter, the Chairman of the NIGC issued a "Notice of Violation" stating that the Tribe's operation of certain Class III games in the absence of the requisite Tribal-State compact violated 25 U.S.C. § 2710(b). Despite voicing "serious concerns about the fairness" of the Tribal-State negotiation process, and recognizing the Tribe's critical need for revenues generated by operation of the Casino, the Chairman concluded on May 2, 1996, that the "NIGC does not have the authority to address issues related to the process by which tribal-state compacts are negotiated" and that he had "no choice but to order the closure of the Class III gaming activity presently being conducted". 25 C.F.R. §~573.6(11)(1996). The Tribe closed the Casino on May 5, 1996, only to reinitiate gaming activities several months later.

---

[2]The Commission did not hold, as Plaintiff misrepresents in its papers, "that the evidence demonstrated" that Nebraska failed to negotiate in good faith". Pl.'s Mem. Opposing Def.'s Mot. to Transfer at 3 n1. The Court does not appreciate such a gross exaggeration, not to say misstatement, of the record.

4

Thereafter, much procedural maneuvering ensued before the Commission and in federal court, the details of which are set out at great length in the parties' papers. Ultimately, after many proceedings before Chief Judge William G. Cambridge of the United States District Court for the District of Nebraska, on appeal, the Eighth Circuit held that the United States could seek civil injunctive relief against the Tribe under Nebraska's nuisance law, pursuant to 18 U.S.C. § 1166. It also ruled that because the gaming machines in question were illegal under Nebraska law and the State could not therefore compact for them even if it chose to negotiate in good faith, that it need not reach the issue of whether all provisions of the IGRA related to compacting are unconstitutional. The Supreme Court denied Plaintiff's petition for a writ of certiorari. <u>United States v. Santee Sioux Tribe of Nebraska</u>, 135 F.3d 558, 565-566 (1998), <u>cert. denied</u>, 119 S. Ct. 48 (1998).

On October 15, 1998, the Eighth Circuit issued a mandate to the District Court to enter an "order enjoining the Tribe's operation of class III gaming devices and enforcing the Chairman's closure order." On November 24, 1998, the District Court issued the mandated order. Plaintiff did not close the Ohiya Casino. On February 1, 1999, the District Court found the Plaintiff in contempt of court for continuing to operate the Casino, and fined it $3000 per day for each day the gaming facility continued to remain open. The Ohiya Casino remains open.

On March 1, 1999, the Tribe filed the present action which it

5

styles as an administrative appeal under the Administrative Procedure Act, 5 U.S.C. § 701 et seq., from the Final Order of the NIGC, seeking a declaration that the law upon which that Final Order is predicated, the IGRA, is unconstitutional.

## III.  Analysis

Defendant has moved to transfer this case to the United States District Court for the District of Nebraska under 28 U.S.C. § 1404(a)(1993), which provides that:

> For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it may have been brought.

Defendant concedes that it bears the burden of establishing that transfer is proper and serves the purposes of § 1404(a) "to prevent the waste `of time, energy and money' and `to protect litigants, witnesses and the public against unnecessary inconvenience and expense. . . .'" Van Dusen v. Barrack, 376 U.S. 612, 616 (1964); Airline Pilots Ass'n. V. Eastern Air Lines, 672 F. Supp. 525, 526 (D.D.C. 1987).

A threshold question under § 1404(a) is whether the action may have been brought in Nebraska. The Tribe concedes, as it must, that the case could have been brought in the District of Nebraska.

The Court is well aware that, ordinarily, a plaintiff's choice of forum is entitled to substantial weight and deference. Environmental Crimes Project v. EPA, 928 F. Supp. 1, 2 (D.D.C. 1995). However, where, as here, the Plaintiff does not reside in the chosen jurisdiction, and Defendant seeks to transfer the case

6

to Plaintiff's home forum, the traditional deference to a plaintiff's choice of forum is substantially lessened.  <u>Citizen Advocates for Responsible Expansion v. Dole</u>, 561 F. Supp. 1238, 1239 (D.D.C. 1983).

The parties very much dispute whether the convenience of the parties and witnesses will be served by trying this case in the District of Columbia or Nebraska.   There is no question that Plaintiff's reservation is located within the District of Nebraska, that all the gaming activities in question are also located there, and that both sides have experienced and knowledgeable counsel in both jurisdictions.   Therefore, the Court does not find that the convenience of counsel and parties is a factor that is persuasive one way or the other.

If witnesses are required to testify, then it is clear that the witnesses reside in or near the State of Nebraska and their convenience would be served by litigating the case there.  However, Plaintiff maintains that this case is solely an administrative appeal from a final determination of the NIGC pursuant to the APA and, therefore, only the administrative record will be placed in the evidence.  On the record as it stands now, this appears to be the case.  If so, there would be no inconvenience to Defendant, who is located in Washington, D.C., in litigating the summary judgment motions here rather than in the District Court in Nebraska.

However, there are three compelling reasons which fully justify transferring the case to the District Court in Nebraska.

First, the Defendant is correct that the interests of justice

7

will best be served by transferring the case to the District Court
in Nebraska.    As the Supreme Court explained in applying the
doctrine of forum non conveniens in Gulf Oil v. Gilbert, 330 U.S.
501, 509 (1947):

> In cases which touch the affairs of many persons, there
> is reason for holding the trial [or motions hearing] in
> their view and reach rather than in remote parts of the
> country where they can learn of it by report only.    There
> is a local interest in having localized controversies
> decided at home.

While there is some truth to Plaintiff's argument that in this
day of computers and virtually instantaneous communications,
Gilbert is far less persuasive than it was fifty years ago.
However, the federal courts do not allow cameras or tape recorders
in courtrooms, there is intense local interest in this controversy,
and there is a significant benefit to allowing those whose lives
will be most immediately affected by the outcome of litigation, as
well as the local media, to physically attend the proceedings which
will determine that outcome.    There is no substitute for personally
observing, watching and evaluating the judge who presides, hearing
the quality of the arguments, and getting a first-hand impression
of whether the proceeding is being handled with the appropriate
fairness and seriousness.    Furthermore, the members of this
District Court have repeatedly honored this principle by
transferring cases involving Indian gaming controversies back to
the state in which the controversy and the gaming were located.
See Towns of Ledyard, N. Stonington, and Preston, Conn. v. United
States, Civ. No. 95-0880, slip op. at 4-5 (D.D.C. May 31, 1995);
Apache Tribe of the Mescalero Reservation v. Reno, Civ. No. 96-115,

slip op. (D.D.C. Feb. 5, 1996); <u>Cheyenne-Arapaho Tribe of Okla. v. Reno</u>, Civ. No. 98-065, slip op. (D.D.C. Sept. 8, 1998); and <u>Citizen Advocates for Responsible Expansion, Inc. v. Dole</u>, 561 F. Supp. 1238, 1240 (D.D.C. 1983).

Second, transfer of this case will avoid the waste of judicial resources and the very real possibility of inconsistent results. There is no question that Chief Judge Cambridge, who has presided over this litigation for close to three years, is intimately familiar with the facts, the extensive procedural history, and the applicable law. Obviously, it would be a waste of the parties' time and energy as well as of precious judicial resources to litigate a closely related case before a newly assigned judge, as opposed to Chief Judge Cambridge.

Third, and most persuasive of all, it is perfectly clear that Plaintiff is attempting to forum-shop and avoid the consequences of having lost its case before the Eighth Circuit after having raised the same Constitutional arguments which it raises here. That court squarely rejected these arguments:

> The Tribe argues that because of the Supreme Court's determination in <u>Seminole Tribe</u> that, Congress was not empowered to authorize lawsuits by Indian tribes against states that fail to negotiate in good faith for a tribal-state compact, all provisions of the IGRA are unconstitutional. We decline to address this argument given our conclusion that, under the IGRA, the State is not required to negotiate for gambling that is illegal under Nebraska law. . . . As we already have determined, the class III gambling activities in which the Tribe is engaged are illegal under Nebraska law, ruling out any duty on the part of the State to negotiate a compact with the Tribe for such gambling. <u>United States v. Santee Sioux Tribe of Nebraska</u>, 135 F.2d at 565-566.

9

Thus, Plaintiff is asking this Court to render a ruling which would squarely conflict with the ruling of the Eighth Circuit. That was not the intent of the drafters of Section 1404(a):

> The transfer provisions in the U.S. Code, which grew out of the common law doctrine of forum non conveniens, were in part intended to prevent forum shopping. <u>Cheeseman v. Carey</u>, 485 F. Supp. 203, 214-214 (S.D.N.Y. 1980). This Court cannot find that it is in the interest of justice to encourage, or even allow, a plaintiff to select one district exclusively or primarily to obtain or avoid specific precedents, particularly in circumstances such as these where the relevant law is unsettled and the choice of forum may well dictate the outcome of the case. <u>Schmid Lab., Inc. v. Hartford Accident and Indem. Co.,</u> 654 F. Supp. 734, 737 (D.D.C. 1986).

For all the foregoing reasons, the Defendant's Motion to Transfer is granted.


April 16, 1999
Date

Gladys Kessler
United States District Court Judge


10

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

**SEP – 9 1998**

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

CHEYENNE-ARAPAHO TRIBE
OF OKLAHOMA,
ET AL.,

        Plaintiffs,

        v.

JANET RENO, ATTORNEY GENERAL
OF THE UNITED STATES,
DEPARTMENT OF JUSTICE,
ET AL.,

        Defendants.

Civil Action No.:98-CV-065 (RMU)

Document Nos.: 2, 6, 15, 17, 18, 19, 21
28, 31 & 32

## O R D E R

**Granting The Defendants' Motion to Transfer**

This matter comes before the court on the defendants' motion to transfer this action to the United States District Court for the Northern District of Oklahoma. Upon consideration of the parties' submissions and the entire record, the court grants the defendants' motion to transfer. The convenience of the parties and potential witnesses in addition to the interests of justice dictate that the action be litigated in Oklahoma.

## I. BACKGROUND

The plaintiffs[1] reside in the state of Oklahoma and operate gambling casinos on Indian lands. The plaintiffs operate various types of gambling devices including the MegaMania machine, which is the subject of the present action. On December 30, 1997, the United States

---

[1]     The plaintiffs in this case include the Cheyene-Arapaho Tribe of Oklahoma Gaming Commission, which filed suit on behalf of the Cheyene-Arapaho Tribe of Oklahoma, the Chickasaw Nation of Oklahoma, and The Choctaw Nation of Oklahoma.

**EXHIBIT B**

Attorney for the Northern District of Oklahoma ("U.S. Attorney") obtained warrants to seize approximately 285 MegaMania gambling devices and related equipment located on Indian lands in the Northern and Eastern Districts of Oklahoma. The next day, the U.S. Attorney filed a complaint for forfeiture *in rem* against the plaintiffs ("the Enforcement Action") to seize the MegaMania gambling devices and related equipment. The seizure of the equipment was spurred by a finding by Senior District Judge H. Dale Cook and Magistrate Judge Payne in the Northern District of Oklahoma that there is probable cause to believe that the MegaMania machine is an illegal class III gambling device under the Johnson Act, 15 U.S.C. §§ 1171-1178.

On January 5, 1998, Multimedia, the maker of the MegaMania machine, and the Seneca-Cayuga Tribe of Oklahoma filed an action in the U.S. District Court for the Northern District of Oklahoma ("Oklahoma Action") seeking: (1) declaratory judgment that the MegaMania is a permissible Class II gaming device; and (2) a stay of enforcement activity during the pendency of the lawsuit. Subsequently, on January 12, 1998, the plaintiffs filed a declaratory judgment action in this court ("D.C. Action") requesting similar relief as in the Oklahoma Action. Then, on January 15, 1998, Judge Kern consolidated the Oklahoma action into the Enforcement Action. At present, the defendants seek to transfer this action to the Northern District of Oklahoma claiming that the profound public interest in Oklahoma regarding the classification of the MegaMania machine, the convenience of the parties and witnesses, and the interests of justice warrant such a transfer.

## II. DISCUSSION

The defendants seek to transfer this case to the Northern District of Oklahoma pursuant to 28 U.S.C. § 1404(a), which provides that a district court may transfer any civil action to any other district or division where it may have been brought for the convenience of the parties and witnesses and for the interests of justice. The defendants bear the burden of establishing that the transfer of the action is proper. See Airline Pilots Ass'n v. Eastern Air Lines, 672 F. Supp. 525, 526 (D.D.C. 1987). Section 1404(a) vests the court broad discretion to adjudicate motions to transfer on a case-by-case basis. See Van Dusen v. Barrack, 376 U.S. 612, 622 (1964). Thus, a threshold determination under § 1404(a) is whether the action may have been brought in Oklahoma.

The venue statute, 28 U.S.C. § 1391(e), states that venue is proper in the judicial district in which a substantial part of the events giving rise to the claim occurred, or where a substantial part of property that is the subject of the action is situated. Here, venue could be proper in Oklahoma because the case involves governmental action that will impact the tribe's gambling operation in that state. See Martin-Trigona v. Meister, 668 F. Supp. 1, 4 (D.D.C. 1987). Furthermore, the events giving rise to this controversy occurred in Oklahoma and the property affected is also located there. Thus, under § 1391, venue is proper in the Northern District of Oklahoma.

Next, the court determines whether the case should be transferred based on the convenience of the parties and witnesses and the interests of justice. Of course, deference should be given to the plaintiffs' choice of forum. See Air Line Pilots Ass'n, 672 F. Supp. at 526. The court, however, may give the plaintiffs' choice of forum significantly less deference if the activities surrounding the controversy have little, if any, contact with the selected forum. See Armco Steel Co., L.P. v. CSX Corp., 790 F. Supp. 311, 324 (D.D.C. 1991); see also Martin-Trigona, 668 F. Supp. at 3. In the instant case, the plaintiffs are citizens domiciled in the State of Oklahoma and the MegaMania machines at issue are similarly located in Oklahoma. The Multimedia corporation, the maker of the MegaMania devices, has its headquarters in Tulsa, Oklahoma. All the individuals associated with the MegaMania machines and the records pertaining thereto are located in Oklahoma. The U.S. Attorney's office that filed the enforcement action is also located in Oklahoma. Moreover, a consolidated case with identical issues as the present action is currently pending in the Northern District of Oklahoma. Thus, these facts compel a determination that a transfer of venue is appropriate.

The plaintiffs, however, argue that this case should be litigated in this jurisdiction because the U.S. Department of Justice ("DOJ") and the National Indian Gaming Commission ("NIGC"), the government agency charged with regulating Indian gaming, both have their headquarters in Washington, D.C. This argument is unpersuasive. Under § 1404(a), the court accords insignificant, if any weight, to the location of federal agencies and counsel. See e.g., Armco Steel Co., 790 F. Supp. at 324. The significance here is the location of potential non-party witnesses and the events that form the basis of this controversy, the majority of which are located in

3

Oklahoma. Therefore, for the convenience of the parties and the potential witnesses, this action should be transferred to Oklahoma.

The court further concludes that the interests of justice favor the transfer of this case to Oklahoma. The interests of justice are furthered by avoiding unnecessary expense to the public through duplicative use of judicial resources. See Continental Grain Co. v. Barge, FBL-585, 364 U.S. 19, 26 (1960). See Also Martin-Trigona, 668 F. Supp. at 3 (the interests of justice are better served when a case is transferred to the district where related actions are pending). As mentioned above, a consolidated action involving the same issues in the present action, the classification of the MegaMania machines, is currently pending in the Northern District of Oklahoma. The DOJ is a party in both the present action and in the current litigation in Oklahoma. Therefore, this action must be transferred to the Northern District of Oklahoma in order to avoid inconsistent judgments or duplicative litigation.

In addition, the interests of justice are promoted when a localized controversy is resolved locally where concerned citizens may closely follow the proceedings. See Citizen Advocates For Responsible Expansion, Inc. v. Dole, 561 F. Supp. 1238, 1240 (D.D.C. 1983). In cases that touch the affairs of many people, there are reasons for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. See Gulf Oil v. Gilbert, 330 U.S. 501, 509 (1947). The issues surrounding the classification of the MegaMania machines affect Indian tribes that operate casinos and companies that manufacture gambling devices within the state. Therefore, it is clear that the interests of justice will be better served if the resolution of this case occurs in Oklahoma.

Next, the plaintiffs argue that if the case is litigated in this jurisdiction, where the DOJ has its national headquarters, the DOJ will be bound by the judgment nationwide. This argument is meritless. Under the doctrine of offensive and defensive collateral estoppel, both parties are bound by the final judgment of a case regardless of where the case is tried. See Parklane Hosiery Co. v. Shore, 439 U.S. 322, 329-31 (1979). Therefore, both parties are estopped from resurrecting identical issues in another jurisdiction. See id. In fact, contrary to the plaintiffs' assertion, as discussed above, the interests of justice are better served if the action is litigated in Oklahoma.

4

Finally, the plaintiffs argue that it would serve the interests of justice to litigate the action before this court because the court has familiarity with the MegaMania gaming device. This argument is similarly without merit. Although the court had exposure to the MegaMania device when it entertained evidentiary presentations in <u>Diamond Game Enterprises v. Janet Reno</u>, - - F. Supp. --, 1998 WL 345041 (D.D.C. June 23, 1998), the court may require additional evidentiary and oral hearings to fashion an informed opinion on the classification of the MegaMania device. Furthermore, the plaintiffs fail to explain why another federal judge in Oklahoma would be unable to determine the classification of the MegaMania gaming device even when that judge does not have previous knowledge of the device. In short, the court finds that the plaintiffs fail to demonstrate the interests of justice are better served by litigating this action in the District of Columbia. Therefore, the court transfers the above-captioned action to the U.S. District Court for the Northern District of Oklahoma.

Accordingly, it is this 8th day of September, 1998,

ORDERED that the defendants' motion to transfer the above-captioned action to the U.S. District Court for the District of Oklahoma be and is hereby **GRANTED**; it is

FURTHER ORDERED that the defendants' motion for leave to file a supplement to the motion to transfer be and is hereby **GRANTED** nunc pro tunc; it is

ORDERED that the defendants' motion for leave to file amended reply in support of defendants' motion to transfer be and is hereby **GRANTED** nunc pro tunc; it is

FURTHER ORDERED that the motion to intervene filed by Viejas (Baron Long) Group of Capitan Grande Band of Mission Indians of the Viejas Reservation ("the Viejas Group") be and is hereby **DENIED** without prejudice. The Viejas Group may resurrect its motion to intervene consistent with the order of the transferee court; it is

ORDERED that the Viejas Group's motion for leave to file plaintiffs' supplemental opposition to defendants' motion to dismiss be and is hereby **DENIED** without prejudice; it is

FURTHER ORDERED that the motion to intervene filed by the Cabazon Band of Mission be and is hereby **DENIED** without prejudice. The Cabazon Band may resurrect its motion to intervene consistent without the order of the transferee court; it is

5

**ORDERED** that the motion to intervene filed by Shoalwater Indian Tribe be and is hereby **DENIED** without prejudice. The Shoalwater Indian Tribe may resurrect its motion to intervene consistent with the order of the transferred court; it is

**FURTHER ORDERED** that the Shoalwater Indian Tribe's motion for leave to file memorandum in opposition to defendant's motion to transfer be and is hereby **DENIED** without prejudice; it is

**ORDERED** that the defendants' motion to stay proceedings be and is hereby **DENIED** as moot; and it is

**FURTHER ORDERED** that the defendants' motion for a protective order be and is hereby **DENIED** without prejudice. The defendants' may resurrect this motion with the transferee court.

**SO ORDERED.**

Ricardo M. Urbina
United States District Judge

6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

The Apache Tribe of the Mescalero          :
Reservation,                               :
               Plaintiff,          :          Civil Action No.: 96-115
                                    :
        v.          :
                                      :
Janet Reno, Attorney General, Bruce        :          Document No.:
Babbitt, Secretary of the Interior,        :
               Defendants.          :

Order

**Denying Plaintiff's Motion for a Temporary Restraining Order and Granting Defendants'
Motion to Transfer**

This matter comes before the court upon plaintiff's motion for a temporary restraining

order and defendants' opposition thereto; defendants' motion to transfer this action to the United

States District Court for the District of New Mexico; and plaintiff's opposition thereto.  After

careful consideration of the pleadings and the entire record herein, the court concludes that a

temporary restraining order shall not be imposed because the movant has failed to establish that

it will suffer irreparable injury; or that the public interest will be furthered by the granting of

injunctive relief.  Accordingly, plaintiff's motion for a temporary restraining order is denied.

    In addition, the court concludes that defendants' motion to transfer shall be granted

because the present action could have been brought in New Mexico and the interests of the

parties and of potential witnesses; as well as the interest of justice dictate that the action be heard

in that forum.

**EXHIBIT C**

## I. Background

Plaintiff, the Apache Tribe of the Mescalero Reservation ("Tribe"), resides in the state of New Mexico. The tribe operates the Casino Apache, a gambling enterprise located within the reservation. The Tribe owns and operates various types of gambling equipment. The casino and the gambling equipment are the subject of the present action. According to the tribe it is legally conducting gambling activities pursuant to a compact, it and other tribes reached with the Governor of New Mexico, Gary Johnson and subsequently approved by the Secretary of the Interior. This compact, however, was found to have no legal effect as a matter of state law by the New Mexico Supreme Court. State ex rel. Clark v. Johnson, 904 P.2d 11 (1995). That Court also found that all electronic gaming devices, slot machines and casino-style gaming are unlawful in the state of New Mexico. Citation Bingo, Ltd. v. Otten, No. 22,736 (N.M. Nov. 29, 1005). As a result, in December 1995, the United States Attorney for the District of New Mexico, advised ten New Mexico Tribes, that the gambling activities they were conducting were illegal in the state of New Mexico and were not the proper subject of a compact and thus in violation of federal criminal law.

The United States Attorney then advised the tribes, including plaintiff, that if they did not cease their gambling operations withing thirty days, complaints in civil forfeiture would be filed against them. As a result, nine of the tribes filed suit in New Mexico against the present defendants as well as the United States Attorney for the District of New Mexico and the United States. The parties in that suit reached a stipulation in which the Tribes agreed to close their casinos if the court in New Mexico found their enterprises to be illegal. The United States Attorney agreed not to initiate any criminal proceedings or forfeiture actions against the Tribes. Plaintiff, however, is not a party to the suit pending in New Mexico; it decided to proceed in this jurisdiction.

Plaintiff requests that the court issue a temporary restraining order that would prevent the defendants from taking any action which might interfere with plaintiff's gambling operation, including, but not limited to, the institution of any civil action to enjoin or to declare unlawful the Tribe's operation or to cause a forfeiture of any gambling device utilized in said operation.

2

Furthermore, the Tribe seeks to prevent the initiation of any criminal prosecution of any person associated with the Casino Apache.

## II. Discussion

### A. Temporary Restraining Order

A party seeking a temporary restraining order must establish that: (1) it has a substantial likelihood of succeeding on the merits; (2) it will suffer irreparable harm if the injunction is not granted; (3) other interested parties will not suffer substantial harm if the injunction is granted; and (4) the public interest will be furthered by the injunction. Sea Containers Ltd. v. Stena AB, 890 F.2d 1205, 1208 (D.C.Cir. 1989); see also Foundation on Economic Trends v. Heckler, 756 F.2d 143, 151 (D.C.Cir. 1985); Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C.Cir. 1977). After balancing the four factors, the court concludes that plaintiff has failed to establish that it will suffer irreparable harm if injunctive relief is not granted; or that the public interest will be furthered by the issuance of the temporary restraining order. The court finds it unnecessary to make explicit findings with respect to the other two elements since irreparable harm and the furtherance of a public interest have not been sufficiently established. The court notes, however, the substantial difficulty the plaintiff must overcome in order to succeed on the underlying merits of this case.

In order to establish irreparable harm justifying injunctive relief, a plaintiff must establish injury that is certain, great, and actual, not theoretical. Wisconsin Gas Co. v. Federal Energy Regulatory Commissions, 758 F.2d 669, 674 (D.C.Cir. 1985). The injury must be imminent, creating a "clear and present" need for equitable relief to prevent irreparable harm. Id. (internal citations omitted). Injunctive relief "will not be granted against something merely feared as liable to occur at some indefinite time." Connecticut v. Massachusetts, 282 U.S. 660, 674 (1931). Plaintiff must establish that the irreparable injury is likely to occur. The movant must therefore provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future. Wisconsin Gas. Co., 758

3

F.2d at 674. Finally, the plaintiff must show that the alleged harm will directly result from the action which he or she seeks to enjoin. Id. Plaintiff has not made the requisite showing.

It is clear from the pleadings submitted by the parties for the court's consideration that the only threatened action is the filing of a civil forfeiture complaint by the government. Thus, plaintiff's reference to the United States Attorney's intention to close the casino and to seek forfeiture of the Tribe's gambling devices is not dispositive since it must be evaluated in light of the fact that in order to carry out the threatened action, the government would have to avail itself of civil forfeiture procedures. There are adequate remedies in civil forfeiture of which the plaintiff can avail itself. "The basis for injunctive relief in the federal courts has always been irreparable harm *and* inadequacy of legal remedies." Sampson v. Murray, 415 U.S. 61, 88 (1974) (emphasis supplied). Moreover, the United States Attorney in New Mexico does not intend the immediate seizure of any gambling equipment machines.[1] Further, the defendants have represented in the pleadings that they do not intend to interfere in any way with the casino's operations prior to the entry of a judgment of forfeiture in the District of New Mexico. Consequently, the court fails to see any imminent and irreparable harm to the interests of the Tribe. Finally, since the court is granting defendant's motion to transfer this action to the United States District Court for the District of New Mexico, plaintiff is free to seek injunctive relief in that forum.[2]

---

[1]    Plaintiff requests that the court enjoin the defendants from instituting any criminal proceedings against any individual associated with Casino Apache. This is not an appropriate subject for the court to entertain. Newman v. United States, 382 F.2d 479, 480 (D.C.Cir. 1967); see also Shoshone-Bannok Tirbes v. Reno, 56 F.3d 1476, 1480 (D.C.Cir. 1995). Moreover, it is unlikely that any such proceedings will go forward prior to the court in New Mexico resolving the issue of the legality of the gambling operations.

[2]    Plaintiff's argument regarding the public interest is premised on its position vis-a-vis the alleged irreparable harm that is to occur if injunctive relief is not granted. Consequently, the court does not credit it for the same reasons that plaintiff's position on the irreparable harm prong of the standard for the granting of a temporary restraining order fails.

4

## B. Transfer

The defendants seek to transfer this case to the state of New Mexico pursuant to 28 U.S.C. § 1404 (a), which provides:

> For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

The defendants bear the burden of establishing that the transfer of this action is proper. Airline Pilots Ass'n v. Eastern Air Lines, 672 F.Supp. 525, 526 (D.D.C. 1987); Int'l Brotherhood of Painters & Allied Trades Union v. Best Painting & Sandblasting Co., 621 F.Supp. 906, 907 (D.D.C. 1985). Section 1404 (a) vests "discretion in the district court to adjudicate motions to transfer according to 'individualized, case-by-case consideration of convenience and fairness.'" Stewart Organizations, Inc. v. Ricoh Corp., 487 U.S. 22, 27 (1988) (quoting Van Dusen v. Barrack, 376 U.S. 612, 622 (1964)). The threshold determination under § 1404 (a) is whether the action might have been brought in New Mexico.

Plaintiff bases its claims on federal question jurisdiction, and venue is proper in New Mexico because the case involves governmental action that will impact the Tribe's gambling operation which is located there. See Martin-Trigona v. Meister, 668 F.Supp. 1, 4 (D.D.C. 1987). The venue statute, 28 U.S.C. § 1391 (e), holds that venue is proper in the "judicial district in which...a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." It is clear that the events giving rise to the claim have occurred in New Mexico and that the property being affected is similarly located there.

Accordingly, the court's inquiry proceeds to the issue of whether the case should be transferred based on the convenience of the parties, the convenience of the witnesses, and the interest of justice. The court is aware of the deference that should be given to plaintiff's choice of forum. Air Line Pilots Ass'n, 672 F.Supp. at 526 (internal citations omitted). However, the court is to give this factor significantly less deference when plaintiff files a law suit in a foreign forum, as plaintiff itself concedes. Martin-Trigona, 668 F.Supp. at 3. Plaintiff and its gambling

operation are located in New Mexico. All the individuals associated with the casino and the records pertaining thereto are located in New Mexico; the United States Attorney who is investigating the casino is also located there and any civil forfeiture actions will be brought in that jurisdiction. Plaintiff's reference to the fact that its lead counsel is located in the District of Columbia is immaterial. Under § 1404 (a), the court accords insignificant, if any, weight to the location of counsel. Armco Steel Co., L.P. v. CSX Corp., 790 F.Supp. 311, 324 (D.D.C. 1991). Consequently, for the convenience of the parties and the potential witnesses, this action should be transferred to New Mexico.

The court further concludes that the interest of justice favors the transfer of this case to New Mexico. As previously referenced above, an action is currently pending in New Mexico which involves the same issues of law as this action; the fundamental issue being the legality of casino gambling in New Mexico and the concomitant ability of ten Indian tribes to conduct gambling operations in that state.[3] The action in New Mexico involves the same defendants as those in this case. In addition, the two actions present similar factual backgrounds, claims and requests for relief. "A prime factor to be considered is whether the issues in both actions are substantially the same and whether their determination rests upon the same factual matters." National Union Fire Ins. v. R.H. Weber Exploration, 605 F.Supp. 1299, 1303 (S.D.N.Y. 1985). Further, any forfeiture proceeding, which plaintiff presently seeks to enjoin, would be undertaken by the prosecutorial authorities in New Mexico. Finally, the resolution of this dispute will involve, to a large extent, the interpretation of the law of New Mexico. Accordingly, if this case was transferred to New Mexico, it could be consolidated with the one currently pending there, thereby saving judicial resources and costs. See Continental Grain Co. v. FBI-585, 364 U.S. 19,

---

[3]    The plaintiff points out that in the case pending in New Mexico the plaintiff Tribes and the government entered into a stipulation that would prevent the latter from engaging in any action which would impede the operation of the plaintiffs' operations. Plaintiff refused to enter into this stipulation at its own prerogative. Accordingly, plaintiff's strategic decision to not enter into the agreement cannot serve as a basis for preventing the transfer of the case. Had it entered into the agreement, plaintiff would have been accorded exactly the same relief it now seeks in this jurisdiction.

26 (1960). Consolidation would also avoid the possibility of inconsistent results.

Moreover, the resolution of this controversy, which both sides acknowledge involve issues very important to the local community, will have an exclusively local effect. Thus,

> in cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having localized controversies decided at home.

Gulf Oil v. Gilbert, 330 U.S. 501, 509 (1947). The parties have both represented that the issues of gambling in New Mexico has produced intense interest among the people of that state. The citizens of New Mexico will be in a better position to observe the course of litigation which will intimately affect them at a more proximate and convenient forum.

Accordingly, it is this  5  of February 1996,

ORDERED that plaintiff's motion for a temporary restraining order be and is hereby denied; and it is

FURTHER ORDERED that defendants' motion to transfer this action to the United States District Court for the District of New Mexico be and is hereby granted.

SO ORDERED.

Ricardo M. Urbina
United States District Judge

Copies Sent To:

Phyllis A. Dow
AUSA
P.O. Box 607
Albuquerque, New Mexico 87103

7

AUG 2 6 2002

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LAC COURTE OREILLES BAND OF
LAKE SUPERIOR CHIPPEWA
INDIANS OF WISCONSIN, *et al.*,

    Plaintiffs,

    v.

UNITED STATES OF AMERICA, *et al.*,

    Defendants.

Civil Action No. 01-1042
HHK/DAR



FILED

AUG 1 6 2002

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

## MEMORANDUM ORDER

    This matter was referred to the undersigned for determination of federal defendants' and the State of Wisconsin and Governor Scott McCallum's Motions to Transfer (Docket Nos. 8 and 9). Plaintiffs filed their opposition (Docket No. 12) and replies in support of the motions to transfer were filed by the federal defendants (Docket No. 19) and by the State of Wisconsin and Governor Scott McCallum (Docket Nos. 17, 18). After consideration of the motions, the opposition and the replies thereto, and of the relevant case law, the undersigned will grant the motions to transfer.

## INTRODUCTION

    Plaintiffs, three Wisconsin Indian tribes ("Wisconsin Tribes"), filed the instant action in this Court for a declaratory judgment that the gubernatorial concurrence requirement in §20(b)(1)(A) of the Indian Gaming Regulatory Act, 25 U.S.C. §2719(b)(1)(A), is unconstitutional and a breach of trust by Congress, and seek a remand to the Secretary of the Interior requiring her to complete the trust application for the Wisconsin Tribes. This controversy stems from the administrative process used by the State of Wisconsin in deciding whether certain Indian tribes could open a casino on trust land in the state. In 1993, the Wisconsin Tribes submitted to the Bureau of Indian Affairs-Midwest Regional Office, an

**EXHIBIT D**

Lac Courte Oreilles Band, *et al.* v. United States of America, *et al.*                                    2

application for the acquisition and fee-to-trust transfer of the St. Croix Meadows Racing Facility located in Hudson, St. Croix County, Wisconsin. Defendant's Motion to Transfer at 3. The Midwest Regional Office reviewed the application and submitted a favorable recommendation to the BIA-Central Office on November 15, 1994. On July 14, 1995, the Deputy Assistant Secretary-Indian Affairs ("Deputy AS-IA") determined that the proposed gaming establishment would be detrimental to the surrounding community and raised additional concerns about the potential impact on the environment. Id. at 4. As a result, the Deputy AS-IA declined to exercise his discretion to take the land into trust. Id.

On September 15, 1995, the Wisconsin Tribes filed suit in the United States District Court for the Western District of Wisconsin challenging the Department's denial. In December, 1999, the parties entered a settlement agreement in which the court retained jurisdiction over the enforcement of the settlement. Id. at 5. Also in 1995, the Department agreed to vacate the denial of the application and resume consideration of the Wisconsin Tribes application. On January 25, 2001, the Deputy Commissioner of Indian Affairs for the BIA transmitted a favorable recommendation on Wisconsin Tribes' application to the Assistant Secretary of Indian Affairs. On February 20, 2001, the acting AS-IA issued a two-part determination and findings of fact which included the finding that the proposed gaming establishment was in the best interests of the Wisconsin Tribes and their members and not detrimental to the surrounding community. The acting AS-IA sought the concurrence of the Governor of Wisconsin ("Governor"); however, the Governor has since refused to concur in the determination. Id. at 6.

For the purposes of deciding the instant motions, it is not necessary to go into great detail about the intersection of the two statutes, 25 U.S.C. § 465 and §20 of 25 U.S.C. § 2719, that are at the heart of this constitutional challenge. The applicable administrative procedure requires that the Tribes obtain the concurrence of both the Secretary and the Governor of the Wisconsin in

Lac Courte Oreilles Band, *et al.* v. United States of America, *et al.*                                    3

order to construct a casino. The Wisconsin Tribes argue that the concurrence requirement is

unconstitutional.

The federal defendants request a transfer on the grounds that the Western District of

Wisconsin is a forum in which this action could have been brought; that convenience to the

parties and witnesses would be served by transferring the case; and that the interests of justice

would be served by avoiding the waste of judicial resources and the possibility of conflicting

results; and the specific claims brought here are of a local nature. See Federal Defendants'

Motion to Transfer at 7, 8,10-13.

The State of Wisconsin and Governor Scott McCallum have also requested that this

action be transferred to the Western District of Wisconsin. Their arguments are virtually

identical to those asserted by the federal defendants. They argue that the case could have been

brought in the Wisconsin; that plaintiffs' case has no nexus to the District of Columbia; that the

Western District of Wisconsin is convenient for the parties and the potential witnesses; and that

this controversy has a compelling local interest. See Memorandum in Support of Motion to

Transfer by the State of Wisconsin and Governor Scott McCallum at 8-10, 15.

Plaintiffs, in their opposition, contend that this suit is merely a facial challenge to a

statutory provision having national application; that it will require no witnesses, evidence, or

trial; and that this circuit has a unique familiarity with the legal issues at hand. See Plaintiffs'

Opposition to Motions to Transfer ("Opposition") at 1-2.

Both the federal defendants, and the State of Wisconsin and Governor Scott McCallum,

filed replies in support of the motions to transfer in which they argue that the impact of this case

is local in nature; the choice of forum by plaintiffs should be afforded little deference; this

district is no more capable of resolving this dispute than the Western District of Wisconsin; and

the inconvenience of the Wisconsin defendants of litigating this case in the District of Columbia

Lac Courte Oreilles Band, *et al.* v. United States of America, *et al.*                                        4

is much greater than that of the federal defendants who have already requested a transfer. See

Reply Memorandum in Support of Federal Defendants' Motion to Transfer at 1, 3 and 6; Reply

Memorandum in Support of Motion to Transfer by the State of Wisconsin and Governor Scott

McCallum at 1-2.


## DISCUSSION

A district court may transfer any civil action to any other district or division where the

action may have been brought if the transfer serves the convenience of the parties and witnesses,

and is in the interests of justice. See 28 U.S.C. §1401(a). The moving party bears a heavy

burden of establishing that plaintiff's choice of forum is inappropriate. Thayer/Patricof

Education Funding v. Pryor Resources, Inc., 196 F.Supp.2d 21, 31 (D.D.C. 2002). Additionally,

a court has broad discretion to determine where the proper balance lies and whether a case should

be transferred. Id. (citing Rhee Bros., Inc. v. Seoul Shik Poom, Inc., 869 F.Supp. 31, 33-34

(D.D.C. 1994)). Normally, the plaintiff's choice of forum is a paramount consideration in any

determination of a transfer request. Sheraton Operating Corp. v. Just Corporate Travel, 984

F.Supp. 22, 25 (D.D.C. 1997). However, the choice of forum is not afforded great deference

when the plaintiff is a foreigner to that forum. Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255-

256 (1981); see also Shapiro, Lifschitz & Schram, P.C. v. R.E. Hazard, Jr., 24 F.Supp.2d 66, 71

(D.D.C. 1998).

The parties do not dispute that the Western District of Wisconsin, the location of the land

at issue in this constitutional challenge, is a proper forum for the suit to be brought.

Consequently, the initial requisite in a motion to transfer is satisfied. 28 U.S.C. §1401(a). The

next two considerations require this court assess whether the transfer would serve the

convenience of the parties and witnesses and the interests of justice. Id. In making those

Lac Courte Oreilles Band, *et al.* v. United States of America, *et al.*                              5

assessments, courts in this circuit may consider a number of public and private interests

including: (1) the plaintiff's choice of forum, unless the balance of convenience is strongly in

favor of the defendants; (2) the defendant's choice of forum; (3) whether the claims arose

elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses, but only to

the extent that the witnesses may actually be unavailable for trial in one of the fora; (6) the ease

of access to sources of proof; (7) the transferee's familiarity with the governing laws; (8) the

relative congestion of the calendars of the potential transferee and transferor courts; and (9) the

local interest in deciding local controversies at home. Shapiro, 24 F.Supp. at 71 (citing Trout

Unlimited v. Dep't of Agric., 944 F.Supp. 13, 16 (D.D.C. 1996)).

      The consideration of the convenience to the parties and witnesses and the availability of

evidence does not yield a strong preference for either district. While it is true, as defendants

observe, that plaintiffs' home forum is in the State of Wisconsin, it also appears true, at this point

in the litigation, that there will be few, if any, witnesses to be called and little evidence to be

offered. Since the plaintiffs have chosen the District of Columbia, then their convenience is not

an issue. Since the federal defendants have offices within this district, they cannot reasonably

assert that this district is overly inconvenient for them. The State of Wisconsin and the Governor

will be inconvenienced to some extent if argument is required in this case. However, this

inconvenience is somewhat mitigated by their decision to intervene in this matter which had

already been filed in this district, and the likelihood that the case will be decided through written

motions and limited oral argument. Consequently, the convenience of the parties and witnesses,

and the availability of evidence, are not controlling considerations. However, the undersigned

must also take into account that if any witnesses are needed, those few witnesses are located in

Wisconsin.

Lac Courte Oreilles Band, *et al.* v. United States of America, *et al.*                                    6

  The final consideration requires the court to assess the issue of whether the transfer is in "the interests of justice." This concept gives all parties the opportunity to argue the relative benefits of having this litigation proceed in their forum of choice. 28 U.S.C. §1401(a). As previously discussed, it is the practice of the courts to grant great deference to the decision of the plaintiffs in their forum choice. This deference, however, holds less weight in this instance because the plaintiffs lack any connection to their forum of choice; they do not reside here; and the forum has no particular connection to the specific matter at hand. See Greater Yellowstone Coalition v. Bosworth, 180 F.Supp.2d 124, 128 (D.D.C. 2001)(citations omitted). Plaintiffs discuss at length the national significance of the claims presented here; however, federal jurisdiction is limited to cases and controversies, and this case concerns Indian tribes from Wisconsin claiming that the Governor of Wisconsin yields constitutionally impermissible power in deciding what development is permissible on land within the State of Wisconsin. The only connection to this forum happens to be that the law was passed by the United States Congress. This connection, however, is too attenuated to be given any meaningful effect; the consequence would be that all challenges to federal statutes would eventually be brought in the District of Columbia, because that is where the federal laws are passed. This result is clearly untenable.

  Having discussed the shortcomings in the traditional analysis of deferring to the choice of the plaintiffs, the Court must also consider whether any considerations counsel for transfer. As has been previously discussed, convenience does not seem to be a persuasive issue; however, since all of the parties either reside in or have offices in the State of Wisconsin, a transfer may be somewhat more convenient. Next, the public interest in having local issues decided locally can not be easily dismissed. See Armco Steel Co. v. CSX Corp., 790 F.Supp. 311, 324 (D.D.C. 1991). This public consideration counsels strongly in favor of transfer, especially when coupled with plaintiffs' lack of ties to their forum of choice. Another public consideration, that plaintiff

Lac Courte Oreilles Band, *et al.* v. United States of America, *et al.*                                    7

may be forum shopping, also counsels for transfer. Although the undersigned makes no finding

as to the issue of forum shopping, the court finds unpersuasive plaintiff's argument that this

district has developed a particular expertise in this area of the law, or necessarily would be any

more or less likely to find a federal statute unconstitutional.

In sum, the undersigned finds the private and public considerations and interests of justice

best served by transferring this case to the Western District of Wisconsin. Its local nature, and

the parties' ties to that community, dictate such a conclusion. Plaintiffs are unable to establish

any real ties to their forum of choice, other than their assumption that the chances of success are

greater here. Consequently, in this Court's discretion, the case should be transferred.

## CONCLUSION

It is, therefore, this 16th day of August, 2002,

**ORDERED** that Federal Defendants' Motion to Transfer (Docket No. 8), and the State

of Wisconsin and Governor Scott McCallum Motion to Transfer (Docket No. 9), are

**GRANTED**, and that this action is hereby transferred to the United States District Court for the

Western District of Wisconsin.

DEBORAH A. ROBINSON
United States Magistrate Judge

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TOWNS OF LEDYARD, NORTH            )
STONINGTON, AND PRESTON,           )
CONNECTICUT,                       )
                                   )
            Plaintiffs,            )
                                   )
      v.                           )        Civ. No. 95-0880 (TAF)
                                   )
THE UNITED STATES OF AMERICA,      )
BRUCE BABBITT, Secretary of        )
the Department of Interior,        )
and ADA DEER, Assistant            )
Secretary of the Interior          )
Indian Affairs; FRANKLIN KEEL,     )
Acting Area Director for the       )
Eastern Area Office of the         )
Bureau of Indian Affairs,          )
                                   )
            Defendants.            )

MAY 31 1995

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

## MEMORANDUM OPINION

In this action, plaintiffs, three towns in the state of
Connecticut (hereinafter, the "Towns"), challenge a May 1,
1995 decision by the Secretary of the Interior (hereinafter,
the "Secretary") to take into trust for the benefit of the
Mashantucket Pequot Tribe (hereinafter, the "Tribe")
approximately 248 acres that the Tribe had previously
acquired in fee. Pending before the Court is the defendants'
motion to transfer the case to the federal court in
Connecticut pursuant to 28 U.S.C. § 1404(a). Upon
consideration of the defendants' motion, the plaintiffs'
opposition, and the defendants' reply, and after oral
argument held on May 26, 1995, the Court grants the
defendants' motion.

**EXHIBIT E**

I.   Background

The land which is the subject of this dispute is near the Tribe's Reservation and its Foxwoods Casino. The Tribe intends to develop the property for the purpose of facilitating access to and expanding its gaming operations. The Towns opposed the Tribe's trust acquisition application, citing, among other procedural inadequacies, the Secretary's failure to prepare an environmental impact statement to assess the environmental impact of the Tribe's development plans. The Towns also contend the request violates federal statutes governing trust applications generally and the Mashantucket Pequot Tribe specifically.

On May 11, 1995, the Towns filed the Complaint in this case, seeking injunctive and declaratory relief. Just over five hours later, the state of Connecticut filed in Connecticut federal court a Complaint for declaratory and injunctive relief against the Secretary. State of Connecticut ex rel. Blumenthal v. Babbitt, Secretary of the Interior, Civil Action No. 395 CV00849(TFGD). Plaintiffs in both cases seek to enjoin the Secretary from taking the subject land into trust for the benefit of the Tribe.

Shortly after the Secretary announced his decision to acquire the land in trust, counsel for the Towns contacted counsel for defendants to notify defendants of the Towns' intention to seek a temporary restraining order. Defendants' counsel agreed the Secretary would delay taking the land

until a court rules on a preliminary injunction, and the parties negotiated a briefing in schedule. Pursuant to that schedule, the Towns filed a motion for preliminary injunction on May 22, 1995. Four days earlier, on May 18, 1995, the defendants filed the instant motion to transfer.

II. **Discussion**

The defendants seek transfer of this case to Connecticut pursuant to 28 U.S.C. § 1404(a), which provides:

> For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

28 U.S.C. § 1404(a). The parties do not dispute the threshold determination under § 1404(a) -- whether the action "might have been brought" in Connecticut. The plaintiffs base their claims on federal question jurisdiction, see Martin-Trigona v. Meister, 668 F. Supp. 1, 4 (D.D.C. 1987), and venue is proper in Connecticut because the case involves agency action impacting land located there. See 28 U.S.C. § 1391(e)(venue is proper in the "judicial district in which . . . a substantial part of property that is the subject of the action is situated"). Thus, under § 1404(a), whether the case is appropriately transferred depends on the convenience of the parties, the convenience of the witnesses, and the interests of justice. The burden of establishing that a case should be transferred in on the movant. Int'l Brotherhood of Painters & Allied Trades Union v. Best Painting &

5-31-95 12:52

2027245834

1995 WL 908244

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TOWNS OF LEDYARD, NORTH )
STONINGTON, AND PRESTON, )
CONNECTICUT, )
                                        )
            Plaintiffs,                 )
                                        )
        v.                              )    Civ. No. 95-0880 (TAF)
                                        )
THE UNITED STATES OF AMERICA, )
BRUCE BABBITT, Secretary of )
the Department of Interior, )
and ADA DEER, Assistant )
Secretary of the Interior )
Indian Affairs; FRANKLIN KEEL, )
Acting Area Director for the )
Eastern Area Office of the )
Bureau of Indian Affairs, )
                                        )
            Defendants.                 )
_____)

### ORDER

Upon consideration of the defendants' motion to transfer, the plaintiffs' opposition thereto, and the defendants' reply, and after oral argument held on May 26, 1995, it is by the Court this 31st day of May, 1995, hereby

ORDERED, that the defendants' motion is GRANTED, and that this case be transferred to the United States District Court for the District of Connecticut.

_____
UNITED STATES DISTRICT JUDGE

Sandblasting Co., 621 F. Supp. 906, 907 (D.D.C. 1985).

The parties vigorously dispute, and the Court is unable to say with certainty, whether the case would be most conveniently tried in Connecticut. Plaintiffs are located in Connecticut, while defendants are located in Washington, D.C.; potential witnesses are located in both the Washington, D.C. area and Connecticut; and the administrative record, already provided by the defendants, is equally accessible here and in Connecticut.[1]

The Court finds, however, that the interest of justice overwhelmingly favors transfer of this case to Connecticut. The action here and that in Connecticut seek review of the same administrative decision and present similar claims and demands for relief.    If this case were transferred to Connecticut, the cases could be consolidated, thus saving expense to the public and avoiding the duplicative use of judicial resources.[2]   See Continental Grain Co. v. FBL-585, 364 U.S. 20, 26 (1960)("a situation in which two cases involving precisely the same issues are simultaneously

_____

[1]Plaintiffs' argument that convenience actually favors litigating this matter here because counsel for both parties are located in this area is unpersuasive. Location of counsel carries little, if any, weight under § 1404(a) analysis. See, e.g., Armco Steel Co., L.P. v. CSX Corp., 790 F. Supp. 311, 324 (D.D.C. 1991). Likewise, plaintiffs' asserted need to hire local counsel in Connecticut merits little consideration.    See Paul v. Int'l Precision Metals Corp., 613 F. Supp. 174, 180 (D. Miss. 1983); Poncy v. Johnson & Johnson, 414 F. Supp. 531 (S.D. Fla. 1976).

[2]Defendants state they intend to seek to have the cases consolidated.

4

pending in different District Courts leads to the
wastefulness of time, energy and money that §1404(a) was
designed to prevent"). See also Martin-Trigona, 668 F. Supp.
at 3 ("The interests of justice are better served when a case
is transferred to the district where related actions are
pending"). Not only would consolidation conserve judicial
resources, but it would avoid the possibility of inconsistent
results, which would further complicate matters and require
the expenditure of even more time and money.

In addition, although this case has national
significance in that it involves, as the plaintiffs put it,
"the intersection of national policies regarding Indians and
national environmental policies," it is also a controversy
the resolution of which will have an indisputably local
effect. The interests of justice are promoted when a
localized controversy is resolved locally where concerned
citizens may closely follow the proceedings. As the Supreme
Court has explained in applying the doctrine of forum non
conveniens:

> In cases which touch the affairs of many
> persons, there is reason for holding the
> trial in their view and reach rather
> than in remote parts of the country
> where they can learn of it by report
> only. There is a local interest in
> having localized controversies decided
> at home.

Gulf Oil v. Gilbert, 330 U.S. 501, 509 (1947). See also
Citizen Advocates for Responsible Expansion ("I-Care") v.
Dole, 561 F. Supp. 1238, 1240 (D.D.C. 1983)(transfer

appropriate where matter was of great controversy in Ft.
Worth, Texas).    The subject of this case has generated
intense controversy among individuals residing near the
affected area in Connecticut.   If the case were transferred
to Connecticut, the citizens of the towns would have greater
access to the proceedings than if the case were litigated
here.    This is true, even considering, as the plaintiffs
urge, the citizens' access to news reports in the event the
case were tried here.[3]

Notwithstanding these considerations, the plaintiffs
argue transfer in this case is inappropriate under the
"first-filed" rule, which provides that, absent special
circumstances, where identical or even similar cases are
filed in different jurisdictions, the case which was filed
first takes priority over the later case.   See City of New
York v. Exxon Corp., 932 F. 2d 1020, 1025 (2d Cir. 1991).
Thus, plaintiffs submit, because this case was filed over 5
hours before the case in Connecticut, it is that case which
must be transferred to this court, rather than vice-versa.

The plaintiffs' argument is without merit.   First, as
defendants correctly note, the D.C. Circuit has rejected a
mechanical application of the first-filed rule, instead
noting the significance of "equitable considerations relevant

---

[3]The Court finds unpersuasive the plaintiffs' argument that
because the federal courthouse in Connecticut is 80 miles from the
Foxwoods Casino, the citizens of the Towns will be forced to rely
on the media in any event.

6

to the ends of justice." Columbia Plaza Corp. v. Security
Nat. Bank, 525 F. 2d 620, 627 (D.C. Cir. 1975), quoting
Polaroid Corp. v. Casselman, 213 F. Supp. 379, 381 (S.D.N.Y.
1962). The interests of justice discussed above clearly
militate against application of the rule, particularly where,
as here, the time period between the filing of the two suits
is only a matter of hours.

Plaintiffs also argue that transfer of this case is
inappropriate, because defendants had already agreed to
litigate this matter in Connecticut in accordance with the
parties' negotiated briefing schedule. The Court finds no
evidence of any agreement to litigate this matter in
Connecticut federal court. Rather, the defendants simply
promised to delay taking the subject lands into trust until
"a Court's denial [of] the motion for preliminary
injunction." Def's. Exh. A (emphasis added).

Finally, the plaintiffs argue that a plaintiff's choice
of forum is ordinarily accorded substantial deference, and
for that reason, the case should remain in this Court. See
Best Painting, 621 F. Supp. at 907. See also Air Line Pilots
Ass'n v. Eastern Air Lines, 672 F. Supp. 525, 526 (D.D.C.
1987) (plaintiff's choice of forum to be given "paramount
consideration"). However, as defendants point out, such
deference is not owed where, as here, plaintiffs file suit in
a foreign forum. Piper Aircraft Co. v. Reyno, 454 U.S. 235,
256 (1981); Martin-Trigona, 668 F. Supp. 1; Oudes v. Block,

516 F. Supp. 13 (D.D.C. 1981).

III. Conclusion

The Court finds that although the convenience of the parties and the witnesses do not strongly favor litigating this matter in Connecticut, that the interest of justice clearly does. Thus, the Court declines to apply the "first-filed" rule. In addition, the Court finds that transfer of this case does not violate any prior venue agreement negotiated by the parties. Accordingly, this case must be transferred to the United States District Court for the District of Connecticut. An appropriate Order accompanies this opinion.

UNITED STATES DISTRICT JUDGE

-8-

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TOWNS OF LEDYARD, NORTH            )
STONINGTON, AND PRESTON,           )
CONNECTICUT,                       )
                                   )
              Plaintiffs,          )        Civ. No. 95-0880 (TAF)
                                   )
         v.                        )
                                   )
THE UNITED STATES OF AMERICA,      )
BRUCE BABBITT, Secretary of        )              **FILED**
the Department of Interior,        )
and ADA DEER, Assistant            )            MAY 3 1 1995
Secretary of the Interior          )
Indian Affairs; FRANKLIN KEEL,)          CLERK, U.S. DISTRICT COURT
Acting Area Director for the       )         DISTRICT OF COLUMBIA
Eastern Area Office of the         )
Bureau of Indian Affairs,          )
                                   )
              Defendants.          )
_____)

**ERRATA**

In the Memorandum Opinion filed this date in the above-
captioned case, in the first two sentences in the first full
paragraph on page 7, the Court inadvertently referred to the
state of Connecticut instead of to the District of Columbia.
The paragraph should instead state that "Plaintiffs also
argue. . .defendants had already agreed to litigate this
matter in the District of Columbia" and that "[t]he Court
finds no evidence of any agreement to litigate this matter in
District of Columbia federal court."


_____
UNITED STATES DISTRICT JUDGE

# Exhibit B

Record of Decision

Oneida Indian Nation of New York
Fee-to-Trust Request

U.S. Department of the Interior
Bureau of Indian Affairs
May 2008

**EXHIBIT F**

# U.S. DEPARTMENT OF THE INTERIOR

**AGENCY:**     Bureau of Indian Affairs

**ACTION:**     Record of Decision for the Oneida Indian Nation of New York's fee-to-trust request

**SUMMARY:**    The Oneida Indian Nation of New York ("Nation") submitted an application to the U.S. Department of the Interior, Bureau of Indian Affairs ("BIA"), requesting the Secretary of the Interior to acquire approximately 17,370 acres in trust for the Nation. The lands proposed for acquisition are located in Madison County and Oneida County, New York. The New York State Department of Environmental Conservation, Madison County, Oneida County, and the Nation are cooperating agencies for the preparation of the Environmental Impact Statement ("EIS") for this project. The Draft EIS was issued for public review on November 24, 2006, with a public comment period ending on January 8, 2007. The public comment period was enlarged to February 22, 2007. A public hearing was held in the City of Utica, New York, on December 14, 2006. An additional public hearing was held in the Town of Verona, New York, on February 6, 2007. The Final EIS, issued on February 22, 2008, analyzed the potential effects of acquiring the 17,370 acres in trust for the Nation and eight reasonable alternatives.

With the issuance of this Record of Decision, the Department announces that the action to be implemented is the acquisition of approximately 13,003.89 acres in trust for the Nation under the Preferred Alternative (Alternative I), as modified. This decision is based on the Department's review of the Draft EIS, the Final EIS, comments received from the public, Federal agencies, State agencies, local governmental entities, and potentially affected Indian tribes, and the applicable statutory and regulatory criteria for acquiring title to lands in trust status.

**FOR FURTHER INFORMATION CONTACT:**

James T. Kardatzke, Ph.D.
Branch Manager, Natural Resources
Bureau of Indian Affairs
Eastern Regional Office
545 Marriott Drive, Suite 700
Nashville, TN 37214
Phone (615) 564-6830
Fax (615) 564-6571

2

<u>**TABLE OF CONTENTS**</u>

**1.0   INTRODUCTION** ........................................................................................ 6
  **1.1   Summary** ................................................................................................. 6
  **1.2   Description of the Proposed Action** ....................................................... 8
  **1.3   Purpose and Need for Action** ................................................................ 8
  **1.4   Authorities** ............................................................................................. 8
  **1.5   Procedural Background** .......................................................................... 9
**2.0   DESCRIPTION OF ALTERNATIVES** ....................................................... 10
  **2.1   Alternatives Eliminated from Further Study** ......................................... 10
    *2.1.1   Negotiated Settlement Alternative* ....................................................... 11
    *2.1.2   Resolution of Land Claim Alternative* .................................................. 11
    *2.1.3   Legislative Solution Alternative* ........................................................... 11
    *2.1.4   Land Conveyance in Fee Status Alternative* ........................................ 12
    *2.1.5   Creation of a New York State Reservation or Trust Alternative* .......... 12
  **2.2   Reasonable Alternatives Considered in Detail** ..................................... 13
    *2.2.1   Alternative A – Proposed Action* .......................................................... 14
    *2.2.2   Alternative B – Phased Acquisition of 35,000 Acres* ........................... 15
    *2.2.3   Alternative C – Group 1 and 2 Lands* .................................................. 15
    *2.2.4   Alternative D – Group 1 Lands* ............................................................ 16
    *2.2.5   Alternative E – Turning Stone Casino Gaming Floor Tax Lot* .............. 16
    *2.2.6   Alternative F – Alternate Trust Land Grouping* ................................... 16
    *2.2.7   Alternative G – No Action* .................................................................... 17
    *2.2.8   Alternative H – County Proposal* .......................................................... 17
    *2.2.9   Alternative I – Preferred Alternative* .................................................... 19
**3.0   ISSUES EVALUATED** ................................................................................ 20
  **3.1   Issues Raised During Scoping and During Public Review of the Draft EIS** ............... 20
    *3.1.1   Jurisdictional and Land Use Impacts* .................................................. 20
      3.1.1.1   Analysis of Jurisdictional and Land Use Impacts ........................... 21
    *3.1.2   Socioeconomic Impacts* ....................................................................... 22
      3.1.2.1   Analysis of Socioeconomic Impacts ................................................ 23
    *3.1.3   Historic, Cultural, and Archaeological Resource Impacts* .................. 25
      3.1.3.1   Analysis of Historic, Cultural, and Archaeological Resource Impacts ...... 26
    *3.1.4   Cumulative Impacts* ............................................................................. 27
      3.1.4.1   Analysis of Cumulative Impacts ...................................................... 28
  **3.2   Issues Raised During the Waiting Period** ............................................. 29
**4.0   ENVIRONMENTALLY PREFERABLE ALTERNATIVE** ............................. 29
**5.0   DECISION TO IMPLEMENT THE PREFERRED ALTERNATIVE** ............. 30
**6.0   MITIGATION** .............................................................................................. 31
**7.0   DECISION TO ACQUIRE 13,003.89 ACRES IN TRUST** ......................... 31
  **7.1   25 C.F.R. § 151.3 – Land Acquisition Policy** ........................................ 32
  **7.2   25 C.F.R. § 151.10(a) – Statutory Authority for Acquisition** ................. 33
  **7.3   25 C.F.R. § 151.10(b) – Nation's Need for Land** ................................... 34
    *7.3.1   Nation's Need for Land in Trust Status* ............................................... 34
      7.3.1.1   Tribal Membership and Economic Status ........................................ 35
      7.3.1.2   Determination of Necessity .............................................................. 35

7.4    25 C.F.R. § 151.10(c) – Purposes for Which the Land Will be Used ...................... 39
7.5    25 C.F.R. § 151.10(e) – Impact on the State and Its Political Subdivisions Resulting
      from Removal of the Land from the Tax Rolls ............................................ 40
    *7.5.1    Analysis of Taxes Assessed and Payments Made* ...................................... 41
      7.5.1.1    Potential Tax Revenue Loss If Taxes are Not Due and Owing .... 41
        *7.5.1.1.1    Cities of Sherrill and Oneida* .................................42
        *7.5.1.1.2    Counties of Madison and Oneida* ..........................43
        *7.5.1.1.3    School Districts* ....................................................43
      7.5.1.2    Sales, Excise, and Hotel Taxes ........................................ 44
    *7.5.2    Potential Tax Revenue Loss If Taxes are Due and Owing* ...................... 45
    *7.5.3    Net Nation Financial Contributions to the State and Local Governments* ............. 47
      7.5.3.1    Net Payments:  Cost of Services Attributed to the Nation ............... 48
      7.5.3.2    Net Payments:  Loss of Property Tax Revenues ........................ 49
    *7.5.4    Taxability of the Turning Stone Casino* ........................................ 50
      7.5.4.1    Taxability under IGRA ............................................ 51
      7.5.4.2    Town of Verona's Valuation ........................................ 51
      7.5.4.3    Department's Valuation ............................................ 52
    *7.5.5    Bank Letters of Credit as Satisfaction of Tax Liens* ........................ 53
7.6    25 C.F.R. § 151.10(f) – Jurisdictional Problems and Potential Conflicts of Land Use
      That May Arise ............................................................................ 55
    *7.6.1    Characteristics of the Subject Lands* .......................................... 56
    *7.6.2    Jurisdiction and Land Management Prior to City of Sherrill and Currently* ......... 57
      7.6.2.1    Criminal Offenses and Civil Court Jurisdiction ................... 57
      7.6.2.2    Municipal Service and Cross-deputization Agreements .......... 57
      7.6.2.3    Intergovernmental Agreements With the Cities of Oneida and Sherrill .... 58
      7.6.2.4    Consistency of Nation Land Use With Local Land Use ............. 59
    *7.6.3    Potential Future Jurisdictional Problems and Conflicts of Land Use* ............... 60
      7.6.3.1    Potential Land Use Conflicts After Acquisition of the Subject Lands in Trust
        ........................................................................ 60
      7.6.3.2    Potential Jurisdictional Problems After Acquisition of the Subject Lands in
        Trust ................................................................. 60
        *7.6.3.2.1    Wetlands and Threatened and Endangered Species* .........61
        *7.6.3.2.2    Air* ...................................................62
        *7.6.3.2.3    Wildlife Protection and Conservation* ....................62
        *7.6.3.2.4    Water* ................................................62
        *7.6.3.2.5    Historic, Cultural, and Archaeological Resources* ..............63
        *7.6.3.2.6    Solid and Hazardous Wastes* .............................63
        *7.6.3.2.7    Petroleum Bulk Storage, Chemical Bulk Storage, and Spill Response* ......64
        *7.6.3.2.8    Oil and Gas* ...........................................64
        *7.6.3.2.9    Inactive Hazardous Waste Disposal Sites and Brownfields* ..........64
        *7.6.3.2.10  Pesticides* .............................................64
        *7.6.3.2.11  Transportation* .........................................65
        *7.6.3.2.12  Utilities and Infrastructure* ..............................65
      7.6.3.3    Protectiveness of Federal and Nation Requirements in Relation to State and
        Local Requirements ................................................. 66
      7.6.3.4    Governance and Management of Checkerboard Trust Lands ............ 68

7.7    **25 C.F.R. § 151.10(g) – Whether the BIA is Equipped to Discharge Additional Responsibilities Resulting from Acquisition of the Lands in Trust Status** ............... 69

7.8    **25 C.F.R. § 151.10(h) – The Extent of Information to Allow the Secretary to Comply With 516 DM 6, Appendix 4, National Environmental Policy Act Revised Implementing Procedures, and 602 DM 2, Land Acquisitions: Hazardous Substances Determinations** ........................................................................ 70

7.9    **Comments Received Under 25 C.F.R. § 151.10** ........................................... 70

    7.9.1    *Nation's Responses to Comments* ............................................................. 71

    7.9.2    *Comments of State, Local, and Other Tribal Governments* ..................... 71

8.0    **IMPLEMENTATION** ....................................................................................... 73

## 1.0    INTRODUCTION

### 1.1    Summary

This is the Record of Decision ("ROD") concerning the April 4, 2005 request of the Oneida Indian Nation of New York ("Nation") for the United States, through the Secretary of the Interior, to acquire title to real property in trust status for the Nation under authority of Section 5 of the Indian Reorganization Act of 1934 ("IRA"), codified at 25 U.S.C. § 465. The property is located in Madison County and Oneida County, New York, and is owned by the Nation. The Nation's land-into-trust request (an on-reservation, fee-to-trust request) includes 330 parcels, or 440 tax lots, totaling approximately 17,370 acres.

The Nation submitted its fee-to-trust request in response to the March 29, 2005 decision of the U.S. Supreme Court in *City of Sherrill v. Oneida Indian Nation of New York*, 544 U.S. 197 (2005). In *City of Sherrill*, the Supreme Court ruled that the Nation could not unilaterally assert tribal tax immunity to prevent a local government from assessing real property taxes on lands that the Nation re-acquired two centuries after they had last been possessed by the Oneidas. The Supreme Court instructed that the "proper avenue" for the Nation "to reestablish sovereign authority over" the lands is by a fee-to-trust application to the Secretary of the Interior pursuant to 25 U.S.C. § 465 and the Department's implementing regulations at 25 C.F.R. Part 151. *City of Sherrill*, 544 U.S. at 221.

The Nation's fee-to-trust request categorized the 17,370 acres into three groups, which are generally described as follows:

> **Group 1** lands comprise approximately 3,428 acres in Oneida County and are the location of the Nation's Turning Stone Resort & Casino, which includes a Class III casino under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701 *et seq.*, gaming-related amenities, five neighboring golf courses, and one SavOn gas station and convenience store.

> **Group 2** lands comprise approximately 6,475 acres in Madison County and Oneida County and are the location of Nation government, health, education, and cultural facilities and activities; member housing; hunting lands; and numerous non-gaming Nation enterprises, including 12 SavOn gas stations and convenience stores, a newspaper operation, three marinas, and agricultural operations.

> **Group 3** lands comprise approximately 7,467 acres in Madison County and Oneida County and are generally undeveloped, active and inactive agricultural lands.

The environmental, socioeconomic, and other impacts of the proposed trust acquisition were analyzed, in accordance with the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, in a Draft Environmental Impact Statement ("EIS") issued for public review on November 24, 2006. The public comment period ending on January 8, 2007 was extended 45 additional days to February 22, 2007. A public hearing was held in the City of Utica, New York, on December 14, 2006. An additional public hearing was held in the Town of

Verona, New York, on February 6, 2008. The Draft EIS and the Final EIS, which was issued for public review on February 22, 2008, considered nine alternatives for meeting the stated purpose and need for action.

The nine reasonable alternatives analyzed in detail in the Final EIS are:

> **Alternative A – Proposed Action (17,370 acres)**, which is the action proposed by the Nation to acquire all Group 1, 2, and 3 lands in trust.

> **Alternative B – Phased Acquisition of 35,000 Acres**, which is based on a land claim settlement framework between the Nation, the State of New York, and Madison and Oneida Counties that was announced by the State in 2002, but not ratified by the parties.

> **Alternative C – Group 1 and Group 2 lands (9,903 acres)**.

> **Alternative D – Group 1 lands (3,428 acres)**.

> **Alternative E – Turning Stone Casino Gaming Floor Tax Lot (225 acres)**.

> **Alternative F – Alternate Trust Land Grouping (11,986 acres)**, which includes all Group 1 lands and some Group 2 and Group 3 lands.

> **Alternative G – No Action (0 acres)**.

> **Alternative H – County Trust Land Alternative (1,026 acres)**, which includes 590 acres in Madison County (located adjacent to a 32-acre tract of Oneida reservation land that is not included in the Proposed Action) and 436 acres in Oneida County (including the Turning Stone Casino tax lot and adjacent lands) that the Counties proposed for acquisition subject to several conditions.

> **Alternative I – Preferred Alternative (13,086 acres)**, which includes all Group 1 lands and some Group 2 and Group 3 lands neighboring the Nation's 32-acre territory in Madison County ("Government-Cultural Grouping") or neighboring the Turning Stone Resort & Casino in Oneida County ("Casino-Resort Grouping").

With the issuance of this ROD, the Department announces its intent to acquire approximately 13,003.89 acres in trust status for the Nation. This decision implements the Preferred Alternative (Alternative I), excluding one parcel (Parcel 136) located in the Town of Stockbridge, Madison County, comprising 81.76 acres. A list of the parcels to be acquired in trust (hereinafter the "Subject Lands") is included in **Appendix A** to this ROD. The Department's final determination was reached after an individual parcel-by-parcel review and decision on the Nation's request based on the Department's analysis of the Nation's application under Section 5 of the IRA (25 U.S.C. § 465) and the land acquisition regulations at 25 C.F.R. Part 151, and based on its review of the Draft EIS, Final EIS, administrative record, and comments received from the public, Federal agencies, State agencies, local governmental entities, and potentially affected Indian tribes.

In rendering this determination, the Department understands that the Nation has no plans to convert any of the Subject Lands to gaming or gaming-related uses, except where the lands are already being used for those purposes (*i.e.*, the Turning Stone Resort & Casino).

## 1.2    Description of the Proposed Action

Under the Proposed Action, the Secretary would accept into trust approximately 17,370 acres located within the Oneida reservation as confirmed by the 1794 Treaty of Canandaigua, 7 Stat. 44. The lands proposed for conveyance comprise approximately 1.5% and 1.3% of the total acreage of Madison County and Oneida County, respectively.

The Nation intends to continue the existing uses of the lands and proposes no change in land use or ground-disturbing activity as part of the Proposed Action.

## 1.3    Purpose and Need for Action

The purpose of the Proposed Action is to help address the Nation's need for cultural and social preservation and expression, political self-determination, self-sufficiency, and economic growth by providing a tribal land base and homeland that:

- is subject to tribal sovereignty;
- allows for a diversified and productive economic base to support the Nation's financial integrity and the employment and financial well-being of its members;
- provides for the location of tribal government and administrative buildings, housing for Nation members, health and educational facilities, burial grounds, and lands for agricultural, hunting, fishing, recreational, cultural, and social activities;
- protects the Oneida historic and cultural sites under Oneida sovereignty and control;
- assures the preservation of a homeland for those Nation members located elsewhere in New York State and throughout the United States;
- is restricted against future alienation and is immune from New York State and local taxation and regulation unless otherwise provided under Federal law;
- enables application of Federal laws that pertain to lands held in trust; and
- permits further growth and consolidation of Nation lands.

## 1.4    Authorities

Section 5 of the IRA, codified at 25 U.S.C. § 465, provides the Secretary of the Interior with authority to acquire title to lands in the name of the United States in trust status for Indian tribes and individuals. The Department's land acquisition regulations implementing Section 5 of the IRA are codified at 25 C.F.R. Part 151. This ROD records the decision by the Secretary to acquire approximately 13,003.89 acres in trust for the Nation pursuant to these authorities.

The State of New York and others questioned whether further State approval of Class III gaming at the Turning Stone Resort & Casino is necessary before the Department may issue this ROD. Since 1993, the Nation has been lawfully conducting Class III gaming at Turning Stone under

8

IGRA. The casino is situated within the Oneida reservation on Indian lands as required by IGRA. *See* 25 U.S.C. § 2703(4). The casino has been operating pursuant to a gaming compact between the State and the Nation that was approved by the Department in 1993 and that remains in effect. *See* BIA, *Notice of Approved Nation-State Compact*, 58 Fed. Reg. 33160 (June 15, 1993). Under the terms of the compact, the Nation exercises "full jurisdiction over and . . . responsibility for Nation Class III gaming operations" at Turning Stone. *Nation-State Compact Between the Oneida Indian Nation of New York and the State of New York* § 3 (1993); *see also id.* §§ 5 (law enforcement powers), 12 (protection of health and safety). Thus, no further approvals by the State or the Department are required. In any case, a challenge to the lawfulness of gaming at Turning Stone must have been filed in Federal court by 1999 under the applicable statute of limitations, and no such lawsuit was filed.[1]

**1.5    Procedural Background**

A decision to acquire land in trust is a Federal action that requires compliance with NEPA. *See* 25 C.F.R. § 151.10(h). NEPA establishes procedures for the review of Federal actions that may affect the quality of the human environment. The Nation has proposed no change in land use as part of its fee-to-trust request. A land-into-trust request that proposes no change in land use is typically subject to "categorical exclusion" under BIA policies and procedures for implementing NEPA such that no EIS is required. *See* 516 DM 10.5(I) (May 27, 2004). Although not required, the BIA, in consultation with the Nation, elected to prepare an EIS to evaluate the Proposed Action and reasonable alternatives in order to ensure that the Nation's fee-to-trust request received the most thorough environmental review available under NEPA.

The BIA published a Notice of Intent ("NOI") in the *Federal Register* on December 23, 2005 (Vol. 70, No. 246, page 76325) describing the Proposed Action, announcing the BIA's intent to prepare an EIS for the Proposed Action, and providing the time and location of public scoping meetings and the deadline for submitting written scoping comments. Public scoping meetings were held on January 10, 2006 in the Town of Verona, Oneida County, New York, and on January 11, 2006 in the City of Oneida, Madison County, New York. The written comment period closed on January 23, 2006. In addition, the BIA held a public informational meeting in the City of Utica, Oneida County, New York, on March 2, 2006, during which the BIA described the land-into-trust process and the relationship of that process to NEPA, and responded to audience questions (but did not take comments). A scoping report was issued in July 2006. The scoping report summarized and categorized the major issues and concerns from the written and verbal scoping comments. The scoping comments received were considered by the BIA in developing the alternatives and analytical methodologies of the EIS. During scoping, the BIA identified four Cooperating Agencies: the Nation, the New York State Department of Environmental Conservation ("NYSDEC"), Madison County, and Oneida County. Each of these four agencies entered into a Cooperating Agency Memorandum of Agreement with the BIA. *See* Final EIS, App. J.

---

[1] Furthermore, Section 5 of the IRA and its implementing regulations control this decision to acquire lands in trust. IGRA governs the conduct of Indian gaming. The Department's procedure is to make land-into-trust decisions prior to rendering two-part determinations under Section 20(b)(1)(A) of IGRA, 25 U.S.C. § 2719(b)(1)(A), when Section 20(b)(1)(A) applies. In this case, Section 20(b)(1)(A) does not apply for the reasons stated above.

An administrative version of the Draft EIS ("pre-publication Draft EIS") was circulated to the Cooperating Agencies in August 2006 for review and comment. The comments received were taken into consideration and revisions to the pre-publication Draft EIS were made before the public release of the Draft EIS. The EPA Notice of Availability ("NOA") for the Draft EIS (EIS No. 20060480) appeared in the *Federal Register* on November 24, 2006 (Vol. 71, No. 226, page 67863), and initiated a comment period ending on January 8, 2007. The BIA issued its own *Federal Register* notice (Vol. 71, No. 226, pages 67896-67897) and local notices in newspapers. These notices provided information on the proposed project and announced the public comment period and public hearing on the Draft EIS. At the beginning of the comment period, the Draft EIS was made available to the public, Federal agencies, State agencies, local governmental entities, and potentially affected Indian tribes for review and comment. A public hearing on the Draft EIS was held in the City of Utica, New York, on December 14, 2006. An additional NOA published by the EPA in the *Federal Register* on January 5, 2007 (Vol. 72, No. 3, page 546) extended the comment period on the Draft EIS to February 22, 2007. A separate NOA published by the BIA (Vol. 72, No. 12, page 2544) announced an additional public hearing on the Draft EIS. This public hearing was held in the Town of Verona, New York, on February 6, 2007.

All comments received during the comment period were considered in the preparation of the Final EIS. Responses to the comments received were included in Appendix M of the Final EIS and relevant information was incorporated into the Final EIS as appropriate to address those comments. The EPA NOA for the Final EIS (EIS No. 20080064) appeared in the *Federal Register* on February 22, 2008 (Vol. 73, No. 36, pages 9803-9804). A separate BIA NOA for the Final EIS (Vol. 73, No. 36, pages 9823-9824) appeared in the *Federal Register* on the same date. The NOAs initiated the 30-day waiting period for the final determination, which ended on March 24, 2008. At the beginning of the waiting period, the Final EIS was made available to the public, Federal agencies, State agencies, local governmental entities, and potentially affected Indian tribes for review and comment.

The Department received 55 individual written comments on the Final EIS during the waiting period. In addition, Oneida County held a public hearing regarding the Preferred Alternative at the Legislative Chambers of Oneida County in the City of Utica, New York, on March 6, 2008, and submitted a copy of the hearing transcript to the Department as comments on the Final EIS.

## 2.0    DESCRIPTION OF ALTERNATIVES

A range of possible alternatives for meeting the purpose and need, including alternative land configurations, were considered in the Draft EIS and Final EIS.

## 2.1    Alternatives Eliminated from Further Study

Several alternatives identified in scoping or from other sources were eliminated from further evaluation because they were determined to be unreasonable or did not meet the purpose and need for action. They are described in Sections 2.1.1 through 2.1.5 of this ROD, below.

### 2.1.1    *Negotiated Settlement Alternative*

Commenters proposed that the Department not act on the Nation's fee-to-trust request unless and until an agreement regarding placement of lands into trust and related issues is reached. This alternative was eliminated from further consideration because achieving a negotiated resolution is not reasonably foreseeable. The Nation and the State and local governments were free to reach and submit an agreement to the Department for its consideration prior to the issuance of this ROD, but have not done so. Moreover, the issuance of this ROD does not prevent them from doing so prior to formal acceptance of the Subject Lands into trust.

### 2.1.2    *Resolution of Land Claim Alternative*

Commenters proposed that the Department not act on the Nation's fee-to-trust request unless and until the Nation's land claim and related issues are resolved. Deferral of a decision on the Nation's April 4, 2005 request until the land claim is resolved is not reasonable.

The acquisition of land in trust status for Indian tribes under authority of Section 5 of the IRA is separate from tribal land claims based on Federal common law and/or the Non-Intercourse Act, 25 U.S.C. § 177. For example, a tribe may still maintain a money damages claim based on a possessory right and/or an unjust enrichment claim after the land at issue has been re-acquired by the tribe and placed into trust. Such relief would, in the Department's view, also still be available to any other tribal claimants to the same land. Thus, the pending land claims of other Indian tribes to some or all of the lands claimed and owned by the Nation, including the claims of the Oneida Tribe of Indians of Wisconsin and the Stockbridge-Munsee Community Band of Mohican Indians, do not disqualify the Subject Lands from being acquired in trust for the Nation.

Where trust land acquisitions and land claims may become intertwined is when land is taken into trust in settlement of a land claim. In that case, trust land acquisitions may substitute in part or in whole for the judicial relief that the tribal claimant seeks. The Nation's land claim has been pending in the courts since 1970 and mediations have been terminated by courts as futile, most recently in 2005. Reaching a land claim settlement that also addresses the trust land issue is less likely than resolving the trust land issue by agreement alone.

On February 16, 2002, the Governor of New York announced that the State, the Nation, Madison County, and Oneida County had agreed on the framework of a land claim settlement that included 35,000 acres of land to be held and governed by the Nation. In consideration of this prior land claim settlement framework, Alternative B was developed to provide an analysis of the potential impacts of acquiring 35,000 acres in trust status in the event that land claim settlement discussions are revived.

### 2.1.3    *Legislative Solution Alternative*

Commenters proposed that the Department not act on the Nation's fee-to-trust request unless and until Federal legislation is enacted to address it. No such legislation has been enacted, and the prospect for agreement among the governments and implementing legislation is speculative.

**2.1.4    *Land Conveyance in Fee Status Alternative***

Commenters proposed that the United States acquire fee title to some or all of the lands and make them subject to State and local taxation and regulation. There is no statutory authority for the Secretary to acquire title to lands in fee status for Indians and to subject the lands to State and local taxation and regulation. This alternative conflicts with Section 5 of the IRA, which expressly provides that title to lands acquired for Indians shall be held by the United States in trust status and that the lands shall be exempt from State and local taxation. Moreover, this alternative appears to contemplate that the State and local governments could enforce taxes on Federal fee lands through foreclosure. Such a situation is precluded by the Federal government's sovereign immunity.

**2.1.5    *Creation of a New York State Reservation or Trust Alternative***

Commenters proposed that the lands be placed in a reservation to be created by New York State or be acquired in trust by the State and governed by State law. Basic features of Federal trust status include restriction of the land against alienation (including by the state and local governments), immunization of the land against state and local taxation, and the exercise of tribal sovereignty and jurisdiction over the land to the exclusion of the state and local governments (except as otherwise provided under Federal law). A New York State-created reservation or a State-created trust would be only as protective as the State would allow and it would not prevent future encroachment by the State or local governments in the areas of alienation, taxation, or regulation. Although the State could enact legislation conferring immunity from real property taxation, which the Nation contends the State has already done, *see, e.g.,* New York Indian Law § 6 (2008) ("No taxes shall be assessed, for any purpose whatever, upon any Indian reservation in this state, so long as the land of such reservation shall remain the property of the nation, tribe, or band occupying the same"), the State and local governments oppose removal of the Nation's lands from the tax rolls. In addition, this alternative would apparently entail disestablishment of the existing Federal reservation, contrary to the fact that "only Congress can divest a reservation of its land and diminish its boundaries." *City of Sherrill v. Oneida Indian Nation of New York*, 544 U.S. 197, 215 n.9 (2005) (quoting *Solem v. Bartlett*, 465 U.S. 463, 470 (1984)).

On February 13, 2007, legislation was introduced in the New York State Assembly to establish an "Oneida Indian Nation Turning Stone State Reservation" in recognition of the "significant economic benefits" that the Turning Stone Casino provides "to the local population, such that it is not in the best interest of New York State to order 'Turning Stone' to cease its gaming operation. . . ." 2007 NY A.B. 5270. New York State legislation is neither necessary nor sufficient to authorize Class III gaming at Turning Stone. Turning Stone is now operating lawfully under IGRA. In addition, the United States does not recognize land held in trust by a state or a state-created reservation as an Indian reservation under Federal law. Consequently, state legislation alone would not authorize gaming under IGRA. For these reasons and the reasons stated above, this alternative does not meet the purpose and need for action.

## 2.2    Reasonable Alternatives Considered in Detail

The alternatives evaluated in the Final EIS were developed to address the purpose and need for action, and to respond to concerns expressed by commenters about potential jurisdictional, socioeconomic, and environmental impacts of acquiring lands in trust. The BIA identified nine alternatives representing the reasonable range of alternatives for analysis in the Final EIS, including a No Action Alternative. The selection of these alternatives for detailed analysis reflects the comments received on the Nation's fee-to-trust request from the State and local governments pursuant to 25 C.F.R. § 151.10, public comments received during scoping and on the Draft EIS, and NEPA requirements in general.

Under seven of the alternatives, Alternatives C, D, E, F, G (No Action), H (County Proposal), and I (Preferred Alternative), the lands proposed for acquisition comprise less than the total 17,370 acres included in the Proposed Action (Alternative A). The lands that would be conveyed into trust in each of these seven alternatives would be subject to the Nation's sovereign authority and regulatory jurisdiction, immune from State and local real property taxation, and Federally restricted against alienation. The impacts of conveying these lands into trust are evaluated in the seven alternatives.

The future status of the lands not acquired in trust in these seven alternatives is also evaluated. Following the Supreme Court's decision in *City of Sherrill*, the Nation and the State and local governments continue to dispute taxation and jurisdiction over the Nation's lands. In order to fully consider the comments of the Nation and the State and local governments, while remaining for the most part neutral on their respective legal positions during its review of the fee-to-trust request, the Department evaluated the full range of possible outcomes or "scenarios" for these lands. The future status of the lands not acquired in trust falls under one or more of the following taxation/jurisdiction scenarios:

> **Property Taxes Paid (PTP)** – In this scenario, the Nation would pay property taxes on the lands not acquired in trust and New York State and local governments would exercise jurisdiction over those lands.

> **Property Taxes Not Paid and Foreclosure (PTNP-F)** – In this scenario, the Nation would not pay property taxes on the lands not acquired in trust and New York State and local governments would exercise jurisdiction over those lands. The properties might be foreclosed upon by local governments for non-payment of taxes or sold by the Nation in advance of foreclosure. Madison and Oneida Counties are currently seeking to foreclose on certain Nation-owned lands for non-payment of taxes.[2]

---

[2] After the Final EIS was issued, the Nation provided bank letters of credit to Madison and Oneida Counties for all of the taxes, penalties, and interest allegedly owed on all of the Nation's 17,370 acres, except for the taxes and related charges on the Turning Stone Casino tax lot (225 acres). The Counties have commented that the letters of credit are insufficient to remove tax liens. As discussed in Section 7.5.5 of this ROD, *infra*, the Department has determined that the letters of credit are sufficient for purposes of Federal requirements for acquiring lands in trust.

**Property Taxes Not Paid and Dispute Continues (PTNP-DC)** – In this scenario, the Nation would not pay property taxes on the lands not acquired in trust and the Nation and New York State and local governments would continue their ongoing disputes regarding taxation/foreclosure and jurisdiction.

**Casino Closes and All Enterprises Close (CC-AEC)** – In this scenario, which applies to the No Action Alternative (Alternative G), no Nation-owned lands would be acquired in trust. Only for the purpose of considering the State's comments that the Turning Stone Resort & Casino is operating unlawfully, Turning Stone is assumed in this scenario to be an unlawful gaming operation and the casino, along with all SavOn gas stations and convenience stores and other Nation enterprises, would cease operations. The Department emphasizes that this scenario would occur only if the State prevailed on its stance regarding the lawfulness of the casino.

The Department disagrees with the State that the casino is unlawful, given the Indian status of the lands on which the casino is situated and the 1993 Nation-State gaming compact that was approved by the Department and is in effect. In addition, the Department notes the incongruity of a situation in which a casino is operating under IGRA but is still subject to taxation. The Department's position on the taxability of the casino is explained in Section 7.5.4 of this ROD, *infra*. Even though the Department finds that operation of the casino is lawful, the **CC-AEC** scenario reflects the Department's consideration of comments to the contrary.

In this scenario, it is assumed that the Nation would not have jurisdiction over any of its reacquired lands while still under its ownership. It is the Nation's position that in this scenario the Nation would not have revenue to pay taxes and that all of the 17,370 acres might be foreclosed upon or sold in advance of foreclosure.

The foregoing taxation/jurisdiction scenarios reflect the ongoing taxation/jurisdiction disputes between the Nation and the State and local governments. The scenarios are not intended, individually or in combination, to represent the direct or actual results of a decision not to acquire lands in trust. Apart from the **CC-AEC** scenario, the Department takes no position here on the future status of lands not acquired in trust. The future status of the lands not to be acquired in trust under this final decision ultimately will be determined by third parties, including the Nation and the State and local governments, and possibly the courts.

## 2.2.1   *Alternative A – Proposed Action*

Under the Proposed Action (Alternative A), title to 17,370 acres now owned by the Nation would be acquired by the United States and held in trust for the Nation. (The Proposed Action includes all of the lands now owned by the Nation except for its 32-acre territory in Madison County.) Alternative A is comprised of all the lands in Groups 1, 2, and 3. These lands consist of 330 Nation parcels comprising 440 tax lots. (As the Nation purchased properties, it assigned a parcel number to each acquisition under its property classification system. Some of these parcels contain more than one tax lot.) The Nation has proposed no change in land use or ground-disturbing activity as part of the Proposed Action.

14

The lands comprising Alternative A occupy 6,594 acres or 1.5% of the total acreage of Madison County (432,152 acres), and 10,776 acres or 1.3% of the total acreage of Oneida County (814,934 acres). Alternative A represents 1.4% of the combined acreage of both Counties.

## 2.2.2    *Alternative B – Phased Acquisition of 35,000 Acres*

Under Alternative B, the 17,370 acres included in the Proposed Action would be acquired in trust. Up to 17,630 additional acres within the Oneida reservation would be acquired by the Nation from willing sellers and then placed into trust.

This alternative was developed in light of the prior 35,000-acre land claim settlement framework and is intended to provide an analysis of the potential impacts of acquiring 35,000 acres in trust in the event that land claim settlement discussions are revived. Alternative B also responds to comments received from the State and local governments on the Nation's fee-to-trust request and during scoping that expressed concerns over jurisdictional issues that might arise from interspersed Nation and non-Nation lands. Under this alternative, additional lands could be acquired in such a way that Nation parcels are connected with one another and form a more contiguous trust land area than Alternative A.

The 35,000 acres represents 2.8% of the combined acreage of Madison and Oneida Counties.

## 2.2.3    *Alternative C – Group 1 and 2 Lands*

Under Alternative C, Group 1 and 2 lands (9,903 acres) included in the Proposed Action would be acquired in trust, but Group 3 lands would not be acquired in trust.

Combined, the Group 1 and 2 lands include the Turning Stone Resort & Casino; all lands associated with the Nation's government affairs and member services; 85 Nation member residences; health and education centers; 5,675 acres of agricultural lands; 2,235 acres of hunting and fishing lands; 2,263 acres of wetlands; and lands being used for other Nation enterprises, including 13 SavOn gas stations and convenience stores, a newspaper operation, and three public access marinas. (Note that these acreage figures represent parcels that may be included in multiple land use categories.) Alternative C also contains many, but not all, of the Oneida historic, cultural, and archaeological resource sites.

Alternative C lands make up 7,986 acres or 1% of the total acreage of Oneida County, and 1,917 acres or 0.4% of the total acreage of Madison County. Alternative C represents 0.8% of the combined acreage of both Counties.

The lands not included in Alternative C total 7,467 acres or 0.6% of the combined acreage of both Counties. The current land use is predominately active and inactive agriculture, and includes the Nation's Black Angus cattle farm and hunting and fishing areas. The lands also include 13 Nation member residences and a number of archaeological sites. The future status of these lands is identified by one or more of the taxation/jurisdiction scenarios previously described.

### 2.2.4    *Alternative D – Group 1 Lands*

Under Alternative D, Group 1 lands (3,428 acres) included in the Proposed Action would be acquired in trust, but Group 2 and 3 lands would not be acquired in trust.

This alternative was developed in response to comments made during scoping to limit lands acquired in trust to the casino-resort complex and associated lands. Alternative D includes the Turning Stone Resort & Casino, two Nation member residences, one SavOn gas station and convenience store, 1,757 acres of agricultural lands, 843 acres of wetlands, and a small number of identified archeological sites. Alternative D represents 0.4% of the total acreage of Oneida County.

The 13,942 acres that would not be acquired in trust include all of the Nation's lands associated with government affairs and member services; 96 of the total 98 Nation member residences; and all of the Nation enterprises that are not directly linked to the Turning Stone Resort & Casino, including three marinas and 12 SavOn gas stations and convenience stores. These lands also include agricultural operations; all hunting and fishing lands; and the great majority of historic, cultural, and archaeological resource sites. The future status of these lands is identified by one or more of the taxation/jurisdiction scenarios previously described.

### 2.2.5    *Alternative E – Turning Stone Casino Gaming Floor Tax Lot*

Alternative E was developed in response to comments received during scoping that only the lands comprising the Turning Stone Casino proper should be placed into trust. The Turning Stone Resort & Casino is located on one tax lot (comprised of two Nation parcels totaling 225 acres) in the Town of Verona in Oneida County.

The lands not included in Alternative E make up the majority of the Group 1 and all of the Group 2 and 3 lands. Collectively, these lands comprise 17,145 acres. A number of the Turning Stone Resort & Casino facilities, including lodging and parking lots, are not included in this alternative. In addition, this alternative excludes all of the Nation's lands associated with government affairs and member services; all Nation member residences; all of the historic, cultural, and archaeological resource sites; all of the active and inactive agricultural lands, including the Black Angus cattle farm; all hunting and fishing areas; the Nation's wetland mitigation site; and all of the Nation enterprises that are not within the casino gaming floor tax lot, including 12 SavOn gas stations and convenience stores and three marinas. The future status of these lands is identified by one or more of the taxation/jurisdiction scenarios previously described.

### 2.2.6    *Alternative F – Alternate Trust Land Grouping*

Alternative F totals 11,986 acres and is based on combining all of the parcels contained in Group 1 with additional parcels from Groups 2 and 3 to create a more contiguous and compact group of trust lands than the Proposed Action, while also including somewhat dispersed but culturally significant lands. Of the total 289 parcels comprising Alternative F, 228 parcels or 79% are

16

located adjacent to another Nation parcel, and many others are separated by only a few non-Nation properties.

Properties within Alternative F include the location of the principal Oneida villages from 1635 to 1850 as they developed along Oneida Creek, including major villages documented at the Sterling site and at Kanonwalohale (Oneida Castle), which is the home of the Oneida stone. These are among the many significant Oneida archaeological sites that were considered to be an important cultural aspect of formulating Alternative F. Alternative F includes the majority of Nation member housing, most of the Nation's enterprises, and all of the Nation's government facilities and properties containing member services. The parcels within Alternative F are for the most part located within a reasonably short driving time of approximately 15 minutes from one another.

More specifically, Alternative F includes 80 Nation member residences; the Turning Stone Resort & Casino; 13 SavOn gas station and convenience stores; two of the three marinas; all other Nation enterprises; 7,978 acres of agricultural land and related operations; 3,294 acres of hunting and fishing lands; 2,537 acres of wetlands; and the great majority of historic, cultural, and archaeological resource sites. (Note that these acreage figures represent parcels that may be included in multiple land use categories.) Alternative F covers 9,834 acres or 1.2% of the total acreage of Oneida County, and 2,152 acres or 0.5% of the total acreage of Madison County. Alternative F represents 1% of the combined acreage of both Counties.

The lands omitted from Alternative F total 5,384 acres and are predominately active and inactive agricultural lands. These lands contain the Black Angus cattle farm, some hunting and fishing areas, 18 Nation member residences, and some culturally important areas, including 46 identified archaeological sites. The future status of these lands is identified by one or more of the taxation/jurisdiction scenarios previously described.

### 2.2.7    Alternative G – No Action

Under the No Action Alternative (Alternative G), none of the Nation's lands would be acquired in trust. The future status of these lands is identified by one or more of the taxation/jurisdiction scenarios previously described (with the caveat that the Department disputes the **CC-AEC** scenario).

### 2.2.8    Alternative H – County Proposal

Alternative H was proposed by Madison and Oneida Counties in a letter dated November 1, 2006 and at the December 14, 2006 public hearing on the Draft EIS. *See* Final EIS, App. M.9, Letter from David Schraver to Kurt Chandler, Regional Environmental Scientist, BIA (Nov. 1, 2006). As proposed by the Counties, this alternative was comprised of a cluster of land in Madison County that included the 32-acre territory and a cluster of land in Oneida County. After the Department subtracted the 32-acre territory, which is not part of the Proposed Action, the Madison County cluster totals 590 acres neighboring the 32-acre territory. The Oneida County cluster totals 436 acres and consists of the Turning Stone Casino tax lot and some adjacent lands.

As proposed by the Counties, Alternative H was subject to several conditions, including: (1) a prohibition against all future trust acquisitions; (2) payment of taxes/assessments, penalties, and interest on all Nation lands prior to acquisition of any Nation-owned land in trust; (3) compensation by the Nation for future loss of real property taxes; (4) county approval of service agreements for services on all Nation trust land; (5) adoption by the Nation of building, fire, public safety, and environmental codes equal to or better than State, county and local requirements; (6) a negotiated and legislatively approved (State and Federal) resolution authorizing gaming at the Turning Stone Casino; (7) resolution to the satisfaction of the Counties of sales tax issues regarding sales to non-members, not to be based on tax parity; (8) final resolution of the Nation's land claim; and (9) a requirement that all agreements contain provisions for dispute resolution and be enforceable in New York State or Federal courts.

The Department considered the foregoing conditions and determined not to retain them as part of Alternative H for the reasons detailed in the Final EIS at pages 2-38 to 2-40. In sum, these conditions (a) conflict with Section 5 of the IRA or are otherwise beyond the Department's authority to impose, (b) are unrelated to project impacts, or (c) are intended to prevent impacts from acquiring land in trust that have been fully considered by the Department in its analysis of each of the nine alternatives.

Alternative H as evaluated by the Department contains lands for 55 Nation member residences, some government services, the Turning Stone Resort & Casino, one golf course, one SavOn gas station and convenience store, 390 acres of agricultural lands, 138 acres of hunting and fishing lands, and 177 acres of wetlands. (Note that these acreage figures represent parcels that may be included in multiple land use categories.) Alternative H would accommodate in trust some Nation lands that support social, cultural, and religious practices, but would include only a limited number of the historic, cultural, and archaeological resource sites (18, or 12%, of the identified archaeological sites). The Alternative H lands occupy 436 acres or 0.05% of the total acreage of Oneida County, and 590 acres or 0.07% of the total acreage of Madison County. Alternative H represents 0.08% of the combined acreage of both Counties.

The lands excluded from Alternative H comprise 16,344 acres. Situated on these lands are 43 Nation member residences; some government services, including telecommunications and information services, media relations, administrative offices, and security offices; cultural and social facilities and resources, including the Cultural Resources Department, Living History Department, festival sites, reenactment sites, black ash used in traditional basket making, the traditional Three Sisters cropland, and the great majority of archaeological sites; over 90% of the Nation's agricultural and hunting and fishing lands; Nation enterprises including 12 SavOn gas stations and convenience stores, a sand and gravel quarry, the Inn at Turning Stone, four golf courses, the Villages at Turning Stone RV Park and Peaceful Pines Campground, Four Directions Media, Standing Stone Gaming, the Retail Outlet, wholesale distribution and warehouse facilities, three public access marinas, CNY Fiberglass and Boat Repair, and crop rental on agricultural land holdings. The future status of these lands is identified by one or more of the taxation/jurisdiction scenarios previously described.

## 2.2.9    *Alternative I – Preferred Alternative*

The Preferred Alternative (Alternative I) reflects the balance of the current and short-term needs of the Nation to reestablish a sovereign homeland and the New York State and local government requests to establish a more contiguous and compact trust land grouping than the Proposed Action. As under the County-proposed Alternative H, the lands to be acquired under Alternative I are centered around the Turning Stone Resort & Casino in Oneida County ("Casino-Resort Grouping") and the Nation's 32-acre territory in Madison County ("Government-Cultural Grouping").

Alternative I includes all of the Group 1 lands and additional parcels from Groups 2 and 3, for a total of 13,086 acres. In both the Casino-Resort and Government-Cultural groupings, the great majority of properties are adjacent to another Nation-owned property. Of the total 234 parcels comprising Alternative I, 211 parcels – 90% – are located adjacent to another Nation parcel and many others are separated by only a few non-Nation properties. Alternative I encompasses 13,086 acres located over a 9 by 14 mile area. In comparison, Alternative A encompasses 17,370 acres located over a 20 by 20 mile area. Thus, while Alternative I occupies 75% of the acreage of Alternative A, the land encompasses an area that is only 31% of that of Alternative A.

Alternative I lands contain 80 Nation member residences, the majority of government services, the Turning Stone Resort & Casino, all of the associated golf courses, four SavOn gas stations and convenience stores, 9,789 acres of agricultural lands, 3,076 acres of hunting and fishing lands, and 2,274 acres of wetlands. (Note that these acreage figures represent parcels that may be included in multiple land use categories.) Alternative I would place into trust a large part of the Nation's lands containing social and cultural facilities, and 82, or 52%, of the identified archaeological sites. The Alternative I lands occupy 8,833 acres or 1.1% of the total acreage of Oneida County, and 4,253 acres or 1% of the total acreage of Madison County. Alternative I represents 1.05% of the combined acreage of both Counties.

Under Alternative I, 4,284 acres would not be placed into trust. Situated on these lands are 18 Nation member residences and some government services, including media relations, a member services department, and security offices. Several cultural and social facilities and resources, including the Cultural Resources Department, Living History Department, festival sites, and living history reenactment sites, in addition to a number of archaeological sites, would not be placed into trust. Nation enterprises in this category include nine SavOn gas stations and convenience stores, a sand and gravel quarry, the Retail Outlet, wholesale distribution and warehouse facilities, three public access marinas, CNY Fiberglass and Boat Repair, and crop rental on some agricultural land holdings. The future status of these lands is identified by one or more of the taxation/jurisdiction scenarios previously described.

A summary table of the lands included in the Proposed Action in comparison to all other alternatives is provided in the Final EIS at Table 2.6-1.

**3.0     ISSUES EVALUATED**

**3.1     Issues Raised During Scoping and During Public Review of the Draft EIS**

A number of issues were raised during the scoping process and during public review of the Draft EIS. Each of the alternatives considered in the Final EIS were evaluated relative to these and other issues. The Nation is proposing no physical resource-impacting projects or changes in land use as part of the Proposed Action. Ongoing enhancements to the Turning Stone Resort & Casino are occurring independently of the Department's action on the fee-to-trust request. As a result, the most substantive issues did not relate to physical environmental impacts and instead related to the following:

- Jurisdictional and land use regulation impacts
- Socioeconomic impacts
- Historic, cultural, and archaeological resource protection impacts
- Cumulative impacts

In these areas, unavoidable adverse impacts could occur under certain alternatives in one or more of the taxation/jurisdiction scenarios previously described. Unavoidable adverse impacts associated with the Preferred Alternative (Alternative I) are expected to be minor and/or localized.

**3.1.1     *Jurisdictional and Land Use Impacts***

New York State and local governments and other commenters suggested that because placement of the Nation's lands into trust would afford the Nation jurisdiction over the lands and preclude State and local authorities from regulating the lands, significant negative impacts to the environment and public health and safety would result from alternatives in which lands would be acquired in trust. Commenters also asserted that placement of lands into trust would complicate State and local governance with respect to land use planning and the uniform and equitable application of environmental laws and policies over an entire geographic area. In addition, commenters asserted that State and local laws and regulations are more stringent than their Federal and tribal counterparts in the areas of environment, health, safety, and zoning.

NEPA serves to inform administrators about the environmental consequences of proposed Federal actions. Issues concerning transfer of regulatory jurisdiction and land use control from state and local governments to tribal governments are evaluated in the context of the Secretary's consideration of the impacts of acquiring land in trust under 25 C.F.R. Part 151. *See* 25 C.F.R. § 151.10(f) (requiring consideration of "jurisdictional problems and potential conflicts of land use which may arise"); *City of Sherrill v. Oneida Indian Nation of New York*, 554 U.S. 197, 220-21 (2005) ("The [land-into-trust] regulations implementing § 465 are sensitive to the complex interjurisdictional concerns that arise when a tribe seeks to regain sovereign control over territory."); *County of Sauk, Wisconsin v. Midwest Regional Director*, 45 IBIA 201, 220 (2007) (loss of jurisdiction alone does not establish standing under NEPA). The Department's evaluation pursuant to 25 C.F.R. § 151.10(f) of the jurisdictional problems and potential conflicts of lands use that may arise following placement of the Nation's lands into trust is contained in

Section 7.6 of this ROD, *infra*. In this case, the Department considered whether there are existing non-conformities in the land use and whether problems may result from placement of lands into trust based on the Nation's past, current, and reasonably foreseeable use and management of its lands.

Although not required under NEPA, as a matter of discretion and to more comprehensively evaluate and respond to the concerns of the State and local governments and other commenters in this particular case, the Department prepared a Final EIS containing a thorough analysis of the jurisdictional and land use issues that were raised in connection with the Proposed Action and other alternatives. Because the Nation is proposing no change in land use or ground-disturbing activity as part of the Proposed Action, resource categories related to the physical environment (*e.g.*, soils, groundwater, air, noise, wildlife, vegetation, wetlands, etc.) would not be subjected to unavoidable adverse impacts as a result of implementing the Proposed Action or one of the alternatives.

### 3.1.1.1    Analysis of Jurisdictional and Land Use Impacts

Acquiring land in trust may negatively impact the ability of state and local governments to provide cohesive and consistent governance due to loss of regulatory control and lack of contiguity/compactness among the trust lands. In view of the Nation's past and current management and use of its lands, this effect is not expected to be significant. Prior to the decision in *City of Sherrill*, the Nation managed its lands under Nation laws. Sections 3.9.5 and 4.9.5 of the Final EIS analyzing the Nation's management of its lands show that there have not been significant adverse effects on environmental resources. In addition, Sections 3.2, 3.8.6, 4.2, and 4.8.6 of the Final EIS analyzing land resources and land use show that the permitted uses of Nation lands under Nation law are generally consistent with the uses of surrounding non-Nation lands. The Nation is using most of its re-acquired lands for the same purposes for which the lands were used prior to re-acquisition, with the primary exception being the Turning Stone Resort & Casino.

The potential negative jurisdictional and land use effects on the surrounding community would be least conspicuous under Alternative E, F, H, or I, because the majority of the properties that would be acquired in trust under those alternatives form highly contiguous and compact groupings. Alternative H reflects the request of Madison and Oneida Counties to create two highly contiguous and compact clusters of trust lands, one focused on the Turning Stone Resort & Casino in Oneida County and one focused around the Nation's 32-acre territory in Madison County. The land base included in this alternative, however, is not adequate to meet the purpose and need for action.

The Department developed the Preferred Alternative (Alternative I) to afford a more inclusive yet still highly contiguous and compact trust land configuration to meet the Nation's immediate and short-term needs while minimizing the potential for jurisdictional disruption and balancing other factors. Like Alternative H, Alternative I is comprised of two land clusters, one focused on the Turning Stone Casino & Resort ("Casino-Resort Grouping") and the other focused on the 32-acre territory ("Government-Cultural Grouping").

The No Action Alternative would not meet the purpose and need for action. In addition, although the No Action Alternative is one of the alternatives preferred by the State and local governments, implementing it would not necessarily produce the jurisdictional results that they seek. For example, in the **PTNP-DC** scenario, which essentially reflects the current situation, the Nation and the State and local governments would continue their jurisdictional disputes. For the same reason, the County-proposed Alternative H would not necessarily meet the State and local governments' jurisdictional objectives.

### 3.1.2    *Socioeconomic Impacts*

The potential fiscal impacts of acquiring land in trust are evaluated in the context of 25 C.F.R. Part 151. *See* 25 C.F.R. § 151.10(e) (requiring consideration of "the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls"); *City of Sherrill*, 544 U.S. at 221. The Department's evaluation pursuant to 25 C.F.R. § 151.10(e) of the impact on New York State and its political subdivisions resulting from the removal of the Nation's lands from the tax rolls is contained in Section 7.5 of this ROD, *infra*. Under NEPA, economic or social effects of a proposed action "are not intended by themselves to require preparation of an environmental impact statement." 40 C.F.R. § 1508.14.

Although not required under NEPA, as a matter of discretion and to more comprehensively evaluate and respond to the concerns of the State and local governments and other commenters in this particular case, the Department prepared a Final EIS containing a thorough analysis of the socioeconomic issues that were raised in connection with the Proposed Action and other alternatives. This analysis includes, among other things, the potential loss of real property tax revenues resulting from acquisition of the Nation's lands in trust; costs to the State and local governments for rendering services that are attributable to the Nation; and the economic benefits to the State and local governments provided directly and indirectly by the Nation (*e.g.*, payments under municipal service agreements, contributions to infrastructure, employee tax payments, etc.). *See* Final EIS §§ 3.7, 4.7, 5.2, and App. E.

In general, the Nation has not paid taxes on its lands since re-acquiring them beginning in 1987 under the assumption that it had could assert tribal tax immunity over those lands. After the Supreme Court's 2005 ruling in *City of Sherrill* that the Nation cannot unilaterally assert tribal tax immunity as a matter of Federal law, disputes persist over whether the Nation owes taxes as a matter of State law.[3] The Nation has, however, recognized that it uses State and local government services, and has therefore made voluntary payments through service agreements to defray the costs of such services. These payments, in combination with other direct and indirect contributions that the Nation has made to the State and local governments, more than offset the alleged annual loss of revenue resulting from the Nation's non-payment of real property taxes. Under agreements reached with the Cities of Sherrill and Oneida after the *City of Sherrill* decision, the Nation makes payments to cover the full amounts of the taxes levied by the Cities.

---

[3] As discussed in Section 7.5.4 of this ROD, *infra*, the Department has determined that the taxes, penalties, and interest that have been assessed on the Turning Stone Casino tax lot are, in major part, unlawful. The taxes and related charges on this 225-acre tax lot comprise most of the taxes and related charges that are allegedly owed by the Nation.

**3.1.2.1    Analysis of Socioeconomic Impacts**

The Final EIS analyzed the baseline 2005 economic conditions by comparing the Nation's use of State and local government services to its positive economic contributions. In 2005, the revenues provided directly and indirectly by the Nation to the State and local governments (including agreements and employee and multiplier taxes) totaled approximately $24.29 million. The Nation's costs to New York State and local governments for services attributed to the Nation totaled approximately $7.54 million. Thus, the Nation provided a net positive contribution of $16.76 million to the New York State and local governments.

The Final EIS also analyzed the baseline 2005 economic conditions by subtracting (a) the uncollected property taxes combined with the costs of services attributable to the Nation and not usually paid for with property tax revenues from (b) the Nation's direct and indirect contributions. Depending on the taxable value of the Turning Stone Casino tax lot, the Nation provided a net contribution of between $4.76 million (including the casino tax lot as assessed by the Town of Verona) and $15.90 million (excluding the casino tax lot). Thus, when the Nation did not pay taxes in the past it more than offset the total lost tax revenue, if taxes are in fact due and owing.

Further, the Final EIS analyzed economic conditions in the year 2011 under each of the alternatives. Although the placement of lands into trust permanently removes the lands from the tax rolls, the Nation's ongoing direct and indirect contributions would more than offset the loss of real property tax revenues under any of the alternatives in which Nation-owned lands would be acquired in trust. This effect is summarized in Tables 4.7-42 to 4.7-44 and 5.2-1 of the Final EIS. Even assuming, *arguendo*, that taxes on the Nation's lands are now due and owing, for the various trust acquisition alternatives (Alternatives A through F, H, and I), the net positive contributions range from approximately $1.9 million to over $17 million annually, depending on the taxable value of the Turning Stone Casino tax lot.

The Proposed Action (Alternative A) would result in a net contribution to the State and local governments of between $4.76 million and $16.96 million after property tax loss. The Preferred Alternative (Alternative I) would result in a net contribution of between $4.46 million and $16.66 million after property tax loss. The County-Proposed Alternative (Alternative H) would result in a net contribution of between $4.34 million and $16.54 million after property tax loss. Thus, the net contribution under the Proposed Action would be higher than the Preferred Alternative, which in turn would be higher than the County-Proposed Alternative. This would result from reductions in Nation direct and indirect contributions under Alternatives H and I, which would occur if the lands not acquired in trust under these alternatives are alienated and the Nation enterprises situated on them cease to operate (**PTNP-F** taxation/jurisdiction scenario).

Under the No Action Alternative (Alternative G), in contrast, the net effect would be a positive contribution of $360,000 irrespective of the taxable value of the casino tax lot. (As represented in Table 5.2-1, a significant net loss would result if it is assumed that the casino tax lot is taxable to the degree the lot is being assessed by the Town of Verona and that the taxes would be collected but for closure of the casino under the **CC-AEC** scenario. As previously discussed,

that scenario would occur only if the State prevailed in its stance regarding the lawfulness of the casino.)

With respect to employment as a component of socioeconomics, in comparison to the Proposed Action (Alternative A) and Alternative B, a reduction in jobs would occur in certain taxation/jurisdiction scenarios under all other alternatives. This is summarized in Table 4.7-4 of the Final EIS. Under Alternative H, in the **PTNP-F** scenario, a short-term loss of 491 Nation- and non-Nation jobs would occur. Under Alternative I, in the **PTNP-F** scenario, a short-term loss of 234 Nation- and non-Nation jobs would occur. Under the No Action Alternative (Alternative G), in the **PTNP-F** scenario or the **CC-AEC** scenario (which scenario the Department disputes), a loss of 5,265 Nation- and non-Nation jobs would occur. The region generally has been in economic decline, with several major regional employers ceasing operations in the recent past. *See* Final EIS at 4-150 to 4-153. The historical regional economic decline indicates that the region could not readily absorb the loss of 5,000 jobs and the over $100 million payroll that those jobs provide.

Due to future job growth associated with the Turning Stone Resort & Casino, the short-term job loss discussed above would be offset in part or whole by the year 2011. Under Alternative H, the net job loss by the year 2011 would be 234 jobs. Under Alternative I, future growth would exceed short-term job loss by the year 2011, resulting in a net gain of 56 jobs. Under Alternative A, in which no short-term job loss would occur, future growth would add 313 jobs by the year 2011.

Under Alternatives A, B, C, F, and I, the Nation's demand for healthcare, emergency medical service, fire protection, and other community-supplied services would increase with incremental growth in the community and with added visitation of the Turning Stone Resort & Casino. This would represent an unavoidable adverse effect on the resources of the local governments. The anticipated growth, however, would not likely increase the demand such that it would result in the creation of new facilities or in physical alterations to existing facilities. The increased demand also would not likely affect current response times for emergency services. Thus, the effect on community services is expected to be less than significant under these alternatives.

In the **PTP** and **PTNP-DC** scenarios under Alternatives A through F, H, and I, the Nation's service agreements related to the provision of community services would be maintained to varying degrees depending on the particular alternative. However, in the **CC-AEC** scenario of the No Action Alternative (which scenario the Department disputes) and in the **PTNP-F** scenario under Alternatives C through I, the service agreements would be significantly reduced in scope or terminated. In addition, under Alternatives D, E, and G, the Nation's own government programs and services would cease to operate in their current form and would be forced to rely heavily on Federal funding, if they could continue at all. Some of the Nation's government programs and services may be curtailed in Alternatives H and I. The reduction in Nation-provided services could lead to greater burdens on municipal budgets.

A number of comments suggested that placement of lands into trust for the Nation would create a competitive business advantage for the Nation and would decrease the marketability of non-Nation lands. Specifically, State and local governments contended that the beginnings of a

24

"monopolistic or 'big operator' business environment" is evident in an alleged predominance of Nation-owned gas stations and convenience stores in the area in general and marine gasoline sales at Oneida Lake in particular. These comments suggested that the Nation should therefore be required to pay its "fair share" of taxes.[4]

The State's policy of not enforcing sales and excise taxes on Indian-owned stores supports the Nation's economic competitiveness. *See, e.g.,* Final EIS at 3-276 to 3-279, 3-386 to 3-389. Placement of the lands into trust would not prevent the State from enforcing lawfully applicable sales and excise taxes if in the future it determines to do so. In addition, the Nation has generally not paid real property taxes to date, and Federal district court decisions subsequent to *City of Sherrill* have ruled that taxes cannot be assessed on the Nation's lands under State law. *See Oneida Indian Nation of New York v. Madison County*, 401 F. Supp. 2d 219 (N.D.N.Y. 2005), *motion to alter, amend, or obtain relief from the judgment denied*, 235 F.R.D. 559 (2006); *Oneida Indian Nation of New York v. Oneida County*, 432 F. Supp. 2d 285 (N.D.N.Y. 2006). Thus, the placement of lands into trust would have the practical effect of continuing the *status quo* with regard to real property tax collections.

Moreover, for the most part, Nation enterprises conducted on the Preferred Alternative (Alternative I) lands do not compete with other local businesses. The Preferred Alternative, through its focus on the Casino-Resort and Government-Cultural groupings, results in the omission of nine out of the 13 Nation-owned gas stations and convenience stores and all three Nation-owned marinas at Oneida Lake. Also, in this region where dairy cattle operations are predominant, the Nation has established a Black Angus beef cattle operation and it provides dairy cattle boarding and feeding services to local farmers at its "Heifer Hotel," thereby complementing the local farming industry.

In contrast, in the **PTNP-F** scenario under Alternatives C through I, or in the **CC-AEC** scenario under Alternative G (which scenario the Department disputes), large amounts of Nation-owned lands would enter the real estate market, ranging from 17,370 acres under the No Action Alternative to 4,284 acres under the Preferred Alternative. The influx of these properties into the market, in combination with the closure of associated Nation enterprises on which the community depends for jobs and revenues, could result in significant adverse impacts to the community. The potential for such impacts would be minimized under the Preferred Alternative while also meeting the purpose and need for action, and promoting contiguity and compactness among the trust lands.

### 3.1.3    *Historic, Cultural, and Archaeological Resource Impacts*

The New York State and local governments commented that placing lands into trust would have a negative impact on their ability to preserve and protect historic, cultural, and archaeological

---

[4] Consideration of any economic impact that may result from placing land into trust is not required by NEPA, Section 5 of the IRA, or 25 C.F.R. Part 151. *See Santa Ynez Valley Concerned Citizens v. Pacific Regional Director,* 42 IBIA 189, 202-05 (2006), *aff'd after limited reopening, Preservation of Los Olivos v. Pacific Regional Director,* 45 IBIA 98 (2007), *appeal pending, Preservation of Los Olivos v. Department of the Interior,* No. CV-06-1502 AHM (C.D. Cal.). The Department analyzed these issues in its discretion in this particular case.

resources due to loss of jurisdiction. However, the State Office of Parks, Recreation and Historic Preservation ("OPRHP") concluded that the Proposed Action would have "No Effect upon historic properties in or eligible for inclusion in the State and National Registers of Historic Places." Letter from New York State OPRHP to Franklin Keel, Regional Director, BIA (Oct. 19, 2006). The State and local governments also commented that the Nation does not need lands in trust status because State laws regarding historic, cultural, and archaeological resources are adequate without any need for application of Federal laws.

### 3.1.3.1    Analysis of Historic, Cultural, and Archaeological Resource Impacts

Placement of the Nation's lands into trust would guarantee the broadest applicability of Federal laws regarding preservation and protection of historic, cultural, and archaeological resources. Federal laws afford Indian tribes greater input and provide additional protections, more than what State laws offer alone. *See, e.g.,* Final EIS § 4.6.

Section 106 of the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470f, ensures that the Federal Advisory Council on Historic Preservation and the State Historic Preservation Officer ("SHPO") are consulted about impacts from Federal or Federally assisted undertakings potentially affecting a property listed or eligible for listing on the National Register of Historic Places. Properties covered by the NHPA may be located on Federal, tribal, state, or private lands. The State Historic Preservation Act ("SHPA"), New York Parks Recreation and Historic Preservation Law § 14.09 (2007), which is the State counterpart to Section 106 of the NHPA, ensures that the Commissioner of the OPRHP is consulted about impacts from projects involving State agencies that may affect a property listed or eligible for listing on the State Register of Historic Places. In comparison to the SHPA, Section 106 of the NHPA offers Indian tribes greater involvement in the consultation processes required under these laws, including the ability of tribes under Section 106 to designate a Tribal Historic Preservation Officer ("THPO") and to assume all or part of the functions of the SHPO with respect to tribal lands. 16 U.S.C. § 470a(d)(2) & (6); 36 C.F.R. § 800.2(c)(2).

Section 106 of the NHPA could apply more generally to Nation lands acquired in trust than it does currently depending on the current status of the lands. The State and local governments assert that the Nation's lands are not Federally restricted against alienation. Federal district court decisions have ruled that the Nation's lands are restricted, but Madison and Oneida Counties are appealing those rulings in *Oneida Indian Nation of New York v. Madison County and Oneida County,* Nos. 05-6408-cv (L), 06-5168-cv (CON), 06-5515-cv (CON) (2d Cir.). If the Nation's lands are unrestricted, Section 106 would become applicable to a larger class of actions on Nation lands placed into trust. No interest in lands held in trust for a tribe or owned by a tribe in restricted status can be conveyed (*e.g.,* a lease, right-of-way, etc.) without Federal approval. The need for Federal approval of a project involving such a conveyance would render the project subject to Section 106.

In addition, the Archaeological Resources Protection Act ("ARPA"), 16 U.S.C. §§ 470aa-470mm, regulates archaeological sites on public lands, trust lands, and restricted lands. ARPA establishes criminal penalties for violations of its resource protections, ranging from not more than a $10,000 fine, a one year imprisonment, or both, to not more than a $100,000 fine, a five

year imprisonment, or both. *Id.* § 470ee. The Native American Graves Protection and Repatriation Act ("NAGPRA"), 25 U.S.C. §§ 3001-30013, protects Native American human remains, funerary objects, sacred objects, and objects of cultural patrimony found on Federal lands and tribal lands, including all lands within the exterior boundaries of an Indian reservation. The New York State Education Law, New York Education Law § 233 (2007), is the State counterpart to ARPA and NAGPRA. In comparison to ARPA and NAGPRA, the State Education Law only applies where there is an excavation on State land. The State Education Law does not apply to the Nation's lands, because they are not owned by the State.

ARPA could newly apply to Nation lands acquired in trust depending on the current status of the lands. If the Nation's lands are unrestricted as the State and local governments contend, ARPA does not apply to the Nation's lands now but it would apply after acquisition of the lands in trust. Because NAGPRA applies to all lands within the exterior boundaries of an Indian reservation, NAGPRA already applies to the Nation's lands. The Oneida reservation is discussed further in Section 7.1 of this ROD, *infra*.

Alternatives A and B would guarantee the most protection through the broadest application of Federal laws. Alternative F includes some of the historic resources and most of the identified archaeological sites. Alternative I includes just over half, and Alternative H includes some, of the archaeological sites. The No Action Alternative includes none of the historic resources or archaeological sites.

While Federal resource protections are potentially somewhat limited under the Preferred Alternative (Alternative I) in comparison to Alternatives A and F, this consideration was balanced against jurisdictional and fiscal concerns raised by the State and local governments. In addition, unless the lands not acquired in trust under the Preferred Alternative follow the **PTNP-F** scenario, the Nation would continue to apply its own Cultural, Historical or Archeological Resources Ordinance, and activities related to the preservation of historic, cultural, and archaeological resources would continue to be overseen by the Nation's Historic Preservation Committee.

The potential adverse indirect effects relating to historic, cultural, and archaeological resources could be far more significant under the No Action Alternative than for the other alternatives. In the **PTNP-F** scenario or the **CC-AEC** scenario (which scenario the Department disputes), the Nation would not have its primary source of revenue that enables the Nation to maintain historic, cultural, and archaeological assets and programs.

### 3.1.4    *Cumulative Impacts*

As previously noted, the Nation is proposing no physical resource-impacting projects or changes in land use as part of the Proposed Action. The State and local governments commented that the Nation's pre-application development of its lands was undertaken out of compliance with State and local laws and zoning, and has had substantial adverse environmental impacts on the lands and surrounding properties. Other commenters stated that if lands are not placed into trust, particularly the Turning Stone Casino tax lot, significant adverse cumulative unemployment impacts could result. Other commenters have sought to compel the preparation of a

Programmatic EIS that would consider the impacts of all applications to place lands located in the State of New York in trust.

### 3.1.4.1    Analysis of Cumulative Impacts

The Final EIS evaluated the incremental impact of the Proposed Action and the other alternatives when added to past, present, and reasonably foreseeable future actions by the Nation and others within the regional study area. Past actions by the Nation, including the construction of the Turning Stone Resort & Casino, are reflected in the current environmental conditions described in Section 3 of the Final EIS. Jurisdictional problems and conflicts of land use that may arise after placement of lands into trust must be considered under 25 C.F.R. § 151.10(f), and these issues were taken into account in the Department's development and selection of the Preferred Alternative. Sections 3.9.5 and 4.9.5 of the Final EIS analyzing the Nation's past management of its lands show that there have not been significant adverse effects on environmental resources. In addition, Sections 3.2, 3.8.6, 4.2, and 4.8.6 of the Final EIS analyzing land resources and land use show that the permitted uses of Nation lands under Nation law are generally consistent with the uses of surrounding non-Nation lands, with the primary exception being the Turning Stone Resort & Casino.

Increased unemployment, loss of population, and increased burdens on State and local governments for providing unemployment compensation and social welfare services would result in the **PTNP-F** scenario under alternatives in which Nation lands are not placed into trust and in the **CC-AEC** scenario under the No Action Alternative (Alternative G) (which scenario the Department disputes). Under the No Action Alternative, significant negative cumulative impacts would occur when the foregoing impacts are considered in combination with the regional loss of thousands of jobs formerly provided by the Griffiss Air Force Base, the Oneida Limited silverware manufacturing facility (a non-Nation enterprise), the Lockheed-Martin manufacturing facility, and other major non-Nation regional employers. *See* Final EIS at 4-150 to 4-153. Alternatives C through F, H, and I would have less such cumulative impacts due to fewer lay-offs, but the impacts still have the potential to be significant. The potential cumulative impacts of the Preferred Alternative (Alternative I) were balanced against potential jurisdictional and other fiscal impact concerns, and considered to be acceptable. Also, while some jobs may be lost in the short-term under the Preferred Alternative (in the **PTNP-F** scenario) the loss would be more than offset by the year 2011.

Finally, the request of some commenters for the Department to prepare a Programmatic EIS for all of the land-into-trust applications in New York State was considered during the scoping process and rejected. Land-into-trust applications are initiated by the applicant Indian tribes and individuals, and are highly variable in the period of the request and the submission of information in support of the request; the location, scale, purpose, and potential impacts of the acquisition; and the period of Departmental review. This renders a collective assessment unfeasible and ineffective. Indeed, three of the five land-into-trust applications that were pending when these commenters requested the preparation of a Programmatic EIS were denied before the completion of the Final EIS for the Nation's fee-to-trust request.

In the future, Air Force lands located in Oneida County and within the Oneida reservation might be transferred into trust for the Nation under Federal policies and procedures concerning excess Federal property. These lands are situated close to the Casino-Resort Grouping of lands in the Preferred Alternative (Alternative I) and are not now under State and local jurisdiction or on the tax rolls. Thus, significant adverse cumulative impacts are not anticipated to result if a transfer ultimately occurs. The Department considered this potential transfer in its discretion in this particular case. The consideration of any loss of governmental jurisdiction or revenue is not required under cumulative impact analysis. *County of Sauk, Wisconsin v. Midwest Regional Director*, 45 IBIA 201, 219-20 (2007).

## 3.2    Issues Raised During the Waiting Period

The Department received 55 individual written comments on the Final EIS during the 30-day waiting period following the issuance of the Final EIS on February 22, 2008. In addition, Oneida County held a public hearing regarding the Preferred Alternative (Alternative I) at the Legislative Chambers of Oneida County in Utica, New York, on March 6, 2008, and submitted a copy of the hearing transcript to the Department as comments on the Final EIS.

In general, the comments raised the same or similar concerns as the comments received on the Draft EIS, to which the Department responded in Appendix M of the Final EIS. All of the comments on the Final EIS concern issues that (a) were previously discussed and thoroughly analyzed, or (b) are unrelated to potential project impacts under NEPA. The comments and the Department's responses to them are included in **Appendix B** to this ROD. Some of the governmental comments pertain to the criteria for acquiring land in trust in 25 C.F.R. Part 151 and are addressed in Section 7 of this ROD containing the Department's application of the Part 151 criteria to the Nation's fee-to-trust request. These issues include the Nation's need for land in trust status, *see infra* § 7.3; the Department's acceptance of letters of credit given to the Counties as satisfaction of tax liens for purposes of acquiring land in trust, *see infra* § 7.5.5; and the effect of acquiring land in trust on existing rights-of-way, *see infra* § 7.6.3.2.12.

## 4.0    ENVIRONMENTALLY PREFERABLE ALTERNATIVE

Resource categories related to the physical environment (*e.g.*, soils, groundwater, air, noise, wildlife, vegetation, wetlands, etc.) would not be affected by any alternative. Among the most substantive issues that were evaluated (*i.e.*, jurisdiction, socioeconomics, cultural resources protection, and cumulative impacts), none have a direct impact on the physical environment.

Indirect impacts under the trust acquisition alternatives would depend on the effective application of Federal and tribal jurisdiction in the management of Nation lands acquired in trust, and on the future status of the lands not acquired in trust. As explained more fully in Section 7.6 of this ROD, *infra*, the Nation asserted control over its lands prior to the Supreme Court's 2005 decision in *City of Sherrill*. Sections 3.9.5 and 4.9.5 of the Final EIS analyzing the Nation's past management of its lands show that there have not been significant adverse effects on environmental resources as a result of the Nation's management. In addition, Sections 3.2, 3.8.6, 4.2, and 4.8.6 of the Final EIS analyzing land resources and land use show that the permitted

uses of Nation lands under Nation law are generally consistent with the uses of surrounding non-Nation lands.

Among all of the alternatives, Alternatives A and B would make certain the broadest application of Federal laws regarding historic, cultural, and archaeological resources, which provide additional protections in relation to State laws, as discussed in Section 3.1.3 of this ROD, *supra*. The No Action Alternative, in contrast, could result in loss of protections that the Nation provides for such resources on the lands it owns.

The Council on Environmental Quality ("CEQ") has defined the term "environmentally preferable alternative" to mean the alternative(s) that will promote the national environmental policy as expressed in NEPA Section 101. While this usually means the alternative that causes the least damage to the physical and biological environment, "it also means the alternative which best protects, preserves, and enhances historic, cultural, and natural resources." *CEQ's Forty Most-Asked Questions*, 46 Fed. Reg. 18026 (Mar. 23, 1981).

Because Alternative A includes all of the parcels containing historic, cultural, and archaeological resources and would best preserve and protect these resources, it has been identified as the environmentally preferable alternative. The Preferred Alternative (Alternative I) is an environmentally acceptable alternative that is designed to reduce the potential for jurisdictional problems by increasing contiguity and compactness among the trust lands. Alternative I would meet the Nation's immediate and short-term needs while also minimizing potential jurisdictional impacts due to the highly contiguous (approximately 90%) and compact arrangement of the Nation lands included within it. Alternative B could preserve and protect historic, cultural, and archaeological resources as well as or better than Alternative A, and could also result in an even higher degree of contiguity than Alternative I, depending on the location of the additional lands that would be purchased by the Nation and placed into trust, but the potential impacts of that alternative are not as well understood as Alternatives A or I.

## 5.0    DECISION TO IMPLEMENT THE PREFERRED ALTERNATIVE

Based on a thorough review of the alternatives and their potential impacts, and comments received from the public, the Nation, other Indian tribes, and Federal, State, and local agencies, it is the Department's intention to adopt and implement the acquisition strategy proposed in the Preferred Alternative (Alternative I). In comparison to the Proposed Action (Alternative A), the potentially negative impacts of implementing the Preferred Alternative include limitations on historic, cultural, and archaeological resource preservation and protection, possible losses of some Nation enterprises and lands, less net economic benefit to the local economy, and cumulative unemployment impacts. Nonetheless, the Preferred Alternative meets the purpose and need for action.

The No Action Alternative (Alternative G) would not meet the purpose and need for action. In addition, the No Action Alternative could provide significantly less net economic benefit to the State and local governments, and may result in significant negative socioeconomic impacts both to the Nation and the surrounding community

The Nation has proposed no change in land use or other ground disturbing activity as part of the Proposed Action, so no physical impacts to the environment would result from the Preferred Alternative. All impacts from the Preferred Alternative are anticipated to be less than significant.

The Department has determined that it will implement the Preferred Alternative (Alternative 1), excluding one parcel (Parcel 136) comprising 81.76 acres located in the Town of Stockbridge, Madison County, as discussed further in Section 7.1 of this ROD, *infra*. The Preferred Alternative reflects the balance of the Nation's needs against the potential jurisdictional, socioeconomic, and environmental impacts of placing the Nation's lands into trust. The Preferred Alternative addresses the current and short-term needs of the Nation to reestablish a sovereign homeland and responds to the requests of the State and local governments to consider a more contiguous and compact trust land grouping than the Proposed Action, centered around the Turning Stone Resort & Casino ("Casino-Resort Grouping") in Oneida County and the Nation's 32-acre territory in Madison County ("Government-Cultural Grouping").

The future status of the Nation's lands not acquired in trust is identified by one or more of the taxation/jurisdiction scenarios previously described, with the qualification that the Department disputes the **CC-AEC** scenario. Also, the Department emphasizes that this decision is to implement the Preferred Alternative, as modified, regardless of whichever taxation/jurisdiction scenario(s) ultimately would occur with respect to lands not acquired in trust. Put another way, while this decision was made after consideration of all of the possible scenarios, this decision neither assumes nor is dependent upon the future occurrence or non-occurrence of any particular scenario(s).

## 6.0   MITIGATION

No significant impacts requiring mitigation were identified in the Final EIS. *See* Final EIS § 5.

The Nation has reaffirmed its commitment to continue its financial support of and cooperation with the surrounding community. *See* Final EIS, App. J, Letter from Nation Representative Ray Halbritter to James Cason, Associate Deputy Secretary of the Interior (Jan. 7, 2008) ("The Nation's commitment to directly assist local governments will continue even if lands acquire trust status. . . . As the post-trust era is likely still to be some time off, it is premature to make precise commitments. . . . Those in the community around us can continue to count on us, as they have in the past, to make very significant grants, donations and other payments. . . ."). This commitment, while non-binding, is anticipated to help avoid and/or offset potential negative jurisdictional and socioeconomic impacts in the future with the Subject Lands in trust.

## 7.0   DECISION TO ACQUIRE 13,003.89 ACRES IN TRUST

The procedures and policies concerning the Secretary's exercise of discretion for acquiring lands in trust for Indian tribes and individuals are set forth in 25 U.S.C. § 465 and 25 C.F.R. Part 151. The Department's evaluation of the Nation's fee-to-trust request based on the applicable criteria is provided in Sections 7.1 through 7.9 of this ROD, below.

**7.1    25 C.F.R. § 151.3 – Land Acquisition Policy**

The Nation's fee-to-trust request meets the two threshold requirements of the Secretary's land acquisition policy in 25 C.F.R. § 151.3. First, land may be acquired in trust status for an Indian tribe or individual. A "tribe" includes any Indian tribe or nation "which is recognized by the Secretary as eligible to receive the special programs and services from the Bureau of Indian Affairs." 25 C.F.R. § 151.2(b). The Nation is a Federally recognized Indian tribe and is eligible to receive services from the BIA. *See* Department of the Interior, *Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs*, 72 Fed. Reg. 13648, 13650 (Mar. 22, 2007) (listing the Oneida Nation of New York as an eligible entity).

Second, land may be acquired for a tribe in trust status:

> (1)  When the property is located within the exterior boundaries of the tribe's reservation or adjacent thereto, or within a tribal consolidation area; or
> (2)  When the tribe already owns an interest in the land [*i.e.,* the tribe owns an interest in an off-reservation asset and seeks to consolidate that interest]; or
> (3)  When the Secretary determines that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing.

25 C.F.R. § 151.3(a)(1)-(3). This requirement is satisfied under the first prong (subsection 151.3(a)(1)), because the Nation's request is for acquisition of lands located within the exterior boundaries of its "Indian reservation," as defined in 25 C.F.R. § 151.2(f), or adjacent thereto. *See City of Sherrill v. Oneida Indian Nation of New York*, 544 U.S. 197, 215 n.9 (2005) (acknowledging the Second Circuit Court of Appeals ruling that "the Oneida's reservation was not disestablished," and declining to review that issue) (citing *Oneida Indian Nation of New York v. City of Sherrill*, 337 F.3d 139, 167 (2d Cir. 2003)). Subsequent to the Supreme Court's decision in *City of Sherrill*, a Federal district court has ruled that the Oneida reservation was not disestablished. *Oneida Indian Nation of New York v. Madison County*, 401 F. Supp. 2d 219 (N.D.N.Y. 2005), *motion to alter, amend, or obtain relief from the judgment denied*, 235 F.R.D. 559 (2006); *Oneida Indian Nation of New York v. Oneida County*, 432 F. Supp. 2d 285 (N.D.N.Y. 2006).

Therefore, the Nation's request was evaluated under the on-reservation acquisition criteria listed at 25 C.F.R. § 151.10. The same criteria would apply even if the Oneida reservation has been diminished or disestablished as the State and local governments contend. Where there has been a final judicial determination that a reservation has been diminished or disestablished, "Indian reservation" also includes the area of land constituting the former reservation of the tribe as defined by the Secretary. 25 C.F.R. § 151.2(f); *Shawano County, Wisconsin, Board of Supervisors v. Midwest Regional Director*, 40 IBIA 241, 245-46 (2005); *County of Mille Lacs, Minnesota v. Midwest Regional Director*, 37 IBIA 169, 172 (2002).

Certain lands now owned by the Nation and located in the Town of Stockbridge are claimed by the Stockbridge-Munsee Community Band of Mohican Indians to be within a Stockbridge reservation. The Nation contends that all of these lands are located within the Oneida reservation. This dispute does not prevent the United States, through the Secretary, from

acquiring title to the Subject Lands in trust for the Nation. No court has ruled on the Stockbridge-Munsee Community's claim to a Stockbridge reservation in New York. Nor does the Stockbridge-Munsee Community currently exercise jurisdiction over the disputed area. Therefore, it is the Department's determination that 25 C.F.R. § 151.8 does not apply to require consent of the Stockbridge-Munsee Community to acquire the disputed lands in trust for the Nation. Moreover, the Nation-owned parcels that are both (a) located within the disputed area and (b) included in the Subject Lands are all located contiguous to the undisputed (by the Stockbridge-Munsee Community) Oneida reservation. Lands that are located "within or contiguous to" the Oneida reservation are subject to the on-reservation trust acquisition criteria. *See* 25 C.F.R. § 151.10. The Department considered the reservation dispute in its selection of the Preferred Alternative (Alternative I) in the Final EIS. This final determination differs from the Preferred Alternative identified in the Final EIS in that the Department has removed one parcel (Parcel 136) located in the Town of Stockbridge that is not contiguous to the undisputed Oneida reservation.

Because all of the Subject Lands are located within or adjacent to the Oneida reservation, the Department need not make a determination with respect to subsection 151.3(a)(3) (acquisition is necessary to facilitate tribal self-determination, economic development, or Indian housing). Nonetheless, as discussed in Section 7.3 of this ROD, *infra*, the Department finds that acquisition of the Subject Lands in trust is necessary to facilitate tribal self-determination, economic development, and Indian housing.[5]

## 7.2    25 C.F.R. § 151.10(a) – Statutory Authority for Acquisition

Section 151.10(a) requires consideration of the existence of statutory authority for the acquisition and any limitations contained in such authority.

Section 5 of the Indian Reorganization Act ("IRA") of 1934, 25 U.S.C. § 465, authorizes the Secretary, in his discretion, to acquire any interest in land located on- or off-reservation for the purpose of providing land for Indians. Section 5 provides that title to any land so acquired shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired. Section 5 contains no specific limitations on acquiring lands in trust for the Nation.

Initially, the Nation opted out of various IRA provisions, including the provisions of Section 5. *See* 25 U.S.C. § 478. In the 1983 Indian Land Consolidation Act, 25 U.S.C. § 2202, Congress

---

[5] The Department also notes that, even if the off-reservation criteria applied to the Nation's fee-to-trust request, the Department would still acquire the Subject Lands in trust. Under the off-reservation standards, the Department considers the distance from the tribe's reservation to the land to be acquired. *See* 25 C.F.R. § 151.11(b). As the distance increases, the Department gives greater scrutiny to the tribe's justification of anticipated benefits from the acquisition and greater weight to the concerns raised the state and local governments regarding the acquisition's potential impacts on regulatory jurisdiction, real property taxes, and special assessments. *See id.* As shown by extraordinary comprehensiveness of the Final EIS and this ROD, the Department has given thoughtful consideration both to the Nation's justification for placing lands into trust and to the concerns raised by New York State and local governments.

extended the provisions of Section 5 to all tribes except as otherwise provided under Federal law. Therefore, no statutory limitation on acquiring land in trust is applicable to the Nation's request.

Some commenters questioned the authority of the Secretary to acquire lands in trust in New York State. The Indian Commerce Clause of the U.S. Constitution, Art. I § 8, cl. 3, is the basis for Congress' grant of authority to the Secretary under Section 5 of the IRA. The statute is a constitutional delegation of authority to the Secretary. *See, e.g., Shivwits Band of Paiute Indians v. Utah*, 428 F.3d 966 (10th Cir. 2005), *cert. denied*, 127 S. Ct. 38 (2006); *South Dakota v. United States Department of the Interior*, 423 F.3d 790 (8th Cir. 2005), *cert. denied*, 127 S. Ct. 67 (2006).

The State of New York is not excluded from this framework by virtue of being one of the original thirteen colonies. For example, in an early Indian law decision, *Worcester v. Georgia*, 31 U.S. 515 (1832), the Supreme Court held that the State of Georgia, one of the original thirteen colonies, could not enforce a statute that was in conflict with the treaty between the Cherokee Nation and the Federal government. Thus, the U.S. Court of Appeals for the Second Circuit stated in the *United States v. Boylan* decision concerning the Nation's 32-acre territory, "[t]he Indian tribes, irrespective of their locality, [a]re under the protection of the Federal government." *United States v. Boylan*, 265 F. 165, 172 (2d Cir. 1920), *error dismissed*, 257 U.S. 614 (1921) (citing *Worcester*). The United States has acquired land in trust in several of the original thirteen colonies under various statutory authorities, including Section 5 of the IRA. In March 2005, the Supreme Court identified the Secretary's land-into-trust process under Section 5 of the IRA as the "proper avenue" for the Nation "to reestablish sovereign authority over" lands it owns in New York State. *City of Sherrill v. Oneida Indian Nation of New York*, 544 U.S. 197, 220-21 (2005). Thus, the Secretary clearly has discretionary authority to acquire the Nation's lands in trust.

## 7.3    25 C.F.R. § 151.10(b) – Nation's Need for Land

Section 151.10(b) requires consideration of "[t]he need of the . . . tribe for additional land."

Section 5 of the IRA authorizes the Secretary to acquire lands through purchase, relinquishment, gift, exchange, or assignment for the purpose of providing land for Indians. 25 U.S.C. § 465. In this case, the Nation already owns all 17,370 acres and is proposing to convey the lands to the Secretary for placement into trust. Therefore, the Nation does not have to demonstrate a need for the Secretary to purchase additional lands on its behalf. *See id.* (authorizing appropriation of up to $2 million in any one fiscal year for the acquisition of lands).

### 7.3.1    *Nation's Need for Land in Trust Status*

The State and local governments commented that the Department must also analyze whether acquisition of land in trust status for the Nation is "actually necessary to facilitate" tribal self-determination, economic development, or Indian housing. Under the land acquisition regulations, no demonstration or finding of need for land in trust status is required where, as here, the land to be acquired is located within or adjacent to the tribe's reservation. *See 25 C.F.R. § 151.3(a).* While the Secretary is not required to do so under the regulations, the

34

Secretary may, in his discretion, consider the tribe's need for additional land in trust status. *See South Dakota v. Acting Great Plains Regional Director*, 39 IBIA 283, 292-94 (2004); *see also South Dakota v. Department of the Interior*, 423 F.3d 790, 801 (8th Cir. 2005). The Department has considered the Nation's need for lands in trust status and finds that the Nation has a demonstrable need for the acquiring the Subject Lands in trust, as discussed below.

### 7.3.1.1    Tribal Membership and Economic Status

The Department considered the Nation's membership in the context of need. The Nation has approximately 1,000 enrolled members, approximately 650 of whom reside on or near the Oneida reservation. *See* BIA, *American Indian Population and Labor Force Report* at 4 (2003). The Nation is a matrilineal society where membership and clan affiliation are derived from one's mother. As a result, the membership roll of the Nation does not fully represent the number of persons who receive services and support from the Nation. The Nation provides services to its enrolled members and their families, and to other Indians in Central New York. In any case, while tribal membership and residence is a permissible consideration in the context of need, no mathematical formula compels a determination of how much trust land is needed. *See County of Sauk, Wisconsin v. Midwest Regional Director*, 45 IBIA 201, 211-13 (2007).

The Department also considered the financial status of the Nation, which is detailed in the Final EIS at pages 3-276 to 3-296. Like tribal membership, no mathematical formula concerning the wealth (or lack thereof) of a tribe is determinative of its need for land in trust. *See County of Sauk*, 45 IBIA at 209-11 ("Indeed, it is readily imaginable that the 'need' will vary from one tribe to another or from one individual Indian to another such that flexibility in evaluating 'need' is an inevitable and necessary aspect of BIA's discretion."). Need for land depends on the circumstances of a particular Indian tribe or individual, and also relates to the purpose for which the land will be used. The Department's determination of the Nation's need for land in trust in relation to the Nation's situation is discussed below.

### 7.3.1.2    Determination of Necessity

As a threshold matter, the Department finds that the Nation's financial wherewithal and competence to manage its affairs do not render it ineligible for placement of land into trust. Section 5 of the IRA is not limited to landless or impoverished tribes, or to tribes that are incompetent to handle their own affairs. *See United States v. 29 Acres of Land*, 809 F.2d 544, 545 (8th Cir. 1987); *Chase v. McMasters*, 573 F.2d 1011, 1015-16 (8th Cir. 1978), *cert. denied*, 439 U.S. 965 (1978); *City of Sault Ste. Marie v. Andrus*, 532 F. Supp. 157, 162 (D.D.C. 1980); *City of Tacoma v. Andrus*, 457 F. Supp. 342, 345 (D.D.C. 1978); *Kansas v. Acting Southern Plains Regional Director*, 36 IBIA 152, 155 (2001). A tribe's casino income does not disqualify it from, and financial difficulties are not a prerequisite for, acquisition of land in trust. *See County of Sauk*, 45 IBIA at 209-11; *South Dakota v. Acting Great Plains Regional Director*, 39 IBIA 283, 290 (2004); *County of Mille Lacs, Minnesota v. Midwest Regional Director*, 37 IBIA 169, 173 (2002); *see also Avoyelles Parish, Louisiana Police Jury v. Eastern Area Director*, 34 IBIA 149, 153 (1999) ("A financially secure tribe might well need additional land in order to maintain or improve its economic condition if its existing land is already fully developed.").

The State and local governments commented that the No Action Alternative would meet the Nation's needs by allowing the Nation to continue to apply its business acumen and operate like a private landowner or corporation on fee land. In particular, Madison County commented that foreign nations conduct business in the State of New York either directly or indirectly through wholly-owned corporations (citing the Venezuelan company Citgo as an example), and that these nations pay taxes or negotiated payments in lieu of taxes and comply with State laws.

This comparison is not fitting. With the IRA and through 25 U.S.C. § 465, Congress provided a mechanism for protecting tribal lands through their acquisition by the United States in trust. The basic features of trust status (*i.e.*, application of tribal sovereignty and jurisdiction over the land to the exclusion of state and local control, immunity from state and local property taxation, protection of the land against alienation, and application of Federal laws unique in their application to trust lands) are largely uncharacteristic of lands held by private individuals or corporations, and are not subject to the same relationships with the state.

Further, while the New York State and local government comments focus on the Nation's business successes, a demonstration of necessity may take into account more than economic need and may also consider the tribe's need for land to support self-determination and tribal housing. The Department finds that the basic features of trust status will promote the Nation's ability to continue its existing uses of the Subject Lands as the Nation intends, thereby supporting tribal economic development, self-determination, and tribal housing.

The Nation has 32 acres that are under its sovereign authority following the *Boylan* litigation and no acres in trust status under 25 U.S.C. § 465.[6] The Oneidas once possessed approximately 300,000 acres within their reservation, nearly all of which was conveyed to the State without Federal approval in violation of the Non-Intercourse Act, 25 U.S.C. § 177. During the Department's evaluation of the Nation's fee-to-trust request, Madison County and Oneida County have sought to foreclose on the Nation's re-acquired lands. *See Oneida Indian Nation of New York v. Madison County and Oneida County*, Nos. 05-6408-cv (L), 06-5168-cv (CON), 06-5515-cv (CON) (2d Cir.). The State of New York has separately contended that the Nation's core enterprise, the Turning Stone Casino, is unlawful. *See, e.g.*, Letter from Richard Platkin, Counsel to the Governor, to Philip Hogen, Chairman, National Indian Gaming Commission (Sept. 16, 2005).

Acquisition of the Subject Lands in trust will help to address the Nation's current and near term needs to permanently reestablish a sovereign homeland for its members and their families, preventing alienation of the lands or involuntary cessation of the Nation's various uses of the lands. The Nation's ability to exercise governmental authority over the lands and its uses, and to protect it for future generations, will promote the health, welfare, and social needs of its members and their families. In addition, the Nation has sought to diversify its economy and land base so that it is not as heavily dependent on its gaming enterprise, which is not a guaranteed future source of revenue. Placement of non-gaming lands into trust will support those efforts and

---

[6] The Nation might receive some additional lands in trust pursuant to excess Federal property policies and procedures. It is not known if or when such a transfer for the Nation will occur and, regardless, these additional lands are not a substitute for the Subject Lands with respect to meeting the Nation's current and short-term needs.

provide lands for other member needs, thereby protecting tribal self-determination and bringing stability to the Nation. The Nation's uses of the Subject Lands to promote the health, welfare, and social needs of the Tribal community are described below.

In Oneida County, the Subject Lands principally include the Nation's core economic enterprises currently and for the foreseeable future. These properties are strategically located near Exit 33 of the New York State Thruway, one of two Thruway exits in the Oneida land claim area. These properties include the land on which the following Nation enterprises or support facilities are situated:

- Turning Stone Resort & Casino, including –
  o More than 2,400 cashless multi-game machines and 1000 table games, a bingo hall, and a poker room
  o On-site lodging (Lodge at Turning Stone, Tower at Turning Stone, Inn at Turning Stone, and Hotel at Turning Stone)
  o Day Spa & Salon
  o Event Center
  o Conference Center
  o 11 dining facilities and a food court
  o Swimming pools
  o Parking
  o Co-generation plant
  o Storage, maintenance, and warehouse facilities
- Five neighboring golf courses (Atunyote, Kaluhyat, Shenendoah, Pleasant Knolls, and Sandstone Hollow), a golf dome, and two club houses
- Three nearby SavOn gas stations and convenience stores
- Off-site lodging
- Villages at Turning Stone RV Park and Peaceful Pines Campground
- Standing Stone Gaming
- Four Directions Media
- Wetlands mitigation site
- Open space and buffer areas
- Intern housing

In Madison County, the Subject Lands represent the hub of Nation government, member housing, agriculture, and culture. The Subject Lands surround the Nation's 32-acre territory. The Subject Lands are the location of the following Nation functions or resources:

- Ray Elm Children & Elders Center
- Family Services
- Health Center
- Legal Services Department and Justice Center
- Housing Administration

- 80 out of 98 member residential properties, including Village of the White Pines (50 homes developed in part with Federal funds provided by the Department of Housing and Urban Development)
- Facilities Department
- Recreation Department
- Shako:wi Cultural Center
- Telecommunications Department
- Information Services
- Main Cattle Farm (Heifer Hotel)
- Three Sisters Traditional Cropland
- Reforested land for traditional black ash basket making and hickory stands for lacrosse sticks
- Hunting and fishing lands
- One SavOn gas station and convenience store
- Nation cemetery
- Cookhouse
- 82 out of 157 identified archaeological sites

Under this final determination, approximately 4,366 acres will not be acquired in trust status. These lands include the following Nation functions or resources:

- 18 member residential properties
- Media Relations
- Member Services
- Security Offices
- Cultural Resources Department
- Living History Department
- Festival sites
- Reenactment sites
- 75 identified archaeological sites
- Nine SavOn gas stations and convenience stores
- Sand and Gravel Quarry
- Wholesale distribution and warehouse facilities
- Three public access marinas (Marion Manor, Snug Harbor, and Mariner's Landing)
- CNY Fiberglass and Boat Repair
- Retail Outlet
- Agricultural land holdings, including some crop rentals

These lands are not adjacent to the Nation's economic or government/cultural centers at the Turning Stone Resort & Casino and surrounding the 32-acre territory, respectively. These lands mainly provide for economic diversification and reduced reliance on a gaming-based economy (*e.g.*, nine SavOns, three marinas, CNY Fiberglass and Boat Repair, crop rental on some agricultural properties, etc.). These lands also provide for cultural expression and resource protection, and growth space for future generations and for the potential return of Oneida members. For purposes of this decision on the Nation's present request, in consideration of the

Nation's needs and the concerns expressed by the State and local governments regarding potential jurisdictional and fiscal impacts, the Department has decided not to acquire these lands in trust. This decision does not disqualify the Nation from submitting land-into-trust applications for these or other lands in the future.

## 7.4    25 C.F.R. § 151.10(c) – Purposes for Which the Land Will be Used

Section 151.10(c) requires consideration of the purposes for which the land to be acquired will be used.

The Nation proposes no change in land use or ground-disturbing activity as part of its fee-to-trust request. For the foreseeable future, the Nation intends to continue the existing uses of the lands proposed for acquisition. The existing uses of the Subject Lands were described in the preceding section of this ROD.

The Department understands that the Nation does not plan to use the Subject Lands for gaming or gaming-related purposes, except with respect to the Turning Stone Resort & Casino lands. Based on the information provided by the Nation and other analysis available to the Department, including the patterns of the development that have occurred on the Nation's lands since the Nation re-acquired them beginning in 1987, the Department is satisfied regarding the stated purposes for which the Subject Lands will be used. *See City of Lincoln City, Oregon v. Portland Area Director,* 33 IBIA 102, 105-07 (Jan. 14, 1999) (rejecting contention that the BIA could not consider a trust acquisition request unless the tribe entered into a legally binding agreement that it would not change the use of the tract in the future).

During the Department's review of the Nation's fee-to-trust request, the Nation has had improvements and other activities in various stages of completion or slated for construction, mainly related to the Turning Stone Resort & Casino. These projects are not dependent upon the final determination because they may be completed whether or not the land is acquired in trust. The Final EIS evaluated the cumulative impacts of these projects in connection with the alternatives. These projects are:

- Nightclub (completed)
- Landscaping (completed)
- Internal road system improvements (underway)
- Comfort station at Atunyote golf course (underway)
- Relocation of driving range (completed)
- Tennis dome and outdoor tennis courts (in planning)
- Clubhouse to connect existing golf dome with new tennis dome (completed)
- Sweat lodge (completed)
- Wedding Pavilion (in planning)
- Grass helicopter pad (completed)
- Installation of underground grease interceptor tanks to reduce biochemical oxygen demand in wastewater sent to municipal wastewater treatment system (completed)

The Nation has identified other potential projects associated with the Turning Stone Resort & Casino that the Nation is now only exploring. The Nation has indicated that it has no designs, construction details, or contracts for any of these potential projects, and that no decision has been made to proceed with any of these concepts. The Department determined these projects to be speculative and not subject or amenable to analysis in the EIS under NEPA. These projects are:

- Additional 18-hole golf course
- Additional 200 to 300 hotel rooms
- Employee Center

The Department has nevertheless considered that these potential projects would be consistent with the existing development patterns of the Nation's lands.

## 7.5     25 C.F.R. § 151.10(e) – Impact on the State and Its Political Subdivisions Resulting from Removal of the Land from the Tax Rolls

Section 151.10(e) requires consideration of the impact on the State and its political subdivisions resulting from removal of the land from the tax rolls.

By letters dated September 20, 2005, in accordance with 25 C.F.R. § 151.10, the Department notified the State and local governments that they would have 30 days in which to provide written comments as to the acquisition's potential impacts on regulatory jurisdiction, real property taxes, and special assessments. As a matter of discretion, the Department divided the comment period among the three land groups and provided substantial extensions. The comment periods for the Group 1 and Group 2 lands were extended to January 1, 2006. The comment period for the Group 3 lands was extended to March 1, 2006. The Nation responded to the comments that were received.

State and local governments uniformly opposed acquisition of land in trust based on asserted loss of tax revenues. State and local governments also requested that the Secretary not acquire any land in trust unless and until the Nation has fully paid all taxes, penalties, and interest that the Nation is alleged to owe.

As discussed below, potential fiscal impacts were comprehensively evaluated in the Final EIS, including in the development and selection of the Preferred Alternative (Alternative I). The Department finds that the impacts of removing the Subject Lands from the tax rolls are not significant when balanced with the benefits to the Nation of placing the Subject Lands into trust. This is based on the tax revenue loss that would result from acquiring the Subject Lands in trust considering the taxes that have actually been assessed and paid. This is also based on the degree to which the Nation's direct and indirect payments to the State and local governments offset the loss of real property taxes that would occur even if taxes are due and owing to the full extent alleged by Madison and Oneida Counties. Further, although it is not necessary to the Department's findings regarding the significance of the fiscal impacts of acquiring the Subject Lands in trust, the Department has determined that the Turning Stone Casino is being assessed unlawfully under IGRA and that a proper tax valuation would include the value of the land only, without the value of the gaming and gaming-related improvements. Finally, the Department has

40

determined that bank letters of credit are sufficient to address tax liens on the Subject Lands for purposes of acquiring the lands in trust.

### 7.5.1    *Analysis of Taxes Assessed and Payments Made*

Under 25 C.F.R. § 151.10(e), the analysis of tax impacts is based on existing circumstances, *i.e.*, taxes actually assessed and paid. The Secretary is not required to speculate on the outcome of the pending litigation between the Nation and the Counties over taxes and related charges that may or may not be owed by the Nation. Nor, contrary to the comments of local governments, is the Secretary required to speculate on potential revenue impacts from future development or improvement of the Nation's lands. *See, e.g., Skagit County, Washington v. Northwest Regional Director,* 43 IBIA 62, 81-82 (2006); *Shawano County, Wisconsin, Board of Supervisors v. Midwest Regional Director,* 40 IBIA 241, 249 (2005); *Rio Arriba, New Mexico, Board of Commissioners v. Acting Southwest Regional Director,* 38 IBIA 18, 21 (2002); *City of Eagle Butte, South Dakota v. Aberdeen Area Director,* 33 IBIA 246, 248 (1999).

### 7.5.1.1    **Potential Tax Revenue Loss If Taxes are Not Due and Owing**

Pursuant to the Supreme Court's decision in *City of Sherrill v. Oneida Indian Nation of New York,* 544 U.S. 197 (2005), the Nation may not unilaterally assert tribal tax immunity over its re-acquired lands as a matter of Federal law. Madison and Oneida Counties have imposed real property taxes on the Nation's lands and have sought to foreclose on the lands for non-payment of taxes, penalties, and interest. However, Federal district court decisions subsequent to *City of Sherrill* have ruled, *inter alia,* that the taxes and related charges are unlawful under New York State law; that the Nation's lands are restricted against alienation pursuant to the Non-Intercourse Act, 25 U.S.C. § 177, and therefore are not subject to foreclosure for non-payment; and that tribal sovereign immunity bars suits to collect. *See Oneida Indian Nation of New York v. Madison County,* 401 F. Supp. 2d 219 (N.D.N.Y. 2005), *motion to alter, amend, or obtain relief from the judgment denied,* 235 F.R.D. 559 (2006); *Oneida Indian Nation of New York v. Oneida County,* 432 F. Supp. 2d 285 (N.D.N.Y. 2006).

With regard to the taxability of the Nation's lands under New York State law, the district court ruled:

> New York State Law provides that 'real property in any Indian reservation owned by the Indian nation, tribe or band occupying them shall be exempt from taxation.' N.Y. Real Prop. Tax Law § 454; N.Y. Indian Law § 6 (McKinney 2001) (directing that no taxes be assessed upon Indian reservation lands). The Nation's 'reservation was not disestablished.' *City of Sherrill,* 337 F.3d at 167. The properties at issue are located within the Nation's reservation. Pursuant to state law, taxes should not have been assessed against the Nation's properties and such properties are exempt from taxation. Therefore, the County's assessment of taxes upon the property and its attempts to foreclose for non-payment of such taxes is contrary to state law.

41

Madison and Oneida Counties appealed these decisions. *Oneida Indian Nation of New York v. Madison County and Oneida County*, Nos. 05-6408-cv (L), 06-5168-cv (CON), 06-5515-cv (CON) (2d Cir.).

In light of the ongoing dispute, the Department is only required to consider the taxes that have actually been assessed and paid. If the Nation prevails in the litigation, the Department's analysis of taxes actually assessed and paid, provided below, would support this final determination. In the event that the Nation does not prevail, the Department has, in its discretion, also considered the potential tax revenue losses to the State and local governments irrespective of whether the taxes have been paid. This analysis is provided in Sections 7.5.2 and 7.5.3 of this ROD, *infra*. In either case, the Department would acquire the Subject Lands in trust.

In addition, after the issuance of the Final EIS, the Nation provided irrevocable bank letters of credit to Madison and Oneida Counties for all of the taxes, penalties, and interest allegedly owed on all of the lands that are the subject of the tax foreclosure litigation (and other lands). If the Nation prevails, the funds will be credited back to the Nation. If the Counties prevail, the funds will be paid to the Counties. The Department takes no position here on the litigation itself.

### 7.5.1.1.1   *Cities of Sherrill and Oneida*

Due to the ongoing tax dispute, the Nation generally has not paid real property taxes to Madison or Oneida Counties. The Nation does, however, make property tax payments to the City of Sherrill in Oneida County and to the City of Oneida in Madison County pursuant to agreements reached with those cities in 2005 and 2006, respectively. *See* Final EIS, App. G.

None of the Nation's lands located within the City of Sherrill will be placed into trust under this final determination. The Nation will continue to make payments pursuant to its agreement with the City of Sherrill.

Under the agreement between the Nation and the City of Oneida, the Nation paid $5.09 million in back taxes allegedly owed and the City agreed to remove any tax liens on the Nation's properties within the City. The Nation further agreed to make payments in future years, with certain reservations of rights. This agreement will not continue to apply to the Nation's lands that will be acquired in trust under this decision after formal acceptance of the lands into trust.

Under this final determination, 25 of the Nation's 45 tax parcels located in the City of Oneida will be acquired in trust. For FY 2008, the Nation paid for all of its lands located in the City of Oneida a total of approximately $739,280 in city, county, and school district tax bills for property taxes levied by the City of Oneida, Madison County, special assessment districts, and school district jurisdictions (*i.e.*, the Oneida City, Stockbridge Valley, and Vernon-Verona-Sherrill ("V.V.S.") School Districts). As a result of the Department's decision and by operation of the Nation's agreement with the City of Oneida, the property tax levying jurisdictions will annually lose a total of $618,029 in future tax revenues from the lands located in the City of Oneida to be acquired in trust. The City of Oneida would lose $58,888 annually, or 2.5% of the City's total annual tax levy. Madison County would lose $156,092 annually, or 0.56% of the

County's tax levy. The annual school district property tax loss would be $333,412 for the Oneida City School District (2.7% of the levy), $22,976 for the Stockbridge Valley School District (1.1% of the levy) and $192 for the V.V.S. School District (0.0001% of the levy). Special assessment districts within the City of Oneida (*i.e.*, hydrant, library, and fire) would annually lose $46,469, or 8.7% of the levy.

The amount of taxes levied for 2008 against the 20 Nation tax parcels within the City of Oneida that will not be acquired in trust is approximately $121,251, inclusive of city, county, school, and special assessment districts. These annual tax revenues will continue to be collected under the agreement.

### 7.5.1.1.2    *Counties of Madison and Oneida*

Because no tax agreements have been reached between the Nation and Madison or Oneida Counties, no actual tax loss to either County would result from placement of the Subject Lands into trust, except for the amount to Madison County included in the Nation's FY 2008 payments to the City of Oneida discussed above.

In August 2005, the Nation made a one-time, non-refundable payment to Oneida County of $650,000. In return, Oneida County agreed to forbear from issuing and recording deeds to 59 Nation-owned properties in the name of the Oneida County Board of Legislators for nonpayment of taxes during the pendency of Federal court tax litigation. The agreement was for the express purpose of avoiding the need for a preliminary injunction hearing in that action. Only if the Nation redeemed all 59 properties would the payment be credited toward the redemption prices of the properties. In December 2005, the Nation paid Oneida County $314,407.83 to redeem six tax lots (322.000-1-30, 322.000-2-19, 322.000-2-28, 323.000-1-1.1, 323.000-1-1.3, and 323.000-1-2). A similar agreement was not reached for other parcels on which the County subsequently sought to foreclose. Accordingly, the Nation then sought and obtained injunctive relief with respect to all of the parcels. *See Oneida Indian Nation v. Oneida County*, 432 F. Supp. 2d 285, 286, 288 (N.D.N.Y. 2006). The Nation's one-time payment to Oneida County under the foregoing agreement and its payment to redeem six tax lots do not constitute taxes actually assessed and paid for purposes of the Department's analysis of tax revenue loss.

### 7.5.1.1.3    *School Districts*

Because no tax agreements have been reached between the Nation and the school districts, no actual tax loss to the school districts would result from placement of the Subject Lands into trust, except for amounts to the Oneida City, Stockbridge Valley, and V.V.S. School Districts included in the Nation's FY 2008 payments to the City of Oneida discussed above.

In 2005, the Nation paid under protest a total of approximately $1,135,200 to several school districts in Madison County (Canastota, Madison, Morrisville-Eaton, and Stockbridge Valley) and to the V.V.S. School District in Oneida County. The payment to the V.V.S. School District was for $298,400, an amount equal to the tax assessments on the properties that are not part of the gaming complex. The Nation has not continued to make such payments. The Nation's one-

time payment under protest does not constitute taxes actually assessed and paid for purposes of the Department's analysis of tax revenue loss.

In addition, the State and local governments expressed concern that placement of the Nation's lands into trust might negatively impact the municipalities' credit rating and costs of borrowing. As described above, the Nation generally does not pay taxes now. In that respect, placement of the Nation's lands into trust would continue the *status quo*. Absent placement of the Nation's lands into trust, the tax dispute may continue. Moreover, as discussed *infra*, the Department has determined that the taxes assessed on the Turning Stone Casino tax lot (which comprise 80% of the taxes assessed on all Nation parcels) are for the most part unlawful under IGRA.

### 7.5.1.2    Sales, Excise, and Hotel Taxes

Apart from real property tax loss, the State and local governments commented that placement of lands into trust would negatively impact their collection of sales and excise tax receipts. Oneida County also stated that since 1984 it has assessed a hotel bed tax that is earmarked for tourism promotion, and that placing lands into trust would negatively impact the County's ability to fund tourism promotion.

The Department has fully considered the disputes over sales, excise, and hotel taxes in its decision to acquire the Subject Lands in trust. *See, e.g.,* Final EIS at 3-276 to 3-279, 3-386 to 3-389. The State of New York has not enforced fuel and cigarette excise tax collections and remittals. Nor has the State, which collects and enforces Madison and Oneida County sales taxes, required the Nation to collect and remit sales taxes. Placement of the Nation's lands into trust would not prevent the State from enforcing lawfully applicable sales and excise taxes if in the future it determines to do so. Furthermore, due to the focus of the Preferred Alternative (Alternative I) on the Casino-Resort and Government-Cultural groupings, most of the Nation's SavOn gas stations and convenience stores where fuel and cigarettes are sold are not being acquired in trust. Also, the Nation collects its own sales tax and, pursuant to its Retail Sales and Hotel Occupancy Tax Ordinance, all sales tax collections are used to support government programs and services, which might otherwise be provided by the State and local governments.

In addition, the Nation has never remitted hotel taxes to the local governments. Although the Nation would continue not to remit hotel taxes after placement of the Subject Lands into trust, the Nation collects its own hotel tax and the Nation's Retail Sales and Hotel Occupancy Tax Ordinance requires it to use these tax receipts to promote regional tourism as would Oneida County. Further, as shown in the Final EIS at page 3-357 and Figure 3.7-20, Oneida County's hotel occupancy tax revenues continued to grow after the Nation began providing on-site lodging in 1997. Additional tourism is likely to be fostered by the acclaim that the Turning Stone Resort & Casino receives, including a 2007 "Most Excellent Resort" award by Condé Nast Johansen. Also, in 2006, the PGA Tour began holding an annual event at the Atunyote golf course at Turning Stone.

In sum, based on the taxes that have actually been assessed and paid, the Department finds that the impact of removing the Subject Lands from the tax rolls is not significant when balanced with the benefits to the Nation of acquiring the Subject Lands in trust.

### 7.5.2    *Potential Tax Revenue Loss If Taxes are Due and Owing*

If the Nation does not prevail in the tax litigation, the Final EIS comprehensively evaluated the potential fiscal effects of placing the Nation's lands into trust under each of the alternatives analyzed. *See* Final EIS §§ 3.7, 4.7, 5.2, and App. E.

The total annual property tax on Nation lands in 2005 is estimated to be $2.76 million, not including the Turning Stone Casino tax lot in the Town of Verona. Based on the 2005 tax rates and the Town's assessed value of the casino tax lot of $362.55 million (which the Department has determined is unlawful), the annual property tax on the casino tax lot is $12.2 million. The total annual property tax on the Nation's lands is $14.96 million, including county, municipal, school district, and special assessment district taxes.[7]

The Final EIS provided the estimated property tax effects of each alternative, including the casino tax lot (using the Town of Verona's assessed valuation of $362.55 million) and excluding the casino tax lot (in light of the disagreement over the assessment of the casino tax lot). At the high end of potential tax revenue loss, the Proposed Action (Alternative A) would reduce the tax rolls by $2.76 million (excluding the casino tax lot) or $14.96 million (including the casino tax lot), assuming that taxes are due and owing. At the low end, the No Action Alternative (Alternative G) would allow for the collection of those tax dollars, again assuming that taxes are due and owing. Under the Preferred Alternative (Alternative I), $2.19 million (excluding the casino tax lot) or $14.39 million (including the casino tax lot) would be removed from the tax rolls annually, and $575,405 would remain subject to collection, if taxes are due and owing.

In addition to the analysis contained in the Final EIS, the Department also considered (a) the total real property tax levy of each jurisdiction (county, town, village, and school district) and (b) the real property tax levy on the Preferred Alternative lands within each jurisdiction, to determine (c) the real property tax levy on the Preferred Alternative lands as a percentage of the total real property tax levy of each jurisdiction. This provides an approximate calculation of the tax loss to each jurisdiction that would result from placing the Subject Lands into trust, if taxes are due and owing.

According to the New York State Office of the State Comptroller, the total real property tax levy of Oneida County in 2005 was $54,753,582. Based on the total levy and the 2005 tax bills issued to the Nation, implementing the Preferred Alternative would reduce the Oneida County

---

[7] There is some difference between the property tax estimates contained in the Final EIS and the tax information contained in the Center for Governmental Research Report (February 2006) that was supplied by the Counties. The Final EIS estimate of total annual property taxes is $14.96 million (including the casino as assessed by the Town of Verona) whereas the report submitted by the Counties estimated the total annual property taxes to be $16.2 million (also including the casino tax lot). The difference between the estimates largely relates to the V.V.S. School District tax applicable to the casino tax lot. The Final EIS applies the V.V.S. School District tax rate for the 2004 levy/roll year. The report submitted by the Counties appears to have applied the V.V.S. School District tax rate for the 2005 levy/roll year. Having considered the difference between the estimates, the Department has determined that it does not lead to a different decision on the Nation's fee-to-trust request. The overall net fiscal impact to the State and local governments from placing the Subject Lands into trust is positive regardless of which data set is used.

property tax revenues by approximately $3,257,470 (5.9% of the County's property tax levy), including the casino tax lot, if taxes are due and owing. Excluding the casino tax lot, the Oneida County property tax revenues would be reduced by approximately $203,378 (0.4% of the property tax levy), if taxes are due and owing. According to the Office of the State Comptroller, the total real property tax levy of Madison County in 2005 was $25,282,779. Implementing the Preferred Alternative would reduce the Madison County property tax revenues by approximately $220,282 (0.9% of the County's property tax levy), if taxes are due and owing. (The real property tax revenue loss to the Cities of Sherrill and Oneida based on the Nation's intergovernmental agreements with them were discussed in Section 7.5.1.1.1 of this ROD, *supra*.)

The impacts of implementing the Preferred Alternative on the real property tax levies of individual towns, villages, and school districts are as follows.[8] The Towns of Augusta, Lincoln, Stockbridge, and Vernon would experience an annual loss of property tax revenues of approximately $2,763 (0.6% of the property tax levy), $1,407 (0.4% of the levy), $17,999 (5.1% of the levy), and $1,819 (0.7% of the levy), respectively, if taxes are due and owing. The Town of Verona, where the Turning Stone Casino is located, would experience an annual loss of approximately $872,817 (107.6% of the property tax levy), including the casino tax lot, or $54,928 (6.8% of the levy), excluding the casino tax lot, if taxes are due and owing. The Village of Vernon would experience an annual loss of approximately $6,909 (2.5% of the levy), if taxes are due and owing. The Madison, Oneida City, and Stockbridge Valley School Districts would experience an annual loss of property tax revenues of approximately $8,284 (0.4% of the levy), $346,809 (3.3% of the levy), and $119,747 (6.5% of the levy), respectively, if taxes are due and owing. Finally, the V.V.S. School District, where the Turning Stone Casino is located, would experience an annual loss of approximately $10,160,130 (99.7% of the levy), including the casino tax lot, or $980,831 (9.6% of the levy), excluding the casino tax lot, if taxes are due and owing.[9]

As indicated above, if the casino tax lot as assessed by the Town of Verona is included in the analysis, the tax revenue loss of the Town of Verona exceeds the Town's total levy (*i.e.*, is over 100%) and the tax revenue loss of the V.V.S. School District almost equals the levy (*i.e.*, is almost 100%). This may be because the Town of Verona did not include the casino tax lot's assessed value in the Town's total assessed value used to set the tax rate. This, in turn, may be attributable to New York State legislation introduced on June 19, 2005 and effective August 16, 2005, which requires tax rates in Oneida County to be set as if the Nation's lands are tax exempt due to uncertainty over tax collections. 2005 NY ALS 5825, *codified in part*, NY CLS St. Fin.

---

[8] This analysis is based on the 2005 property tax levy and includes the special assessment district tax levy as reported by the Office of the State Comptroller. Except for the casino tax lot, the tax on Nation land is derived from the Nation's tax bills for 2005 and the 2005/2006 school district taxes. The property tax on the casino tax lot is based on the July 1, 2004 assessed valuation reported in the Final EIS. The special assessment district tax for the casino tax lot is based on the report submitted by New York State that was prepared by O'Brien and Gere.

[9] The figures for Madison County and the Oneida City, Stockbridge Valley, and V.V.S. School Districts have not been reduced by the amounts that Madison County and these school districts would continue to receive through the Nation's intergovernmental agreement with the City of Oneida, which will continue to apply to the 20 tax lots within the City of Oneida that will not be acquired in trust under this final decision.

§ 99-n. The combined effect of this legislation and the Town of Verona's valuation of the casino tax lot is that the Nation is being assessed taxes that surpass individual budget items of the Town (*e.g.*, the Nation's share of the Town's $142,844 fire protection budget is $539,359).

### 7.5.3    *Net Nation Financial Contributions to the State and Local Governments*

In the Department's evaluation of impacts from removal of lands from the tax rolls, it may in its discretion consider the overall fiscal impacts of trust acquisition. This includes the degree to which the tribe's ongoing business activities generate economic and tax benefits to the local community that offset the taxes that would be lost as a result of trust acquisition. *See, e.g., County of Sauk, Wisconsin v. Midwest Regional Director,* 45 IBIA 201, 214-17 (2007); *Rio Arriba, New Mexico, Board of Commissioners v. Acting Southwest Regional Director,* 38 IBIA 18, 25-26 (2002). The Department's analysis of the overall fiscal impacts of acquiring the Subject Lands in trust is summarized below. Additional information is contained in the Final EIS at Sections 3.7, 4.7, and 5.2, and Appendix E.

While forgone taxes could result in an adverse effect on local government revenues, the service agreements and the property, sales, and income taxes directly and indirectly generated by the Nation and its employees would continue to have a positive effect on the local economy and include:

- **Nation Grants and Payments to Local Governments.** The Nation has made direct payments to local governments totaling $38.5 million since 1995 in several categories of spending (*i.e.*, Silver Covenant Payments, Municipal Service Agreements, Other Utility/Water Sewer Payments, and Infrastructure). This amount includes payments in the fall of 2005 and the spring of 2006 to the City of Sherrill and the City of Oneida, respectively, as well as $7.7 million in Silver Covenant payments to local governments that were discontinued in the fall of 2005. (The Silver Covenant payments have not been credited against taxes.) It can reasonably be expected that the Nation will continue to pay local governments for services provided.

- **Nation Employee Property Taxes.** Nation employees paid an estimated $5.55 million in local property taxes in 2005.

  - Under the Preferred Alternative (Alternative I), these revenues would be maintained and could increase slightly by 2011 because of modest inmigration associated with the Nation's job growth.

- **New York State Income Tax.** The Nation withheld and remitted $3.38 million in New York State income taxes from its employees in 2005.

  - Assuming that the average income tax per job remains constant, a total of $3.39 million in New York State income taxes would be withheld from the Nation's payroll in 2011 under the Preferred Alternative.

- **Nation Spending and Nation Employee Spending.** Nation vendor and employee spending stimulated $7.98 million in New York State tax payments for personal income, business, and sales taxes in 2005, and $1.20 million in local sales tax revenues for Madison and Oneida Counties and the study area municipalities.

  ○ Under the Preferred Alternative, New York Sate tax revenues are anticipated to be $8.01 million in 2011.

  ○ Annual local sales tax revenues created by employee and vendor spending would remain stable at $1.21 million under the Preferred Alternative. An increase in off-site visitor spending and the tertiary effect would generate additional local sales tax revenues.

- **Nation Payments to New York State.** The Nation paid $2.2 million and $2.8 million, respectively, to the New York State Police and the New York State Racing and Wagering Board in 2004 and 2005 for their services to the Turning Stone Resort & Casino, which payments are expected to continue in the future.

The Final EIS included two methods for estimating the economic cost to the State and local governments of providing services to the Nation. Under the first approach, the Department subtracted the costs to New York State and local governments attributable to the Nation from the economic benefits generated directly and indirectly by the Nation. The second approach is based on defining costs as the loss of property tax revenues on Nation land. The Department subtracted both property taxes and Nation payments that are reflective of the cost of services attributable to the Nation and not usually paid for with property tax revenues (*i.e.*, reimbursements to New York Sate and water, sewer, and utility payments) from the economic benefits generated directly and indirectly by the Nation.

### 7.5.3.1    Net Payments:  Cost of Services Attributed to the Nation

In 2005, the total revenues produced directly and indirectly by the Nation (agreements and employee and multiplier taxes) totaled approximately $24.29 million, while its costs to New York State and local governments for services totaled approximately $7.54 million, resulting in a beneficial net contribution to New York State and local governments of $16.76 million.

For the analysis of the alternatives, the projected costs to New York State and local governments for all services required by the Nation in 2011 were contrasted with the estimated Nation-related payments in 2011. The Preferred Alternative (Alternative I) is projected to result in a net contribution to the New York State and local governments of approximately $16.94 million.

Detailed tables showing the effects on individual jurisdictions (State, county, city, town, village, school district) are located in Appendix E-3 of the Final EIS.

### 7.5.3.2    Net Payments: Loss of Property Tax Revenues

Under this approach, due to the dispute over taxation of the casino tax lot, total property tax loss was evaluated in three scenarios: (1) without the casino tax lot; (2) with the casino tax lot as assessed by the local government; and (3) with the casino tax lot valued for non-gaming uses, based on non-gaming lands at comparable locations.

In the third scenario, the Department compared the Nation's total payments against property taxes that would be lost if the casino tax lot had been developed for non-gaming purposes. An analysis of land uses and valuation for property tax purposes was conducted at interchanges along the New York State Thruway (Exits 31 through 34, with the casino tax lot located within a mile of Thruway Exit 33). This was intended to obtain an estimate or range of the taxable assessed value that could apply to the 225-acre casino tax lot absent the casino and associated facilities. This analysis provided a range of values for the casino tax lot of between $6.2 million and $10.5 million.

In 2005, the uncollected property taxes (excluding the casino tax lot) combined with costs of services attributable to the Nation and usually not paid for with property tax revenues totaled $8.49 million. The Nation's total direct and indirect payments were $24.29 million. This results in a maximum net payment to the New York State and local governments of $15.90 million. Including the casino tax lot as assessed by the Town of Verona ($12.2 million in taxes based on a valuation of $340 million for the improvements and $22.55 million for the land) results in a minimum net payment of $4.76 million. Thus, under conditions where the Nation was generally not paying property taxes, the Nation's direct and indirect contributions were greater than the unpaid real property taxes.

Implementation of the Preferred Alternative (Alternative 1) is projected to result in a net contribution to the New York State and local governments of between $16.66 million and $4.46 million, depending on taxable value of the casino tax lot. Detailed tables showing the effects on individual jurisdictions (State, county, city, town, village, school district) are located in Appendix E-3 of the Final EIS.

In all scenarios (with and without casino tax lot, and with casino tax lot valued at $6.5 million or $10.5 million), the net impact on individual jurisdictions is positive under the Preferred Alternative (Alternative 1), with the following few exceptions: (1) with the casino tax lot included as assessed by the Town of Verona at $362.55 million, *which the Department has determined is unlawful*, Oneida County, the Town of Verona, and the V.V.S. School District would experience a net loss of $1.17 million, $651,600, and $8.45 million, respectively; (2) with the casino tax lot valued for non-gaming purposes at $10.5 million, the V.V.S. School District would experience a net loss of $364,100; (3) with the casino tax lot valued for non-gaming purposes at $6.2 million, the V.V.S. School District would experience a net loss of $262,500; and (4) by excluding the casino tax lot, the V.V.S. School District would experience a net loss of $122,400.

The results of the five net fiscal impacts analyses undertaken by the Department are summarized in Table 5.2-1 of the Final EIS.

In conclusion, based on the taxes actually assessed and paid, the impact of removing the Subject Lands from the tax rolls is not significant when balanced with the benefits to the Nation of acquiring the Subject Lands in trust. Even assuming, *arguendo*, that the Nation does not ultimately prevail in the tax litigation, the Department has considered the potential fiscal impacts on the State and local governments from placing the Subject Lands into trust. In all of the Departments' analyses of net fiscal impacts under the Preferred Alternative (Alternative I), the overall net economic impacts projected to State and local governments are positive and substantial because of the Nation's direct and indirect economic contributions to the community. The Department considered that individual jurisdictions (*e.g.*, the V.V.S. School District) may experience a net loss of revenues, but determined that the benefits to the Nation of acquiring the Subject Lands in trust outweigh these impacts.

In connection with the Nation's positive contributions, it is also noteworthy that the Nation has reaffirmed its commitment to continue to support and cooperate with the surrounding community. *See* Final EIS, App. J, Letter from Nation Representative Ray Halbritter to James Cason, Associate Deputy Secretary of the Interior (Jan. 7, 2008) ("The Nation's commitment to directly assist local governments will continue even if lands acquire trust status. . . . As the post-trust era is likely still to be some time off, it is premature to make precise commitments. . . . Those in the community around us can continue to count on us, as they have in the past, to make very significant grants, donations and other payments. . . .").

The State and local governments recommended that the Department consider implementing the No Action Alternative (Alternative G), placing into trust only the casino tax lot (Alternative E), or selecting the County-Proposed Alternative (Alternative H). These alternatives would not meet the Nation's current and short-term needs. In addition, the overall net contributions to the State and local governments may be higher under the Preferred Alternative (Alternative I) than under Alternatives E, H, and especially G, if the Nation's enterprises on the lands not acquired in trust were to close.

Based on the overall effects of placing the Nation's lands into trust and the benefits to the Nation, the Department would reach the same final determination even if taxes are due and owing to the full extent that they have been assessed. As the Department has determined, however, the Town of Verona's tax assessment of the Turning Stone Casino tax lot improvements violates IGRA. This is discussed in Section 7.5.4 of this ROD, below.

### 7.5.4    *Taxability of the Turning Stone Casino*

Prior to the Supreme Court's decision in *City of Sherrill*, the Nation's lands were considered not subject to taxation. *See, e.g., Oneida Indian Nation of New York v. City of Sherrill*, 337 F.3d 139 (2d Cir. 2003). Until 2005, the Town of Verona in fact assessed no taxes on the Turning Stone Casino tax lot. Following *City of Sherrill*, the Town began to assess taxes on the casino tax lot based on a valuation of $362.55 million ($22.55 million for the land and $340 million for the improvements). After *City of Sherrill*, the land on which the Turning Stone Casino is situated is likely to be subject to assessment of real property taxes if it is taxable pursuant to State law. With respect to the gaming and gaming-related improvements on the casino tax lot, the

Department has determined that as a matter of Federal law the improvements are not subject to taxation.

### 7.5.4.1    Taxability under IGRA

The Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701 *et seq.*, establishes "independent Federal regulatory authority for gaming on Indian lands" for the purpose of "protect[ing] such gaming as a means of generating tribal revenue." 25 U.S.C. § 2702(3). IGRA furthers a principal aim of Federal Indian policy: "to promote tribal economic development, tribal self-sufficiency, and strong tribal government." *Id.* §§ 2701(4), 2702(1). The policy of IGRA is "to ensure that the Indian tribe is the primary beneficiary of the gaming operation." *Id.* § 2702(2).

The imposition of taxes by the Town of Verona on gaming and gaming-related improvements that were developed and are being used by the Nation in the exercise of Class III Indian gaming is contrary to the spirit, purpose, and letter of IGRA. *See, e.g.,* 25 U.S.C. §§ 2710(d)(4) (IGRA provides no authority to a state or its political subdivisions to impose any tax, fee, charge, or other assessment), 2710(d)(7)(B)(iii)(II) (a demand by a state for taxation of a tribe or of Indian lands in a gaming compact shall be considered as evidence of lack of good faith); *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136 (1980) (holding that a state fuel tax was impliedly preempted by the Federal objective of guaranteeing Indians the benefit of profits from timber resources); *Cabazon Band of Mission Indians v. Wilson,* 37 F.3d 430 (9th Cir. 1994) (holding that the express objectives of IGRA, combined with the tribe's interests, precluded application of a state license fee on off-track betting). The *City of Sherrill* decision did not change Federal Indian law and policy embodied in IGRA barring the assessment of taxes on the Nation's gaming and gaming-related improvements.

### 7.5.4.2    Town of Verona's Valuation

During the preparation of the EIS, the Department wrote to the Town of Verona regarding its concern about the casino tax lot assessments. The Town's tax assessor responded with limited information about the Town's valuation estimate of the casino tax lot. *See* Letter from Town of Verona Tax Assessor to James Cason, Associate Deputy Secretary of the Interior (August 7, 2007). The assessor stated that the Nation "grieved these assessments in 2005 claiming that the property should have no value due to the fact that no one else could operate the casino," and that "[i]t would seem that it is still in litigation [in State court]." The Nation's grievance pending in the State court system, however, does not suffice to address the Department's concern that taxes are being levied on gaming and gaming-related improvements in violation of Federal law.

In order for the Department to implement this final determination and formalize acceptance of the Subject Lands into trust, the Nation will be required to satisfy tax liens. *See* 25 C.F.R. § 151.13. It is within the purview of the Department to determine in the first instance that taxes being assessed in violation of IGRA need not be satisfied prior to formal acceptance of the casino tax lot into trust.

The Department has concluded that the Town of Verona's approach to taxation of the casino tax lot is, in major part, unlawful. The Town's valuation is based on a report prepared shortly after the *City of Sherrill* decision by American Appraisal Associates ("AAA"), *Designated Assets Associated with the Turning Stone Resort and the Villages RV Park, Verona New York, Calculation Results as of Anticipated Date July 1, 2005* (Apr. 22, 2005). The report, which states that it should not be considered an appraisal and was based on a limited physical inspection, is described more fully at pages 4-213 to 4-216 of the Final EIS. The report plainly indicates that the AAA's replacement cost estimate underlying the Town of Verona's assessment is based on the Turning Stone Casino tax lot's continued use for gaming under IGRA. The report (at 1) states, "we have assumed the continued use of the improvements is legal, economically viable, and reflects the highest and best use." Further, the replacement cost method relies upon the continuation of the economics of operation of the casino to justify the construction of the casino and gaming-related facilities. The report (at 1) states, "our calculations . . . assumes [sic] the earnings of the associated business justify the construction of the facilities." As discussed in Section 3.7 of the Final EIS, improvements such as the luxury hotel are incapable of generating sufficient revenues to operate profitably as stand-alone ventures without the casino.

The underlying facts concerning the Town of Verona's assessment of the casino tax lot demonstrate the need for Federal protection of tribal gaming enterprises that is provided by IGRA. Since 1993, the Nation has invested significantly in the casino and now services a $300 million-plus debt. In order to be competitive with other casino complexes nationally and locally, the Nation has enhanced the facility to draw visitors to the Oneida reservation in Central New York, including the addition of four hotels and five golf courses. The casino is the Nation's primary economic engine through which it funds essential government services and programs for its members and their families.

The Nation requested placement of its lands into trust shortly after the Supreme Court indicated that it is the proper avenue for reasserting tax immunity over the lands. The taxes, penalties, and interest on the casino tax lot that are now being sought were charged to the Nation in the time period between the March 2005 Supreme Court decision/April 2005 Nation fee-to-trust request and the Department's final action on the request. During that time, the Town of Verona has imposed a taxable assessed value on the casino tax lot that exceeds the municipal taxable value for the entire Town of Verona's remaining 3,300 tax lots. Also, the Nation is being assessed taxes that surpass individual budget items of the Town (*e.g.*, the Nation's share of the $142,844 fire protection budget is $539,359). This is based on an assessed value of the casino tax lot of $362.55 million, comprised of $22.55 million for the land and $340 million for the improvements. The 2005 annual property tax on the 225-acre casino tax lot was $12.2 million whereas the total annual property tax on the remaining 17,145 acres of Nation-owned lands was $2.76 million. The taxes assessed on the 225-acre casino tax lot comprise approximately 80% of the taxes assessed on all Nation lands.

### 7.5.4.3    Department's Valuation

For purposes of evaluating the potential impacts of removing the casino tax lot from the tax rolls if the land had been developed for non-gaming uses, the Department examined parcels located at

New York State Thruway exits in Madison and Oneida Counties (with the casino located within a mile of Exit 33). *See* Final EIS at 4-216 and App. E. The analysis indicates that if the casino tax lot had been developed consistent with the areas around Exits 31, 32, and 34 the taxable assessed value for the land and non-gaming improvements would range from $6.2 to $10.5 million. This might suggest that the Town of Verona's assessed value of the casino tax lot (land only) of $22.55 million is excessive. Also, as discussed in the Final EIS at pages 4-215 to 4-216, other aspects of the Town of Verona's assessment based on the AAA report appear to be inaccurate.

However, the Department has no intention of substituting the Town's $22.55 million assessment of the land for any judgment of its own regarding the unimproved value of the land. The Department's analysis was intended only to provide data for evaluating the full range of potential impacts from placing the casino tax lot into trust. As discussed in the next section of this ROD, the Department has determined that before it will formally accept title to the Turning Stone Casino tax lot into trust, the Nation must satisfy the tax liens on the land based on the assessed value of $22.55 million. *See* 25 C.F.R. §§ 151.13, 151.14. The Nation need not satisfy the taxes and related charges on the gaming and gaming-related improvements, unless litigation over this issue is pending at the time the Department could formalize acceptance of the casino tax lot into trust, in which case the Nation would be required to provide the United States a letter of credit for the taxes and related charges on the improvements.

## 7.5.5    *Bank Letters of Credit as Satisfaction of Tax Liens*

The regulations at 25 C.F.R. Part 151 provide that if the Secretary determines that he will approve a land-into-trust request, he will require title evidence meeting the *Standards for the Preparation of Title Evidence in Land Acquisitions by the United States*, issued by the U.S. Department Justice. 25 C.F.R. § 151.13. The title examination must be completed, and liens that make title to the land unmarketable and other liens in the Secretary's discretion must be addressed, prior to formal acceptance of the lands into trust. *See id.* § 151.14; *Avoyelles Parish, Louisiana, Police Jury v. Eastern Area Director*, 34 IBIA 149, 153-54 (1999) ("[T]he requirement to furnish satisfactory title evidence does not arise until after a decision is made as to whether or not the land should be taken into trust.").

The Nation has already provided irrevocable bank letters of credit to Madison and Oneida Counties for all of the taxes, penalties, and interest allegedly owed on all of the lands that are included in the Nation's fee-to-trust request, excluding the Turning Stone Casino tax lot. *See* Letter from Michael Smith to Kaush Arha, Associate Solicitor, Department of the Interior (March 25, 2008) (enclosing irrevocable letters of credit issued on March 19, 2008). The Nation has committed to obtain replacement or supplemental letters of credit to cover the sums billed by both Counties prior to the conclusion of the pending tax litigation. *See* Letter from Michael Smith to Franklin Keel, Regional Director, BIA Eastern Region (March 6, 2008) (enclosing Letter from Michael Smith to Craig Alexander, Chief, Indian Resources Section, U.S. Department of Justice (March 5, 2008)). The Department has considered the letters of credit and the Nation's commitments, and determined that they will be adequate to satisfy tax liens for purposes of acquiring the Subject Lands in trust.

In its March 5, 2008 letter, the Nation stated that it is waiting for direction from the Department on how it should address taxes on the casino property, as the Department explained in the Final EIS that it was considering this matter. The Department has determined that the casino tax lot is not taxable to the extent of including the gaming and gaming-related improvements under Federal law. Therefore, the Nation must satisfy any tax liens on the casino tax lot either by paying the taxes, penalties, and interest allegedly owed based on the Town of Verona's assessment of the land without improvements ($22.5 million) or by providing a letter of credit to the taxing jurisdiction for the same.

As explained above, title issues need not be resolved prior to issuing a fee-to-trust decision, but they must be addressed prior to actual acceptance of the land into trust. The Department anticipates that the issue of the taxability of the casino tax lot under IGRA will be finally resolved prior to the time at which the Department may formalize acceptance of the land into trust. If litigation over the taxability of the casino tax lot is pending at the time the Department could formalize acceptance of the casino tax lot into trust, the Department will require the Nation to provide a letter of credit to the United States for the difference between (a) the total taxes and related charges levied on the casino tax lot as of the date of formal acceptance and (b) the amount that the Nation paid or guaranteed through a letter of credit to the taxing jurisdiction. The Department will not formalize acceptance of lands into trust without an assurance that all appropriate real property taxes and related charges that are lawfully owed to the local governments, if any, have been or will be paid.

Madison and Oneida Counties objected generally, without reference to specific terms or conditions, to letters of credit for purposes of acquiring land in trust status, stating that issuance of the letters of credit provides no immediate revenues to the Counties. The purpose of the letters of credit, however, is to provide assurances that revenues will be paid over to the Counties *if and when* taxes are judicially determined to be due and owing. After lands are placed into trust, the exception for trust lands in the waiver of United States sovereign immunity in the Quiet Title Act, 28 U.S.C. § 2409a, would bar challenges to title to the lands. The letters of credit are guarantees of payment after placement of the lands into trust.

The Counties also contended that under N.Y. Real Property Tax Law §§ 902, 1312, taxes become a lien by statute and remain a lien until paid. In the pending tax appeal, the Nation is defending Federal district court rulings that all of the taxes and related charges assessed on the Nation's lands are unlawful under State law. Moreover, the Department has determined that as a matter of Federal law the taxes and related charges on the casino tax lot are unlawful in large part, and therefore the liens are in part invalid for that reason. In any case, the requirements for acquiring title to land in trust do not call for liens to be removed to the satisfaction of the local taxing authority; liens must be addressed to the satisfaction of the Federal government pursuant to Federal title standards. *See* 25 C.F.R. § 151.13; Section 6(a), *Regulations of the Attorney General Promulgated in Accordance with the Provisions of Public Law 91-393* (1970) ("Prior to or at the time of acquisition of title to the property, except as to certain easements as hereinafter set out, all liens against the title must be fully paid and satisfied *or adequate provision should be made therefore.*") (emphasis added); *Tohono O'Odham Nation v. Acting Phoenix Area Director,* 22 IBIA 220, 235 (1992) (explaining that standard practice in acquisitions of title to land by the United States is to require liens to be paid or to require that adequate provision for satisfying

them be made prior to trust acquisition). Letters of credit are adequate provision for tax liens on the Subject Lands.

**7.6    25 C.F.R. § 151.10(f) – Jurisdictional Problems and Potential Conflicts of Land Use That May Arise**

Section 151.10(f) requires consideration of jurisdictional problems and potential conflicts of land use that may arise as a result of acquiring land in trust.

As explained in the preceding Section 7.5 of this ROD, by letters dated September 20, 2005, in accordance with 25 C.F.R. § 151.10, the Department invited written comments from the State and local governments as to the acquisition's potential impacts on regulatory jurisdiction, real property taxes, and special assessments. Substantial extensions of the comment period were provided and the Nation responded to the comments that were received.

The State and local governments opposed acquisition of land in trust on the basis of possible impacts to the environment, public health and safety, and zoning/land use planning following replacement of State and local jurisdiction with tribal jurisdiction. State and local government comments both on the Nation's fee-to-trust request and on the Draft EIS cited several examples or "case studies" of the Nation's governance of its lands prior to the Supreme Court's decision in *City of Sherrill* as a basis for concern regarding potential future impacts.

These commenters also stated that placement of lands into trust could complicate New York State and local governance with regard to applying environmental laws uniformly and equitably over an entire geographic area. They suggested that any "checkerboard" jurisdiction and land use control that may result from the placement of land into trust conflicts with the Supreme Court's decision in *City of Sherrill*.

Further, State and local governments asserted that some State and local regulations are more stringent than their Federal and tribal counterparts in the areas of environmental protection and public health and safety. In this context, they insisted that the Department compare the Federal/Nation regulatory regime for protecting health, safety, and the environment against their New York State and local counterparts, and require equivalency as a condition for placing lands into trust.

As detailed in the Final EIS, these matters were considered during the preparation of the EIS and in the development and selection of the Preferred Alternative (Alternative I). Placing the Subject Lands into trust is not anticipated to make management significantly more difficult, because the Nation is prepared to assume jurisdiction over the lands, as evidenced by its track record of managing of these lands. Acquisition of the Subject Lands in trust under this final determination will settle jurisdictional disputes in favor of the Nation over areas where the Nation's development is focused and its presence is most pronounced. Moreover, the Subject Lands are highly contiguous and compact, thereby facilitating the Nation's successful governance and minimizing potential impacts to the State and local governments.

### 7.6.1    *Characteristics of the Subject Lands*

This final determination is to acquire approximately 13,003.89 acres in two highly contiguous clusters, one that contains the Turning Stone Resort & Casino and neighboring lands in Oneida County ("Casino-Resort Grouping") and one that neighbors the Nation's 32-acre territory in Madison County ("Government-Cultural Grouping"). The Subject Lands (or the lands included in the Preferred Alternative (Alternative I)) are entirely contained within a single watershed and reflect significant aspects of the history and culture of the Oneida. A nexus of important historical and contemporary transportation routes is located in the approximate center of the Subject Lands where I-90 and the Seneca Turnpike (NYS Route 5) intersect Oneida Creek. For hundreds of years these transportation routes have provided an easily accessible, east-west trade route. While the Oneida hunting grounds extended traditionally north to the St. Lawrence River and south to the Susquehanna River, the population became more and more concentrated to the southeast of Oneida Lake through the sixteenth century. The combined Casino-Resort and Government-Cultural groupings coincide with this area, which has become the focal point of the Nation's development. The Subject Lands include, among other things, the Nation's Turning Stone Resort & Casino, the bulk of Nation member housing, most of the Nation's government facilities, and approximately half of the identified archaeological sites.

The Subject Lands comprise 293 tax lots that encompass 13,003.89 acres; 224 tax lots are located within Oneida County and 69 tax lots are located within Madison County. The Subject lands cover approximately 8,833 acres or 1.1% of the total acreage of Oneida County, and approximately 4,171 acres or 1% of the total acreage of Madison County. Collectively, the Subject Lands represent 1.05% of the combined acreage of both Counties.

The Subject Lands are highly contiguous, however, complete contiguity is neither a practical nor a reasonable expectation considering the process of land reacquisition, *i.e.*, purchases on the open market from willing sellers. The Nation and the State and local governments dispute some of the facts concerning the history and pattern of the Nation's reacquisition of lands. The Nation contends that the local governments preferred that the Nation not buy up lands in a concentrated area, therefore, the Nation acquired reasonably contiguous parcels in several land groupings distributed among Madison and Oneida Counties (*i.e.*, Oneida Lake parcels, Canastota Thruway Exit 33 parcels, Turning Stone Casino & Resort parcels, parcels surrounding the 32-acre territory, and parcels within the Cities of Oneida and Sherrill). The local governments contend that the Nation selected prime properties and that the Nation's lands are not reasonably contiguous or compact.

Most relevant to this determination was the local governments' stress on contiguity, and their request, demonstrated by the County-Proposed Alternative (Alternative H), to focus any trust land acquisition on the Casino-Resort and Government-Cultural areas. Alternative I is responsive to these requests. These areas correlate to the Nation's current and short-term needs for reestablishing a sovereign homeland and are where the Nation's presence is most pronounced. Of the total 234 parcels comprising the Preferred Alternative, 211 parcels or 90% are located adjacent to another Nation parcel and many others are separated by only a few non-Nation properties.

### 7.6.2    *Jurisdiction and Land Management Prior to City of Sherrill and Currently*

The Nation began to reacquire lands within the boundaries of the Oneida reservation in 1987. Between that time and 2005, when the *City of Sherrill* decision was issued, the Nation asserted jurisdiction over its lands. Pursuant to the Nation's 1993 gaming compact with the State of New York, the Nation exercises "full jurisdiction over and . . . responsibility for Nation Class III gaming operations" at the Turning Stone Resort & Casino. *Nation-State Compact Between the Oneida Indian Nation of New York and the State of New York* § 3 (1993); *see also id.* § 5 (providing that Nation law enforcement officers who are adequately trained and certified will have concurrent authority "to maintain public order and safety and to enforce applicable criminal laws of the State"); *id.* § 12 (providing that Nation ordinances and regulations governing health and safety standards applicable to gaming facilities will be no less rigorous than State standards relating to public facilities). Federal environmental, health, and safety statutes generally applied. During this time, the Nation concluded agreements with municipalities on issues such as law enforcement and public health and safety.

Following *City of Sherrill*, the Nation lacks tribal tax immunity over its re-acquired lands. Disputes between the Nation and the State and local governments over regulatory jurisdiction persist.

### 7.6.2.1    Criminal Offenses and Civil Court Jurisdiction

There will be no change in the New York State criminal and civil court jurisdiction that existed before *City of Sherrill* and that exists after *City of Sherrill*, following acquisition of the Subject Lands in trust. The jurisdiction of New York State over offenses committed by or against Indians on Indian reservations within the State is governed by 25 U.S.C. § 232. This statute will continue to apply on lands held in trust. Thus, after placement of the Subject Lands into trust, State police officers will continue to be able to make arrests for violations of Federal, State, and local criminal laws and ordinances committed on these lands.

In addition, the jurisdiction of New York State courts in civil actions and proceedings between Indians or between Indians and non-Indians is governed by 25 U.S.C. § 233. This statute, which does not grant the State general power to tax and regulate Indians on reservations, *see* 1-6 Cohen's Handbook of Federal Indian Law § 6.04 at (4)(a) (2005), will also continue to apply to the Subject Lands after they are acquired in trust.

### 7.6.2.2    Municipal Service and Cross-deputization Agreements

Although the Nation has not paid property taxes, it has recognized that it uses many of the services of the municipalities in which it owns property. The Nation and local governments have signed agreements to provide a mechanism by which the Nation defrays the costs borne by local governments for services such as water, sewer, and fire protection. The Nation has contributed more than $11 million through these agreements. In addition, the Nation has made significant contributions, including for infrastructure development, benefiting both the Nation and local governments. These agreements and contributions, which display the Nation's willingness and ability to cooperate prior to *City of Sherrill* and currently, include the following:

- **Fire Protection.** Beginning in 1993 and continuing today, the Nation has provided funds to the Town of Verona Fire Department through a voluntary service agreement. Also, the Nation, the Verona Fire Department, and other fire departments from the surrounding area have created a Mutual Aid Plan ("MAP") to provide for enhanced emergency services coverage. The MAP details how a significant fire or emergency situation at the Turning Stone Resort & Casino would be staffed and managed. The Nation has also hired its own fire marshal, a former fire chief of the City of Rome, whose position is partially funded by the BIA.

- **Police Cross-deputization.** In 1994, the Nation and Madison and Oneida Counties entered into cross-deputization agreements. The local governments canceled these agreements in 2000, but the Nation's police officers continue to cooperate with surrounding police departments on law enforcement issues. The Nation's police force consists of 45 highly-trained Federal Deputy Special Officers commissioned through the Department of the Interior, including 38 sworn full-time officers and seven other employees. The Nation's police force was accredited by the Commission on Accreditation for Law Enforcement Agencies in 1999 and reaccredited in 2002, 2005, and 2008. This police force is in addition to State Police protection at the Turning Stone Casino, for which the Nation makes payments to the State.

- **Infrastructure Development.** In support of its own government and enterprises, and for the benefit of neighboring communities, the Nation financed the construction of a multi-million dollar water and sewer line and water tower, conveyed them to the Town of Verona, and now pays user fees along with other users. The Nation also contributed millions of dollars in sewer system improvements for the City of Oneida. Further, the Nation has offered to contribute $10 to $11 million to the development of a new water system in Oneida County that would serve several towns and help to alleviate water supply issues. Development of the system, however, has been delayed due the New York State processes and procedures.

Additional information on these and other service agreements and contributions is detailed in the Final EIS at pages 3-345 to 3-356, Table 3.7-101, and Appendix B.

### 7.6.2.3    Intergovernmental Agreements With the Cities of Oneida and Sherrill

In 2005 and 2006, respectively, the Nation entered into intergovernmental agreements with the City of Oneida and the City of Sherrill regarding both tax and regulatory matters. *See* Final EIS, App. G. The Nation agreed to meet or exceed all health, safety, zoning, and signage standards and regulations generally applicable to the Nation's properties within the Cities, and the Nation and City officials agreed to consult and cooperate regarding public health and safety issues of mutual concern. In addition, existing non-conforming uses were deemed not to be in violation of the agreements. The agreements will not apply to land that is placed into trust for the Nation. None of the Nation's lands located within the City of Sherrill will be placed into trust under this decision. Some of the Nation's lands located within the City of Oneida (25 out of 45 tax lots) will be placed into trust under this decision.

The Nation has expressed its willingness to enter into intergovernmental agreements with other local governments. In addition, on February 12, 2008, Madison County passed a resolution authorizing and directing the Chairman of the Board of Supervisors to work with the Nation "to promote the creation of wealth and opportunity," "to ensure public safety, public health, and environmental protection," "to preserve and enhance the culture and quality of life," and to jointly develop and implement a comprehensive development plan. The Department is aware that discussions have been occurring between the Nation and both Madison County and Oneida County leadership to reach these goals. In furtherance of resolving disputes, the Nation has provided letters of credit to both Counties for the taxes, penalties, and interest allegedly owed on Nation lands, including thousands of acres that will not be acquired in trust under this decision, which will guarantee payment of taxes and related charges that are judicially determined to be due and owing, if any, on the lands.

### 7.6.2.4    Consistency of Nation Land Use With Local Land Use

Prior to the 2005 decision in *City of Sherrill*, the Nation did not submit to local land use plans, zoning regulations, or other State and local development regulations. Thus, the Nation's management and development of its lands did not undergo New York State and local right-to-build reviews, and the Nation has not obtained New York State or local permits for its buildings. Nonetheless, the Nation has developed its lands with consideration for the surrounding areas. Overall, the Nation's uses are generally consistent with local zoning and the uses of adjacent non-Nation lands. *See* Final EIS §§ 3.2, 3.8.6, 4.2, 4.8.6, and App. A, G. In the few instances where zoning non-conformance has occurred there have been no significant adverse effects evident on adjacent land uses. In the municipalities where the Nation owns property, approximately 90% of the land usage is agricultural, residential, or vacant. Approximately 86% of the Nation's use falls into these same categories. Approximately 9% of the Nation's use is classified as recreation (*e.g.*, golf courses, water resources, etc.). Commercial and residential use has occurred mainly in relation to the Turning Stone Resort & Casino, associated golf courses, and member housing. It is principally among these latter developments where there has been some non-conformity with local zoning and other land use issues (*e.g.*, isolated complaints regarding construction dust, open burning, etc.).

In the case of non-conformity related to Turning Stone (*i.e.*, the Tower Hotel), it is important that this facility was constructed prior to *City of Sherrill* and that it is a key aspect of an enterprise that is essential to the self-sufficiency of the Nation and to the economic well-being of the surrounding community. In addition, with respect to the Nation's Village of the White Pines residential development, the City treats this development as a conforming use pursuant to its intergovernmental agreement with the Nation (this residential development contains duplex residences that would otherwise be inconsistent with City of Oneida residential zoning). The Ray Elm Children & Elders Center in the City of Oneida is also treated as a conforming use under this agreement.

### 7.6.3    *Potential Future Jurisdictional Problems and Conflicts of Land Use*

In addition to the following discussion pertaining to the Subject Lands, potential future jurisdictional problems and land use conflicts were considered in Sections 4.2, 4.8.6, and 4.9.5 of the Final EIS in relation to all of the alternatives analyzed.

### 7.6.3.1    Potential Land Use Conflicts After Acquisition of the Subject Lands in Trust

As previously noted, the Nation has reached agreements with the Cities of Oneida and Sherrill under which the Nation agrees to follow the Cities' land use regulations and the Cities treat the Nation's uses as conforming. The agreements will continue to apply to all of the lands in the City of Sherrill owned by the Nation, none of which will be acquired in trust, and to the 20 out of 45 tax lots in the City of Oneida owned by the Nation that will not be acquired in trust.

With respect to all of the lands to be placed into trust, local zoning will not apply and, hence, there will be no non-conformity with local zoning among these Nation lands. Placement of the Subject Lands into trust will, for example, eliminate non-conformity associated with the Turning Stone Resort & Casino.

In addition, the Nation has enacted the Oneida Indian Nation Land Use Ordinance. Where the Nation has established a Planned Unit Development District, the land use ordinance requires that developments "enhance the quality of life of residents, create an inviting visual character, and are harmonious with adjoining land uses." Similar provisions are included in the land use ordinance to regulate Unassigned Residential Districts and Community and Governmental Districts. Also, within "all lands possessed, occupied or held by or for the Oneida Indian Nation in its sovereign capacity," the Oneida Indian Nation Land Use Ordinance prohibits existing land uses from being substantially changed or altered without a Land Use Permit. In determining whether or not to issue a Land Use Permit, the Nation considers the compatibility of the use, the location of the proposed use and its physical harmony with the area in which it is proposed, and the environmental impact of the use. The Nation's past actions on lands mapped in a specific district or in an Unassigned Residential District indicates that it would continue to evaluate the compatibility of its uses with surrounding uses in managing lands in the future.

The land use composition of the Nation's lands included in the Proposed Action (Alternative A) in comparison to all other alternatives is summarized in Table 2.6-1 of the Final EIS. Although this final determination to implement the Preferred Alternative (Alternative I), as modified, does not include one-fourth of the Nation's reacquired lands, it maintains the existing allocation of land uses among the Nation's lands. Therefore, this final determination is not anticipated to result in new land use conflicts by promoting a shift of land uses now being conducted on lands that will not be placed into trust onto the Subject Lands.

### 7.6.3.2    Potential Jurisdictional Problems After Acquisition of the Subject Lands in Trust

Prior to the 2005 decision in *City of Sherrill*, the Nation exercised regulatory jurisdiction over its lands with few actual issues. Sections 3.9.5 and 4.9.5 of the Final EIS analyzing the Nation's

management of its lands show that there have not been significant adverse effects on environmental resources. Federal environmental, health, and safety laws generally applied and will continue to apply to lands held in trust. *See, e.g., Reich v. Sand & Gravel,* 95 F.3d 174, 181 (2d Cir. 1996); *Smart v. State Farm Ins. Co.,* 868 F.2d 929, 935 (7th Cir. 1989); *Blue Legs v. Bureau of Indian Affairs,* 867 F.2d 1094, 1097 (8th Cir. 1989).

The State and local governments raised concerns in several specific areas of governance and identified a few past Nation actions and conflicts with the Nation and as a basis for future concern over placing any lands into trust. These incidents, individually and collectively, are not substantial. The Department observes that many of these concerns appeared to stem from disputes over which government had jurisdiction at the time – an issue that this decision will resolve with respect to the Subject Lands after they are acquired in trust. These concerns have been satisfactorily addressed by the Nation in its responses to comments and through information provided to the Department in support of its fee-to-trust request. The State and local governmental concerns, which were also discussed in the Final EIS and considered by the Department in the development and selection of the Preferred Alternative, are summarized below. The Subject Lands that will be acquired in trust are highly contiguous and compact, thereby minimizing these concerns.

### 7.6.3.2.1    *Wetlands and Threatened and Endangered Species*

Comments asserted that loss of State and local jurisdiction would place the integrity of wetland ecosystems and threatened and endangered species at risk. The Nation is proposing no ground disturbing activity as part of the proposed action that would result in impacts to wetlands and/or threatened and endangered species. The Nation consults with the U.S. Army Corps of Engineers ("USACE"), the U.S. Environmental Protection Agency ("EPA"), the U.S. Fish and Wildlife Service ("USFWS"), and the New York State Department of Environmental Conservation ("NYSDEC") in the protection of local wetlands. Notably, several of the Nation's golf courses (Shenendoah, Kaluhyat, and Sandstone Hollow) are eco-friendly Certified Bronze Audubon Signature Sanctuaries, which meet standards for protecting water quality, conserving natural resources, and providing wildlife habitats.

In addition to on-site casino-resort mitigation efforts, the Nation established an off-site 75-acre wetlands mitigation bank to address wetlands impacts from the Turning Stone Resort & Casino and associated development. In so doing, the Nation consulted with the USACE and adopted its suggestions for addressing invasive species. Detailed information on the design and monitoring of the wetland mitigation bank is included in Section 3.3.4.3 of the Final EIS.

The Nation would be obligated to comply with the Federal Endangered Species Act and consult with the USFWS with respect to lands held in trust status, if future actions potentially affect Federally-protected species or their habitat. Future Nation development activities that involve a Federal action (*e.g.,* Federal permit, lease approval, etc.) would generally require compliance with NEPA. The Nation pointed out that several of its casino-resort facilities underwent NEPA analysis through Environmental Assessments.

### 7.6.3.2.2    *Air*

Comments expressed concern over enforcement of clean air programs and policies, and identified the Nation's construction and operation of its cogeneration facility as a basis for concern. This facility was constructed prior to 2005 and the Nation contends that it saves energy, that facilities of this type are promoted by the New York State Energy Research and Development Authority, and that the facility illustrates the Nation's concern for the environment. According to the EPA, the Nation "applied for a [Clean Air Act] Title V permit as soon as it decided to construct a Central Utility Plant making it a major NOx facility," and the facility is in compliance with all applicable requirements. The cogeneration facility will continue to be subject to these requirements after the land on which it is situated is acquired in trust.

### 7.6.3.2.3    *Wildlife Protection and Conservation*

Comments expressed concern about a loss of jurisdiction that may negatively affect the ability to address issues relating to wildlife protection and conservation. In particular, the NYSDEC expressed concerns about handling of deer and preventing the further spread of chronic wasting disease ("CWD") in the wild deer herd. The NYSDEC has established a CWD containment area in Madison and Oneida Counties.

After CWD was discovered in Oneida County in 2005, the Nation communicated with and gave the State permission to carry out its Chronic Wasting Disease Response Plan on the Nation's lands. Since that time, the Nation reports that the NYSDEC has not communicated with the Nation regarding CWD, but the Nation has stated its continuing willingness to provide assistance. A CWD management plan is also being developed by the U.S. Department of Agriculture's Animal and Plant Health Inspection Services to support surveillance and management of wild and captive deer populations at the national level.

### 7.6.3.2.4    *Water*

State and local governments expressed concern regarding water resources and jurisdictional oversight of water protection programs. A reason cited for concern was dredging (in 2000) of the Marion Manor Marina, a property that will not be acquired in trust under this final determination. In any event, the USACE determined that the project complied with Section 10 of the Rivers and Harbors Act of 1899 and Nationwide Permit No. 35.

A second cited incident involved contamination of a well at a mobile home park in the Town of Verona. The local governments contend that this was due to construction at Turning Stone and that it could have been avoided with better planning, but testing by the EPA and the Nation did not identify the Nation as the source. Regardless, the Nation paid to connect the residents to the municipal water supply.

The Nation's multi-million dollar commitments to its local governmental neighbors for water resources development were previously discussed. The Nation has given infrastructure that it paid for to the local governments so that the infrastructure remains under local control. Also, the Nation and the City of Oneida have arranged for the Nation to utilize over 90% of the

wastewater effluent from the City's wastewater treatment plant to irrigate its golf courses, which reduces stress both on groundwater resources and on Oneida Creek, which would otherwise receive the effluent.

### 7.6.3.2.5    *Historic, Cultural, and Archaeological Resources*

Comments asserted that placement of land into trust may undermine historic, cultural, and archaeological resource protection, and that the Nation can show no need for placement of lands in trust to protect such resources in light of existing State protections. The New York State Office of Parks, Recreation and Historic Preservation ("OPRHP") concluded, however, that the Proposed Action would have "No Effect upon historic properties in or eligible for inclusion in the State and National Registers of Historic Places." Letter from New York State OPRHP to Franklin Keel, Regional Director, BIA (Oct. 19, 2006). Moreover, as discussed in Section 3.1.3 of this ROD, *supra*, placement of lands into trust would ensure the broadest application of Federal laws regarding historic, cultural, and archaeological resources, which provide additional protections in relation to State laws.

The Nation has enacted its own Cultural, Historical or Archaeological Resources Ordinance and has a Historian and a Historic Preservation Committee that oversees all activities related to the preservation of the Nation's historic and archaeological resources. In 2004, the Nation and the State Historic Preservation Officer ("SHPO") signed a cooperative agreement for the sharing of archaeological site file information. *See* Final EIS, App. D, Letter agreement signed by Ray Halbritter, Nation Representative, and Bernadette Castro, SHPO (Jan. 26, 2004).

### 7.6.3.2.6    *Solid and Hazardous Wastes*

State and local government comments asserted that removal of State and local jurisdiction would place the environment and public health at risk from the Nation's handling of solid and hazardous waste. The comments identify few concrete reasons for this concern and appear to be based mainly on lack of knowledge and understanding of the Nation's practices.

The comments cited a lawsuit settled in 2002 in which it was alleged that a private waste hauler hired by the Nation (Ricelli Trucking, Inc.) violated Madison County's flow control law by the commingling of recyclables and solid waste materials, and by the unpermitted operation of a solid waste business in the County. The Nation contends that it requires its solid waste disposal contractors (all of whom are State-certified) to comply with local regulations and that, since this case, there has not been another such allegation. Another cited incident (from 2002) involved disposal of non-hazardous building materials on Nation-owned land, which the Nation states it did after consultation with a geological engineering firm.

The comments alleged no instances of the Nation's mismanagement of hazardous waste, of which the Nation generates relatively little as a Conditionally Exempt Small Quantity Generator. The Nation utilizes the EPA's Uniform Hazardous Waste Manifest to track the removal and disposal of hazardous waste.

### 7.6.3.2.7    *Petroleum Bulk Storage, Chemical Bulk Storage, and Spill Response*

While the State and local governments assert that New York State and local oversight and permitting of petroleum bulk storage tanks is necessary to protect the environment and public health and safety, the comments do not identify significant impacts on the environment that have resulted from the Nation's practices. The comments instead stress the State and local governments' lack of information concerning the Nation's petroleum bulk storage and their inability to regulate and monitor the Nation's facilities. For all Nation-owned petroleum bulk storage facilities, the Nation has a compliance program that is based on the EPA's Spill Prevention, Control, and Countermeasure Oil Program; NYSDEC's petroleum bulk storage regulations; and the National Fire Protection Association's regulations. The Nation also complies with its own Hazardous Materials Operational Guidelines and response protocols for handling spills. The Nation has no chemical bulk storage facilities on its lands.

### 7.6.3.2.8    *Oil and Gas*

Comments suggested that the Nation would in the future seek on-site natural gas sources and that placement of lands in trust would curtail the State and local governments' ability to regulate oil and gas. According to the NYSDEC energy well database, there are three oil and gas wells located in Madison and Oneida Counties on Nation lands, all of which were exploratory wells drilled in land not known to be an oil field. Of the three wells, two are leased to non-Nation members while one is under the control of the Nation. Two of the three wells have been decommissioned and capped by a third party contractor according to NYSDEC standards. A determination has been made also to cap and decommission the third well in keeping with NYSDEC standards. Based on the NYSDEC database, none of the oil and gas wells that are located on Nation lands appear to have been productive. One well is located on Group 2 land (Parcel 140) and two of the wells are located on Group 3 lands (Parcels 131 and 235). None of these wells are in operation by the Nation.

### 7.6.3.2.9    *Inactive Hazardous Waste Disposal Sites and Brownfields*

Comments asserted that, due to lack of information, it is not known what programs the Nation has implemented to clean up any existing inactive hazardous waste disposal sites on its lands. There are no regulated hazardous waste facilities on Nation lands.

### 7.6.3.2.10    *Pesticides*

Comments asserted that the Nation makes extensive use of pesticides at the Nation's golf courses, but has not reported to the State on issues concerning storage and application of pesticides, registration of facilities, and certification of pesticide applicators. The suggestion that that removal of State jurisdiction "may place the environment and public health at risk" was frequently repeated in the State and local government comments. However, this is not evidence of a risk to the public health and the environment that has resulted from past Nation pesticide management practices.

The Nation controls insect pests and weeds on its developed and landscaped properties through the commercial application of approved pesticides and herbicides by licensed applicators in accordance with Federal regulations, 40 C.F.R. Parts 150-189. The Nation practices sustainable farming on its agricultural lands and has implemented an integrated pest management plan for both its agricultural lands and golf courses in order to minimize the use of synthetic pesticides and herbicides. The limited use of synthetic pesticides and herbicides is only implemented when a drastic infestation appears inevitable. During the design of the Nation's golf courses, turf grass varieties were selected that require less chemicals, fertilizers, and water. As previously noted, several of the Nation's golf courses meet the requirements of the Audubon International Signature program certification.

### 7.6.3.2.11    *Transportation*

Comments suggested that additional traffic around Nation enterprises developed without community input places additional financial burdens on maintenance and repair of the transportation infrastructure. In addition, comments asserted that Thruway Exit 33 near the Turning Stone Casino has grown to be one of the busiest parts of the State and that the increased number of vehicles means an increase of traffic violations and demand for police services, but no new tax revenues have accompanied this demand.

While exit traffic volumes at Exit 33 increased approximately 164% between 1992 and 2005, this also meant substantial additional toll revenues for the New York State Thruway Authority, increasing by approximately 202% in the same time period. *See* Final EIS § 3.7.6, Tables 3.7-97 and 3.7-98. In addition, the Final EIS analysis of the Nation's share of State and local government spending shows that the Nation's share of transportation spending is small. *See* Final EIS § 3.7.8.5, Tables 3.7-143 and 3.7-147. As discussed in Section 7.5 of this ROD, *supra*, the Nation's costs to the State and local governments are more than offset by the Nation's direct and indirect contributions.

### 7.6.3.2.12    *Utilities and Infrastructure*

State and local governments suggested that by placing lands into trust, community development and infrastructure could be adversely affected through the loss of eminent domain power, and that access to and management of infrastructure may be impeded. As summarized above, the Nation has a demonstrated history of entering into agreements respecting the costs of infrastructure and services, and the Nation has contributed important infrastructure to local governments. The Nation has also allowed access to its lands for maintenance of infrastructure.

The Department received more specific comments during the comment period on the Draft EIS and/or during the waiting period after issuance of the Final EIS from the City of Oneida and the National Grid relating to potential impacts on water service (in the case of City of Oneida) and electric and gas service (in the case of National Grid) resulting from placement of Nation lands into trust. Placement of the Nation's lands into trust will not affect any valid existing rights-of-way that are properly recorded. The United States may acquire title to land in trust subject to existing rights-of-way (*i.e.*, those that the Department would locate in a title examination conducted pursuant to 25 C.F.R. § 151.13). If these utilities pre-existed the Nation's re-

acquisition of lands (as appears to be the case with respect to the City of Oneida water supply line, for which a right-of-way was acquired prior to 1928), presumably the Nation would have acquired title to the lands subject to existing rights-of-way. In that case, the United States may also acquire title to the land subject to those rights-of-way. On the other hand, grants of rights-of-way after the Nation purchased its properties may be subject to Federal laws and regulations, including 25 U.S.C. §§ 323, 324 and 25 C.F.R. Part 169. *See Niagara Mohawk Power Corporation v. Eastern Area Director*, 32 IBIA 276 (1998) (holding that rights-of-way over the Tonawanda and Tuscarora reservations entered into without complying with 25 U.S.C. § 323 were void). Pursuant to Federal statutes and regulations, the Secretary of the Interior may grant rights-of-way over restricted-fee and trust lands. Therefore, to the extent that the City of Oneida and the National Grid have valid existing rights-of-way, they will not be affected by this decision to place lands in trust. To the extent that valid rights-of-way are lacking, they may be obtained pursuant to 25 U.S.C. §§ 323, 324 and 25 C.F.R. Part 169 even after the lands are placed into trust.

It is in the Nation's best interests to work collaboratively with the local governments and service providers to improve the existing infrastructure system, grant any necessary rights-of-way, and address any other infrastructure issues, because the Nation's government, enterprises, and other endeavors are dependent upon such systems being adequate and well-maintained. The Nation has stated that it intends for all rights-of-way, including those used to access utility infrastructure, to remain in effect after placement of lands into trust.

### 7.6.3.3    Protectiveness of Federal and Nation Requirements in Relation to State and Local Requirements

State and local governments commented that the New York State Environmental Quality Review Act ("SEQRA"), N.Y. Envtl. Conserv. Law Art. § 8-0101 et seq., and other State and local requirements such as for building construction and food service inspections, provide for more stringent review and protection of the environment and public health and safety than NEPA and other Federal and Nation requirements. The comments suggested that the Department should require equivalence between standards as a condition for acquiring lands in trust. The State and local governments also commented that removal of State and local jurisdiction could complicate New York State and local governance with regard to applying environmental and other laws uniformly and equitably over an entire geographic area.

The Federal government supports tribal self-determination. Congress enacted the IRA to counteract the precipitous decline in the economic, cultural, governmental, and social wellbeing of Indians. The IRA reflects a Federal policy of encouraging tribal self-government, both politically and economically. *See Morton v. Mancari*, 417 U.S. 535, 542 (1974). Other statements of Federal support for tribal self-determination are contained, for example, in the Indian Self-Determination and Education Assistance Act of 1975. *See* 25 U.S.C. § 450a. One of the mechanisms under the IRA for fostering tribal self-determination and self-governance is the acquisition of land in trust. *See* 25 U.S.C. § 465. Congress only requires trust lands to comply with Federal and tribal standards. It would undermine tribal self-governance to compare and contrast tribal laws against state and local laws, and require equivalency between them as a prerequisite for placing land into trust. While the Secretary is required to consider potential

jurisdictional problems and land use conflicts, these disputes need not be resolved prior to approval of a trust acquisition. *See, e.g., State of South Dakota and Moody County v. Acting Great Plains Regional Director*, 39 IBIA 283, 299-300 (2004), *aff'd, South Dakota v. U.S. Department of the Interior*, 401 F. Supp.2d 1000 (D.S.D. 2005), *aff'd*, 487 F.3d 548 (8th Cir. 2007); *State of South Dakota and Bennett County v. Acting Great Plains Regional Director*, 39 IBIA 301, 309 (2004); *Avoyelles Parish v. Eastern Area Director*, 34 IBIA 149, 155 (1999).

The State and local governmental comments are, in part, arguments about which government should have jurisdiction over the Nation's lands and are not grounded in significant actual deficiencies in the Nation's past administration of its lands. The Nation has also argued for jurisdiction over its lands. The Department is aware that in some instances state and local standards differ from their Federal and tribal counterparts. The United States holds approximately 55 million acres in trust across the country. In this case, however, the Nation proposes no change in land use as part of its fee-to-trust request. Thus, there is no direct environmental, health, or safety impact that would result from a change in jurisdiction following the acquisition of land in trust, regardless of differences between Federal/Nation and New York State/local requirements.

The Subject Lands will continue to be regulated by Federal laws, including environmental, health, and safety laws. Section 3.9.5 of the Final EIS detailing the Nation's regulatory programs and procedures, cooperative efforts, and other actions demonstrate the Nation's commitment to standards of environmental protection, conservation, and public health and safety. In the areas of concern identified by the local governments, including building construction and inspections and food safety, the Nation has followed accepted practices.

Between 1993 and 1999, the Nation performed building inspections pursuant to codes developed by the Building Officials and Code Administrators International, Inc. ("BOCA"), which were the model codes used on the East Coast. In 1999, after regional model code groups combined and formed the International Code Council ("ICC"), the Nation adopted the International Building Code ("IBC"), the International Fire Code ("IFC") and the Property Maintenance Code ("PMC"), and incorporated them into its own building code – the Oneida Indian Nation Building Code Compliance Policy and Procedures. Under the Nation's Building Code, new construction requires notification, presentation of plans, and procurement of a building permit from the Building and Construction Inspector, who is also the Code Enforcement Officer for the Village of Hamilton in Madison County. The outstanding quality of the facilities that the Nation has constructed has been widely recognized, including by Condé Nast Johansen, the PGA Tour, and Audubon International.

The vast majority of the Nation-owned structures that are currently in disrepair were in disrepair before the Nation acquired them and are located on agricultural lands. While farming has been on the decline in the region, *see* Final EIS § 3.8.2.1, the Nation has acquired and preserved agricultural lands. The Nation has developed and implemented a program to remove or repair dilapidated structures on the lands it re-acquired, which is described in the Final EIS at pages 3-648 to 3-649 and Appendix I. As of September 2006, deteriorated structures on 36 properties had been removed and repair or removal of the rest is pending.

Further, the Nation's construction contractors agree to follow the conditions of the NYSDEC State Pollution Discharge Elimination System General Permit for Storm Water Discharges from Construction Activities. This, combined with erosion audits conducted by the Nation's Environmental Planning Manager, helps to ensure that the Nation is achieving its aim of meeting or exceeding State storm water pollution prevention standards.

In the area of food safety, the Indian Health Service ("IHS") of the U.S. Department of Health and Human Services inspects the Nation's food service stations, including the restaurants at Turning Stone Resort & Casino, SavOn gas stations and convenience stores, and food stands, at the Nation's request. Inspections are conducted three times per year (in contrast to the Oneida County requirement of one inspection per year). The IHS follows the U.S. States Food and Drug Administration's Food Code. The IHS also inspects the Nation's pools, wading pools, and spa pools. These inspections are conducted pursuant to the *Recommended Standards for Swimming Pool Design and Operation by the Committee of the Great Lakes-Upper Mississippi River Board of State and Provincial Public Health and Environmental Managers, Illinois, Indiana, Iowa, Michigan, Minnesota, Missouri, New York, Ohio, Ontario, Pennsylvania, and Wisconsin,* 1996 ed. (also known as the 10 State Standards).

In addition, concerns raised in connection with the Nation's SavOn gas stations and convenience stores are minimized under this final determination, because very few of them will be acquired in trust. These issues include, for example, unsubstantiated belief expressed by the Counties that underage persons have been able to obtain tobacco products from Nation-owned stores.

In sum, the combination of Federal and Nation regulatory oversight, the government-to-government agreements that the Nation entered with respect to water, sewer, public safety, and fire protection, and the ongoing practice of consultation and coordination between the Nation and Federal, New York State, and local agencies will avoid any potential adverse consequences of placing the Subject Lands into trust. Further, acquisition of the Subject Lands in trust will support the Nation's efforts for ensuring that tribal, Federal, State, and local environmental, health, and safety concerns are met.

### 7.6.3.4    Governance and Management of Checkerboard Trust Lands

The Department recognizes that checkerboard ownership could affect a community's ability to effectively plan and regulate. In its administration of millions of acres of trust properties, the Department has observed some difficulties in the ownership and management of checkerboard lands that are a mix of non-trust and trust property, particularly with respect to fractionated interests in individual Indian lands owned in restricted status or held by the United States in trust status. Difficulties have included: complications in leasing of either trust or non-trust properties or a combination of both; obtaining access and rights-of-way; large scale land use planning and natural resource regulation; and the application of different jurisdictional codes and regulations to different landowners. With regard to property taxes, however, checkerboarding is not a material concern because the tax assessor must make a property-by-property determination of whether or not a tax exemption or immunity applies. *See County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation,* 502 U.S. 251, 265 (1992).

With respect to the Nation's lands, there is currently an alternating pattern of enforcement of Nation and State and local laws due to ongoing disputes. In the Cities of Sherrill and Oneida, the Nation has entered into intergovernmental agreements whereby the Nation follows local requirements. Elsewhere, jurisdictional disputes continue. On one hand, placing all of the Nation's lands into trust would resolve disputes over which government has jurisdiction. On the other hand, the State and local governments contend that the Nation's lands as a whole are not contiguous or compact, and that checkerboard jurisdiction could affect their ability to plan and regulate effectively. Placement of the Subject Lands into trust under this final determination is anticipated to address both of these issues: first, this final decision will settle jurisdiction in favor of the Nation over areas where the Nation's development is focused and its presence is most pronounced, and second, the Subject Lands are highly contiguous and compact, thereby facilitating the Nation's successful governance and minimizing potential impacts to the State and local governments. Overall, placing the Subject Lands into trust is not anticipated to make management significantly more difficult, because the Nation will assume jurisdiction over the lands and is prepared to do so, as evidenced by its past management of these lands.

### 7.7    25 C.F.R. § 151.10(g) – Whether the BIA is Equipped to Discharge Additional Responsibilities Resulting from Acquisition of the Lands in Trust Status

Section 151.10(g) requires consideration of the BIA's ability to discharge additional responsibilities resulting from the acquisition of the lands in trust.

Over its long history of administering Indian trust assets, the Department has also observed some difficulties in its own administration of those assets, most notably with respect to fractionated interests in individual Indian lands in restricted-fee or trust status. Acquisition of the Subject Lands in trust, however, is anticipated to impose limited additional responsibilities on the BIA beyond those already inherent in the Federal trusteeship to the Nation.

The Nation will continue its existing uses of the Subject Lands, which uses the Nation conducted prior to applying for acquisition of the lands in trust. The Nation submitted its fee-to-trust request for the purpose of exerting sovereign authority over its reacquired lands and, consequently, acquiring the Subject Lands in trust will result in increased tribal self-determination and self-sufficiency. The Nation will pay for any municipal services that may be required in connection with the Subject Lands. In addition, the Nation has indicated that leasing issues are unlikely to arise, because it does not lease its lands with exception for informal arrangements with local farmers. As such, the BIA is able to administer any additional responsibilities that may result from acquisition of the Subject Lands in trust. Moreover, the highly contiguous and compact character of the Subject Lands will facilitate the BIA's discharge of its responsibilities concerning the lands.

The lands that will not be acquired in trust under this final determination are less contiguous and located farther from the Turning Stone Resort & Casino properties in Oneida County and the Nation's center of government in Madison County, and as a result would be anticipated to place additional administrative burdens on the BIA if and when on-site visits are necessary. For example, the BIA experienced additional administrative burdens in conducting environmental site assessments on some non-contiguous properties, not included in the Preferred Alternative,

during the processing of the Nation's fee-to-trust request. These additional burdens were also attributable in part, however, to new Federal requirements for conducting these assessments.

**7.8    25 C.F.R. § 151.10(h) – The Extent of Information to Allow the Secretary to Comply With 516 DM 6, Appendix 4, National Environmental Policy Act Revised Implementing Procedures, and 602 DM 2, Land Acquisitions: Hazardous Substances Determinations**

Section 151.10(h) requires consideration of the extent to which the applicant provided information that allows the Secretary to comply with 516 DM 6, Appendix 4 (NEPA Revised Implementing Procedures), and 602 DM 2 (Hazardous Substances Determinations).

The BIA's guidelines for NEPA compliance are set forth in the BIA NEPA Handbook, 59 IAM 3-H (May 5, 2005). This ROD documents the Department's compliance with NEPA through the preparation of an EIS.

In order to comply with 602 DM 2, the BIA must complete an Environmental Site Assessment ("ESA") to determine if there are any environmental contamination-related concerns and/or liabilities affecting the land being considered for acquisition. The BIA conducted Phase I ESAs during August 14-18 and August 28-September 1, 2006. The BIA conducted Phase I ESA updates during October 22-26 and November 5-9, 2007. The Nation undertook Phase II investigation, sampling, and analysis and Phase III remediation such that there are no recognized environmental conditions on the Subject Lands. Thus, Federal action to acquire the Subject Lands in trust is appropriate.

**7.9    Comments Received Under 25 C.F.R. § 151.10**

Comments were submitted by tribal, State and local governments on the Nation's fee-to-trust request in response to the Department's September 20, 2005 notice and request for comments under 25 C.F.R. § 151.10. The notice sought comments as to the acquisition's potential impacts on regulatory jurisdiction, real property taxes, and special assessments. In general, the comments raised the same or similar concerns as the comments received during scoping and on the Pre-Publication Draft EIS and the Draft EIS. As a result, the Department considered and addressed virtually all of the comments submitted under 25 C.F.R. § 151.10 prior to issuing this ROD (see especially the Department's responses to comments contained in Appendix M of the Final EIS). The Department's development and selection of the Preferred Alternative (Alternative I) in the Final EIS reflected the Department's consideration of the comments that had been received by that time. Comments that were received on the Final EIS were addressed in Section 3.2 of this ROD and **Appendix B** hereto.

This section of the ROD only addresses the comments submitted to the Department by tribal, State, and local governments pursuant to the notices issued under 25 C.F.R. § 151.10, and the Nation's responses to those comments.

### 7.9.1 Nation's Responses to Comments

Pursuant to 25 C.F.R. § 151.10, the Nation was provided a copy of the comments received from the State, local, and other tribal governments and given an opportunity to respond to them. The Department has reviewed the Nation's responses to the comments and other information submitted by the Nation in support of its fee-to-trust request, and finds that the Nation has adequately addressed the concerns of the State, local, and other tribal governments, as well as the Department, with respect to acquiring the Subject Lands in trust.

### 7.9.2 Comments of State, Local, and Other Tribal Governments

In many instances the comments received from the State, local, and other tribal governments are duplicative or substantially similar to one another. Some comments pertained to criteria under 25 C.F.R. Part 151 other than potential impacts on regulatory jurisdiction, real property taxes, and special assessments, but in its discretion the Department considered them. For the reasons discussed above, the tribal, State, and local government commenters should refer to the pertinent topical discussion in the Final EIS for information responsive to their comments and/or to see how their comment was dealt with. References to the pertinent sections of this ROD are provided below. Additional information is contained in the Department's responses to the comments received on the Draft EIS (see Appendix M of the Final EIS) and on the Final EIS (see **Appendix B** to this ROD).

1.   *Secretary's authority to acquire land in trust.* See, e.g., ROD §§ 1.4, 7.2.

2.   *Consideration of the Nation's fee-to-trust request notwithstanding the State's position on the lawfulness of the Turning Stone Casino.* See, e.g., ROD §§ 1.4, 2.1.5, 7.2, 7.5.4.

3.   *Consideration of the fee-to-trust request under the on-reservation criteria under 25 C.F.R. § 151.10 versus the off-reservation criteria under 25 C.F.R. § 151.11.* See, e.g., ROD § 7.1.

4.   *Nation's need for land in trust.* See, e.g., ROD §§ 1.3, 7.3.

5.   *Acquisition only of the Turning Stone Casino in trust to meet the Nation's need.* See, e.g., ROD §§ 1.3, 7.3.

6.   *Purposes for which the land will be used.* See, e.g., ROD §§ 1.3, 7.3, 7.4.

7.   *Future development activities on trust lands.* See, e.g., ROD §§ 7.4, 7.6.

8.   *Consequences to the State and local governments from removal of lands from the tax rolls.* See, e.g., ROD §§ 3, 7.5.

9.   *Loss of tax revenues based on development potential or changes in land use.* See, e.g., ROD § 7.5.1.

10.    *Taxability of the Nation's lands.*  See, e.g., ROD § 7.5.

11.    *Satisfaction of tax liens prior to acquisition of land in trust.*  See, e.g., ROD § 7.5.

12.    *Impacts on regulatory jurisdiction and potential jurisdictional problems.*  See, e.g., ROD §§ 3, 7.6.

13.    *Impacts on land use control and potential conflicts of land use.*  See, e.g., ROD §§ 3, 7.6.

14.    *Patchwork jurisdiction (checkerboarding) concerns.*  See, e.g., ROD §§ 3, 7.6.

15.    *Relationship of the City of Sherrill v. Oneida Indian Nation of New York decision to the fee-to-trust request.*  See, e.g., ROD §§ 7.2, 7.6.

16.    *Capacity of the Federal government to administer trust lands.*  See, e.g., ROD § 7.7.

17.    *Conduct of an EIS to assess environmental impacts.*  See, e.g., ROD §§ 1.5, 3.1.4, 7.8.

18.    *Impacts on the environment.*  See, e.g., ROD §§ 3, 7.6.

19.    *Management of public infrastructure and utilities.*  See, e.g., ROD § 7.6.

20.    *Unfair competitive advantage.*  See, e.g., ROD §§ 3.1.2, 7.5.1.2.

21.    *Relationship of Indian land claims to land-into-trust.*  See, e.g., ROD §§ 2.1.2, 7.1.

## 8.0     IMPLEMENTATION

By the signatures below, the Department indicates its final decision to implement the Preferred Alternative (Alternative I), as modified: acquisition of title to approximately 13,003.89 acres owed by the Nation in Oneida and Madison Counties, New York, in trust status for the Nation.

Date:     MAY 2 0 2008

_James E. Cason_

James E. Cason
Associate Deputy Secretary
U.S. Department of the Interior

_P. Lynn Scarlett_

P. Lynn Scarlett
Deputy Secretary
U.S. Department of the Interior

73

**U.S. Department of Justice**

Environment and Natural Resources Division

---

*Indian Resources Section*
*P.O. Box 44378*
*L'Enfant Plaza Station*
*Washington, DC 20026-4378*

*Telephone (202) 305-0269*
*Facsimile (202) 305-0271*

July 2, 2008

Honorable Norman A. Mordue, Chief Judge
United States District Court
Northern District of New York
P.O. Box 7336
Syracuse, NY 13261-7336

Re:    NOTICE OF RELATED CASES FOR: <u>Upstate Citizens for Equality, Inc. v.</u>
<u>United States</u>, 5:08-cv-00633-LEK-GJD; <u>City of Oneida v. Kempthorne</u>, 5:08-cv-
00648-LEK-GJD; <u>Niagara Mohawk Power Corporation v. Kempthorne</u>, 5:08-cv-
00649-LEK-GJD; <u>New York v. Kempthorne</u>, 6:08-cv-00644-LEK-GJD; <u>Town of</u>
<u>Verona v. Kempthorne</u>, 6:08-cv-00647-LEK-GJD; <u>Central New York Fair</u>
<u>Business Association et al. v. Kempthorne</u>, 6:08-cv-00660-LEK-GJD.

Dear Chief Judge Mordue,

Six actions have been filed with the Northern District of New York between June 17,
2008 and June 21, 2008, all challenging the same administrative decision by the United States
Department of the Interior to take certain lands in the areas of Madison and Oneida Counties in
trust on behalf of the Oneida Indian Nation of New York. Because these actions all concern the
same administrative action, they are suitable for consolidation.

The United States hereby provides notice of two related cases that plaintiffs failed to
mention in their civil cover sheets: <u>Oneida Indian Nation v. Madison County</u>, 5:00-cv-506-DNH-
GJD, and <u>Oneida Indian Nation v. Oneida County</u>, 6:05cv00945-DNH-GJD. These two cases
are before Judge Hurd and concern much of the same land at issue in the six suits listed above.
The defendants of these two suits, Madison County and Oneida County, respectively, are the
plaintiffs in one of the newly filed suits challenging the Department of the Interior's
administrative action, <u>New York v. Kempthorne</u>, 6:08-cv-00644-LEK-GJD. The State of New
York, lead plaintiff in the same suit, is participating as amicus curiae in the current appeal to the
Second Circuit Court of Appeals of the related cases before Judge Hurd. The cases before Judge
Hurd concern the efforts of Madison and Oneida County to collect taxes or foreclose upon lands
held by the Oneida Indian Nation of New York. The outstanding tax liens provide one of the
bases of the Counties' and State's challenge to the administrative action of the Department of the
Interior in <u>New York v. Kempthorne</u>, 6:08-cv-00644-LEK-GJD.

It also should be noted that several of the plaintiffs of another new-filed suit, <u>Central New</u>
<u>York Fair Business Association v. Kempthorne</u>, 6:08-cv-00660-LEK-GJD, have previously
brought a similar suit challenging the Department of the Interior's ability to accept land into trust
within the State of New York, <u>Central New York Fair Business Association v. Kempthorne</u>,
6:06-cv-01501-DNH-GHL. That case was also before Judge Hurd, and, although related, is no
longer pending so the plaintiffs in that action were not obliged to list it.

**EXHIBIT G**

Thank you for your consideration of this matter.

Respectfully submitted,

STEVEN MISKINIS (105769)
Indian Resources Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 44378
Washington, D.C.  20026-4378
(202)305-0262
FAX (202)305-0271
steven.miskinis@usdoj.gov

Attorney for the United States

cc:     Honorable Lawrence E. Kahn
        United States District Court Judge
        Northern District of New York
        James T. Foley U.S. Courthouse
        445 Broadway, Room 424
        Albany, NY 12207-2926

cc: all counsel of record via CM/ECF system

- 2 -